## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. THE CHICKASAW NATION and<br>2. THE CHOCTAW NATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>1. THE DEPARTMENT OF THE INTERIOR;<br>2. GALE NORTON, Secretary of the Interior;<br>3. THE BUREAU OF INDIAN AFFAIRS;<br>4. JAMES CASON, Associate Deputy Secretary of the Interior;<br>5. THE OFFICE OF THE OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS;<br>6. ROSS SWIMMER, Special Trustee for American Indians;<br>7. THE OFFICE OF TRUST FUND MANAGEMENT;<br>8. DONNA IRWIN, Director of the Office of Trust Fund Management;<br>9. THE BUREAU OF LAND MANAGEMENT;<br>10. KATHLEEN CLARKE, The Director of the Bureau of Land Management;<br>11. THE MINERALS MANAGEMENT SERVICE; and<br>12. JOHNNIE BURTON, Director of the Minerals Management Service;<br>13. THE UNITED STATES DEPARTMENT OF THE TREASURY; and<br>14. JOHN SNOW, Director of the Treasury,<br><br>    Defendants. | Case No. _____<br><br>DEMAND FOR<br>JURY TRIAL |

## **COMPLAINT**

1.    This lawsuit is intended to resolve accounting and related equitable claims that the Chickasaw Nation and the Choctaw Nation (herein together the "Nations") bring against the

United States of America (herein the "USA")[1] and a number of its agencies and bureaus directly and through the agencies' and bureaus' directors acting in their official capacity relating to the USA's management of the Nations' assets and funds. This case involves the Nations seeking only to invoke their right to an accounting as a beneficiary of the USA's trusteeship. While this is a discrete matter, the resolution of these claims is intended to strengthen the existing positive working relationship between the Nations and the USA and thereby further the opportunity for development and progressive activities that benefit the Nations, the communities in which the Nations are located, and the USA generally.

## I. HISTORICAL INTRODUCTION: A TALE OF TWO SOVEREIGNS

### A. AN EARLY HISTORY

2. As a factual prelude, the facts and circumstances leading to this legal action comprise a tale of two sovereign nations. The peoples of the Chickasaw and Choctaw Nations have resided on land that is now within the borders of the United States since before the conquest of North America by European powers. Both Nations were present in their historical homelands to meet Desoto, the Spanish explorer, upon his exploration of the lower Mississippi River and related tributaries (Circa 1540).

3. While the Nations and the USA are by necessity legally adverse in this action, they have a long and rich history of being both allies and adversaries in many legal, political and military circumstances, including military engagements.

4. Legally and in cognizance of their relative sovereign status, the Nations and the USA have treated formally with each other on many occasions. The first of the treaties relating to the

---

[1] Unless listed separately, "USA" refers to all defendants.

USA is the Treaty with the Chickasaws of 1786 and the Treaty with the Choctaws of the same year.

5. The Nations and the USA have continued to engage in formal agreements as late as 2004, when, *inter alia*, the two governments, with others, resolved longstanding disputes over the ownership of a reach of the bed and banks of the Arkansas River.

### B. REMOVAL TO THE CHOCTAW NATION

6. The Nations embarked on their own Trail of Tears under the aegis of treaties of removal, whereby the Choctaw Nation first selected a homeland in Southern Oklahoma, and the Chickasaw Nation later selected a homeland in the central portion of the Choctaw Nation.

7. The land encompassed in the Choctaw Nation is described as:

> beginning near Fort Smith where the Arkansas boundary crosses the Arkansas River, running thence to the source of the Canadian fork; if in the limits of the United States, or to those limits; thence due south to Red River, and down Red River to the west boundary of the Territory of Arkansas; thence north along that line to the beginning. The boundary of the same to be agreeably to the Treaty made and concluded at Washington City in the year 1825.

8. The land encompassed in the Chickasaw Nation is described as:

> Beginning on the north bank of the Red River, at the mouth of Island Bayou, where it empties into the Red River, about twenty-six miles on a straight line, below the mouth of False Wachitta, thence running a northwesterly course, along the main channel of said bayou to the junction of three prongs of said bayou nearest the dividing ridge between Wachitta and Low Blue rivers, as laid down upon Capt. R. L. Hunter's map; thence, northerly along the eastern prong of Island Bayou to its source; thence, due north to the Canadian River, thence west, along the main Canadian, to one hundred degrees of west longitude; thence south to Red River, running due north from the eastern source of Island Bayou to the main Canadian shall not include Allen's or Wa-pa-nacka academy within the Chickasaw district, then an offset shall be made from said line so as to leave said academy two miles within the Chickasaw district, north, west, and south from the lines of boundary.[2]

---

[2] Treaty with the Choctaw and Chickasaw, November 4, 1854, 10 Stat. 1116 at Art. 2.

3

9. Pursuant to the Treaty of 1855[3] and later interpretations of the law of the two Nations, the lands encompassed in the Chickasaw and Choctaw Nations are owned jointly by both of them, with 25% of the interest vesting in the Chickasaw Nation and 75% of the interest vesting in the Choctaw Nation.

## II.   PARTIES[4]

10. The Chickasaw Nation's boundaries encompass all or part of 13 counties in what is now south-central Oklahoma. The Chickasaws have a vibrant and unique cultural, social, and military heritage. The Nation is one of the so-called "five civilized tribes," along with the Cherokees, Choctaws, Creeks, and Seminoles.

11. The Choctaw Nation's boundaries encompass ten and one-half counties in the southeastern part of what is now Oklahoma. The Choctaws too have a unique and vibrant heritage, and as referenced above are one of the so-called "five civilized tribes."

12. The Department of the Interior (the "Interior") is a federal agency with the responsibility to provide for the effective management of, and accountability for, the proper discharge of trust responsibilities, to Indian tribes, including the Nations. The trust responsibility of Interior includes the obligation to properly manage assets held in trust for the Nations, and to account for, manage, and reconcile the Nations' corresponding trust accounts and records. This responsibility is taken on, in part, by many of the "sub-bureaus" and "sub-agencies" of Interior, listed in this

---

[3] Treaty with the Choctaw and Chickasaw, June 22, 1855, 11 Stat. 611.
[4] The Nations' claim for an accounting relates only to lands, funds, monies and assets owned by the Nations and not to lands, funds, monies, and assets owned by any individual citizen of the Nations.

action as Defendants. Gale Norton is currently the Secretary of Interior, and she is added hereto as a Defendant in her official capacity, and not personally.

13.     The Bureau of Indian Affairs is a sub-bureau, and an agency within Interior that has the responsibility for executing upon the substantial trust responsibilities to the Nations. There is currently no named Assistant Secretary for Indian Affairs. However, James Cason is currently fulfilling the duties of the Assistance Secretary for Indian Affairs at this time and is therefore listed in his official capacity and not personally.

14.     The Office of the Special Trustee is a sub-agency within Interior that has the responsibility for executing upon the substantial trust responsibilities to the Nations. Ross Swimmer is currently the Special Trustee for American Indians, and he is added hereto as a Defendant in his official capacity, and not personally.

15.     The Office of Trust Fund Management is a sub-agency within Interior that has substantial responsibility for the management of the Nations' trust accounts. Donna Irwin is currently the Director of Trust Fund Management, and she is added hereto as a Defendant in her official capacity, and not personally.

16.     The Bureau of Land Management is a sub-agency of within Interior that has substantial responsibility for the management of the Nations' trust assets. Kathleen Clarke is the Director of the Bureau of Land Management, and she is added hereto as a Defendant in her official capacity, and not personally.

17.     The Minerals Management Service is a sub-agency of within Interior that has substantial responsibility for the management of the Nations' trust assets. Johnnie Burton is the Director of the Minerals Management Service, and she is added hereto as a Defendant in her official capacity, and not personally.

18.     The Department of the Treasury (the "Treasury") is a federal agency with the responsibility to provide for more effective management of, and accountability for the proper discharge of trust responsibilities, to Indian tribes, including the Nations. The trust responsibility of Treasury includes the responsibility to properly manage the Nations' funds, and to account for, manage, and reconcile the Nations' trust accounts. John Snow is currently the Secretary of the Treasury, and he is added hereto as a Defendant in his official capacity, and not personally.

### III.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362; 28 U.S.C. §§ 2201 and 2202; and 5 U.S.C. §§ 702 and 706. The Nations make no claim here for money damages. The Act of June 7, 1924, 43 Stat. 537 does not apply because the Nations' claims either could not have been known to the Nations because the USA failed to account for the management of the Nations' resources, or because the Nations do not make a claim for money damages. The Nations make no claims relating to the settlement embodied in Joint Resolution of June 24, 1948, 62 Stat. 596, except to the extent that the USA has not accounted for the management of the funds allegedly paid to the Nations under that agreement.

20.     Venue is proper in this court under 28 U.S.C. § 1391 because part of the events and omissions basing this suit, as well as some of the lands, interests and funds managed by the Defendants are or have been located within the Western District of Oklahoma.

### IV.     UNITED STATES' TRUSTEESHIP BENEFITING THE NATIONS

21.     The USA agreed in 1854 that "Regular semiannual accounts of the receipts and disbursements of the Chickasaw fund shall be furnished the Chickasaw Council by the

Government of the United States."[5]  Other federal statutes similarly impose a duty on the USA to account to the Nations for the USA's management of land, assets and funds.

### A. ALLOTMENT OF LANDS

22. In 1898 the Nations entered into an agreement known as the "Atoka Agreement" with the USA, which required a number of changes relating to the lands, assets, and funds of the Nations.

23. The Act of June 28, 1898, known as the Curtis Act, ratified the Atoka Agreement at § 29 of the Act.[6]

24. The Atoka Agreement was amended in 1902.

25. After the Atoka Agreement and its amendment, pursuant to various statutes, agreements, orders of the Department of the Interior, and regulations, the federal government pervasively managed the lands, assets and funds belonging to the Nations.

26. The Atoka Agreement required the allotment of the Nations' lands to their Citizens under a process conducted by the USA.  Tribal members were to receive, "so far as possible a fair and equal share" of these allotments "considering the character and fertility of the soil and the location and value of the lands."[7]  During the first half of the 20th Century the USA allotted the Nations' lands as contemplated by the Atoka Agreement (as amended).

27. No accounting for the allotment of Nations' lands to the Nations' Citizens was provided.

---

[5]     *Id*. at Art. 8.

[6]     Act of June 28, 1898, 30 Stat. 495.

[7]     *Id.* at 506.

28.  Following and during the process of allotment, the USA sold property referred to as "surplus lands" that were owned by the Nations but managed in trust by the United States for their benefit.  To date, no accounting for the disposition of these Surplus Lands has been provided by the USA to the Nations.

29.  The USA was not authorized to dispose of the Nations' interest in these Surplus Lands as part of the property interests equitably owned by the Nations, *qua* beneficiary of the United States' trusteeship, in the manner in which these lands were disposed.

### B.   *TIMBER RIGHTS AND OTHER RESOURCES*

30.  The Atoka Agreement reserved certain specified lands from allotment.  The lands withheld from the allotment process were however set aside for town sites, established buildings, schools, cemeteries, as well as lands valuable for the production of coal and asphalt.

31.  Timber lands (hereinafter, "Timber Assets") belonging to the Chickasaw Nation and the Choctaw Nation were not reserved from allotment under the Atoka Agreement or its amendment, or under any other federal statute, law of the Nations, or executive order and remained as an asset equitably owned by the Nations .

32.  The United States was not authorized to dispose of the Nations' interest in the Timber Assets that were part of the property interests equitably owned by the Nations as beneficiary of the USA's trusteeship.  However, beginning as early as 1940 and continuing for several decades, the USA did dispose of the Nations' Timber Assets and frequently did so in large acreage amounts that exceeded the size of acreage permitted for any such conveyance of the Nations interest in lands.

33.  Upon information and belief, no accounting for the disposition of the Timber Assets held in trust for the Nations has ever been provided by the USA.

34. The Nations and the USA settled all claims relating to the USA's failure to properly manage the lands that were validly withheld from allotment under the Atoka Agreement in the Joint Resolution of June 24, 1948, 62 Stat. 596.

35. However, the Nations' interest in the Timber Assets were not a part of the agreement memorialized in the Joint Resolution of June 24, 1948, 62 Stat. 596, nor were they included in the 1948 Resolution of claims arising under the Atoka Agreement.

36. The USA was not authorized to sell or convey to others the lands primarily valuable for timber that were owned by the Nations.

37. The USA has never providing an accounting to the Nations for the management and ultimate sale of lands owned by the Nations which were primarily valuable for timber.

38. The USA has held and managed vast other resources for the Nations, including, *inter alia*, surface leases for agriculture, oil and gas mining leases, sand and gravel leases, income from property owned by the Nations, and monetary funds.

39. The USA has never provided a full and complete accounting to the Nations for its management of any of these lands, assets or funds.

40. The United States has leased portions of the Nations' Lands to third parties for purposes of grazing livestock, conducting oil and gas operations, and for use as "town lots."

41. The funds received by the USA in connection with effectuating the transactions set out in Paragraphs 30 to 40 above were not used to replenish the trust held for the benefit of the Nations.

### C. *APPROPRIATE MANAGEMENT OF RESOURCES*

42. Certain activities allowed by the United States to take place on the Nations' Lands were conducted by third parties and resulted in physical damage or diminution to the Nations' trust properties. This harm to the Nations' trust property occurred in contravention of specific federal

statutes mandating action benefiting the Nations, including *inter alia*: 1) The Act of June 28, 1898 requiring among other things that all lands not reserved under the statute be allotted to the members of the Chickasaw and Choctaw Nations; 2) The Act of January 21, 1903, 32 Stat 774 providing penalties for the wrongful cutting of Timber on the Chickasaw lands; 3) the Act of April 26, 1906 that prohibited the selling the Nations' unallotted lands that were principally valuable for mining, agricultural, or timber purposes or in tracts of not exceeding six hundred and forty acres to any one person; and 4) The Act of May 26, 1930 which allowed the leasing of the Nations' oil and gas pursuant to defined regulations.

43.     The environmental damage to the Nations' lands and assets from the activities described in Paragraph 42 above, must be accounted for and remediated by the USA so that the trust *res* is made whole, restored, replenished, reconstituted or repaired.

## V.    RELEVANT FEDERAL ACCOUNTING AND FINANCIAL CONCEPTS

44.     The General Accounting Office ("GAO") is an agency of the United States that issues accounting pronouncements relevant to various departments and activities of the federal government.

45.     Interior requested GAO provided guidance as to reporting financial activity involving Indian Trust funds and this response was issued by GAO as Statement of Federal Financial Accounting Standards ("SFFAS")  No. 7, Interpretation no. 1.

46.      This SFFAS Interpretation applicable to Interior (and other federal financial reporting functions) states: Tribal "dedicated collections" were to be reported as specific budget items of DOI (for years after 1996) and by BIA (for periods prior to 1996).  "While the Indian tribal funds might appear to meet the criteria for inclusion as a component of the federal reporting entity [in the instant case, Department of Interior], the sovereignty of the Indian tribes . . . and the fiduciary

relationship between the Government and the Indians" should instead be disclosed in the footnotes to the Department of Interior's "basic financial statements."

47. On information and belief, when the USA received funds in respect to transactions involving the Nations' property interests, such as the Timber Assets, the appropriate financial and accounting records were not created by the USA to accurately record or disclose such transactions and dealings involving the Nations' properties and assets.

48. Accordingly, the USA must correct all erroneous (and incomplete) accounting and financial records to accurately reflect details of transfers, deposits, and all other transactions involving the Nations' properties held in trust by the USA.

49. SSFAS No. 5 is one source of federal financial regulations that addresses the methodology for federal entities, such as Interior, to follow with regard to estimating the cost to remediate environmental damages for which the Government is liable.

50. Accordingly, DOI is obligated to economically account for and recognize its responsibility to bear the estimated costs to remediate environmental harms to the Nations' assets occurring in connection with various lease transactions the USA conducted on behalf of the Nations.

51. Interior, the Bureau of Land Management (the "BLM"), and the Minerals Management Service (the "MMS") are charged with the responsibility for managing the Nations' trust resources, including the management of mineral exploration and development, and the use of trust lands for economic development.

52. Interior, Treasury, the Bureau, the Office of the Special Trustee (the "Special Trustee") and the Office of Trust Fund Management (the "OTFM") have substantial responsibilities for the management of the Nations' trust funds and accounts. In 1994, Congress required the USA to

provide the Nations, and all other Native American Indian Tribes, with reconciled account statements for their Tribal Trust Accounts by September 30, 1995.

53. As recited herein the USA committed to provide an accounting to the Nations of the Nations' trust fund, and in the case of the Chickasaw Nation, at least twice per year.

54. The 1994 Reform Act was codified at 25 U.S.C. § 4044, which states:

> The Secretary shall transmit to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate, by May 31, 1996, a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995. In carrying out this section, the Secretary shall consult with the Special Trustee. The report shall include--
> (1) a description of the Secretary's methodology in reconciling trust fund accounts;
> (2) attestations by each account holder that--
>     (A) the Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary; or
>     (B) the account holder disputes the balance of the account holder's account as reconciled by the Secretary and statement explaining why the account holder disputes the Secretary's reconciled balance; and
> (3) a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute.

55. Even while Congress was taking these actions, the Bureau began a preliminary assessment of the reconciliation requirement in March 1992. As a part of that assessment, Interior's reconciliation contractor, Arthur Anderson LLP, and Interior, decided to only perform reconciliation for the time period 1973-1992. Interior subsequently decided to add the time period 1993-1995. *Indian Trust Funds: Tribal Account Balances*, GAO-02-420T (Feb. 7, 2002).

56. Interior and its contractor also later agreed upon "procedures" that would be used in the reconciliation project. Even though Arthur Anderson stated in the report that was transmitted to the Nations that the reconciliation project required an accounting to the Nations for its Trust

Funds, the agreed upon procedures did not allow Arthur Anderson or Interior to provide the required accounting to the Nations. Rather, the "procedures" were developed to "provide a reasonable assurance" as to the accuracy of the historical transactions involving the Nations' accounts.

57. Beyond Arthur Anderson's admission that the reconciliation was not the accounting that was required by the 1994 Reform Act, there were many deficiencies in Interior's "procedures" for the reconciliation project, and in the project itself. These include: (i) a failure to perform the accounting as required by the 1994 Reform Act; (ii) a scope limitation on the reconciliation project to the 20-year time period 1972-1992 (Congress did not place a temporal limitation on Interior's responsibility to provide an accounting, but stated the accounting should extend back to "the earliest possible date"); (iii) a failure to properly analyze the management and investment of the tribal trust accounts; and (iv) a failure to analyze Interior's and Interior's sub-agency's management of the Nations' trust assets, including the mineral and estate assets held in trust for the Nations.

## VI.  CAUSES OF ACTION

### FIRST COUNT:
### PROPERTY INTERESTS

58. Paragraphs 1 through 57 are incorporated by reference.

59. The Nations have substantial interests in resources and funds that are held, and managed by the USA, or have been subject to the USA's trusteeship in the relatively recent past. These interests were obtained variously by treaty, other agreements, or by congressional or administrative action. The fact that an accounting had not been provided by the USA for the management of the Nations' trust assets, accounts and funds in a way approved by the Nations constitutes a deprivation of the Nations' interests and has impermissibly impacted the Nations'

13

ability to govern itself and its people, or to provide greatly needed services and economic development in the Nations' communities in violation of the Fifth Amendment of the United States Constitution.

60. An example of the property interests that have not been accounted for is the forest lands and timber assets described herein. In 1902 the USA withheld a large area of forest lands from allotment. These lands are believed to encompass approximately 1.3 million acres. Until the period beginning in the 1940s and ending in the 1960s, the USA disposed of these lands and timber assets. The USA has not accounted to the Nations for the disposition of these lands and timber assets, or the management of these lands and timber assets prior to their disposition.

61. The Nations are seeking relief whereby the USA is required to provide an accounting of the resources and funds that are held and managed by the USA *qua* trustee for the Nations.[8]

## SECOND COUNT:
## THE FEDERAL TRUST RESPONSIBILITY

62. Paragraphs 1 through 61 are incorporated by reference.

   *A.  ACCOUNTING*

63. Where the USA takes on or has control or supervision over the Nations' monies or properties, the fiduciary relationship normally exists with respect to such monies or properties, and the obligation to manage the Nations' resources must, at a minimum, comport with statutory directives, including particularly those directives relating to obligations on the USA to account for the management of assets and funds.

---

[8] Until the USA provides an accounting to the Nations for the management of the Nations' funds and assets the Nations cannot present a claim for the damages that may result from the USA's potential breaches of obligations to the Nations. Accordingly, no claim is presented for money damages in this action because the Nations have never been provided the accounting that would support such a claim. However, the Nations reserve the right to bring such a claim for money damages in the future should an accounting demonstrate such a claim or claims to be appropriate.

64. 25 U.S.C. § 4011 provides:

a) Requirement to account

The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a).

(b) Periodic statement of performance

Not later than 20 business days after the close of a calendar quarter, the Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a). The statement, for the period concerned, shall identify--
(1) the source, type, and status of the funds;
(2) the beginning balance;
(3) the gains and losses;
(4) receipts and disbursements; and
(5) the ending balance.

(c) Annual audit

The Secretary shall cause to be conducted an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a), and shall include a letter relating to the audit in the first statement of performance provided under subsection (b) of this section after the completion of the audit.

65. Interior has failed to provide to the Nations any of the accounting required by 25 U.S.C. § 4011 as required also by 25 U.S.C § 4044, and the USA has failed to provide the accounting required by the Treaty of 1854, Article 8.

### B.   *MANAGING ASSETS IN THE NATIONS' BEST INTERESTS*

66. Interior generally, and its sub-agencies specifically, have been and are currently charged with the trust responsibility for managing the Nations' mineral and real resources that are held in trust.

67. None the requirements set out in 25 U.S.C. § 162a have been or are adequately being implemented by Interior. These obligations include those set out below in paragraphs 67 to 75, below.

68. Interior has not and is not providing adequate systems for accounting for and reporting the Nations' trust fund balances.

69. Interior has not and is not providing adequate controls over receipts and disbursements from the Nations' accounts that are managed or controlled by Interior.

70. Interior has not and is not providing the Nations with periodic, timely reconciliations to assure the accuracy of accounts.

71. Interior has not and is not determining accurate cash balances in the Nations' accounts.

72. Interior has not and is not preparing and supplying the Nations with periodic statements of its account performance and with balances of its account available on a daily basis.

73. Interior has not and is not establishing consistent, written policies and procedures for trust fund management and accounting for the Nations' accounts

74. Interior has not and is not providing adequate staffing, supervision, and training for trust fund management and accounting for the Nations' accounts.

75. Interior has not and is not appropriately managing the Nations' natural resources.

76. The Tribe has substantial interests in natural resources and funds that are and have been held, and managed by the USA. These interests were obtained variously by treaty, other agreements, or by congressional action. The USA's failure to properly manage the Tribe's trust assets, accounts and funds, coupled with Interior's refusal to provide a complete accounting of the accounts and the funds held in trust for the Tribe, constitutes a breach of the Defendant's trust responsibility to the Tribe.

77. As a remedy, the Nations seek an injunction requiring that the USA:

(1) Provide the Nations with as full and complete an accounting as possible of the Nations' funds, assets and natural resources to the earliest possible date.
(2) Provide adequate systems for accounting for and reporting the Nations' trust fund balances.
(3) Provide adequate controls over receipts and disbursements from the Nations' funds that are managed or controlled.
(4) Provide periodic, timely reconciliations to assure the accuracy of accounts managed or controlled for the Nations by the USA.
(5) Determine accurate cash balances in the Nations' accounts that are managed by the USA.
(6) Prepare and supply the Nations with periodic statements of its account performance and with balances of its account and make such statements available on a daily basis.
(7) Establish consistent, written policies and procedures for trust fund management and accounting of the Nations' accounts.
(8) Provide adequate staffing, supervision, and training for trust fund management and accounting for the Nations' accounts.
(9) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands in accordance with statutory and regulatory requirements.

## THIRD COUNT:
## ADMINISTRATIVE PROCEDURE ACT CLAIM

78. Paragraphs 1 through 77 are incorporated by reference.

79. Interior has not and is not providing adequate systems for accounting for and reporting the Nations' trust fund balances.

80. Interior has not and is not providing adequate controls over receipts and disbursements from the Nations' accounts that are managed or controlled by Interior.

81. Interior has not and is not providing the Nations with periodic, timely reconciliations to assure the accuracy of accounts.

82. Interior has not and is not determining accurate cash balances in the Nations' accounts.

83. Interior has not and is not preparing and supplying the Nations with periodic statements of its account performance and with balances of its account available on a daily basis.

84.     Interior has not and is not establishing consistent, written policies and procedures for trust fund management and accounting for the Nations' accounts

85.     Interior has not and is not providing adequate staffing, supervision, and training for trust fund management and accounting for the Nations' accounts.

86.     Interior has not and is not appropriately managing the Nations' natural resources.

87.     Interior has not provided the Nations with as full and complete accounting as possible of the Nations' funds to the earliest possible date.

88.     Because the USA has breached any and each of these duties set out in paragraphs 79 to 87, as well as other obligations specifically set forth in treaties, other statutes, regulations, and orders, the USA, through its agencies and sub-bureaus has acted contrary to statutory obligations and the Plaintiffs are entitled to review thereof under 5 U.S.C. § 702.

89.     Because the USA has and is taking and wasting the Nations' interests by managing natural resources, assets, and funds, the USA, through its agencies and sub-bureaus has acted finally or refused to act in violation of constitutional requirements and the Plaintiffs are entitled to review thereof under 5 U.S.C. § 702..

90.     For both of the reasons set forth in paragraphs 88 and 89, above, the USA, through its agencies and sub-bureaus has acted arbitrarily, and capriciously, and such action constitutes final agency action and the withholding of agency action that is required.

91.     As a remedy, the Nations seek an injunction requiring that the USA:

(1)     Provide the Nations with as full and complete accounting as possible of the Nations' funds, assets and natural resources to the earliest possible date.
(2)     Provide adequate systems for accounting for and reporting the Nations' trust fund balances.
(3)     Provide adequate controls over receipts and disbursements from the Nations' funds that are managed or controlled.
(4)     Provide periodic, timely reconciliations to assure the accuracy of accounts managed or controlled for the Nations by the USA.

(5)     Determine accurate cash balances in the Nations' accounts that are managed by the USA.

(6)     Prepare and supplying the Nations with periodic statements of its account performance and with balances of its account and make such statements available on a daily basis.

(7)     Establish consistent, written policies and procedures for trust fund management and accounting of the Nations' accounts.

(8)     Provide adequate staffing, supervision, and training for trust fund management and accounting for the Nations' accounts.

(9)     Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands in accordance with statutory and regulatory requirements.

## RELIEF REQUESTED

Wherefore, the Nations request the relief set out above in Paragraphs 61, 77 and 91. The Nations also request that this Court order the USA to make whole, restore, replenish, reconstitute or repair the trust property wasted, lost or unaccounted for when the required accounting is completed. The Nations also seek their costs of suit, including, without limitation, attorneys' fees under the Equal Access to Justice Act and under general principles of law and equity, and the fees and costs of expert assistance. The Nations also request that this Court provide all other relief as this Court deems necessary and equitable.

                Respectfully submitted,

                **MILLER, KEFFER, BULLOCK & PEDIGO**

By:    __/s/ Jason B. Aamodt_____
        Jason B. Aamodt, OBA No. 16974
        222 South Kenosha Avenue
        Tulsa, Oklahoma 74120
        Telephone: (918) 584-2001
        Facsimile: (918) 743-6689

        K. Lawson Pedigo, TX Bar No. 15716500[9]
        **MILLER, KEFFER, BULLOCK & PEDIGO**
        8401 N. Central Expressway, Ste 630
        Dallas, Texas 75225
        Telephone:  (214) 696-2050
        Facsimile:  (214) 696-2482

        and

        Bob Rabon, OBA No. 7373
        **RABON WOLF & RABON**
        P.O. Box 726
        Hugo, OK 74743
        Telephone: (580) 326-6427
        Facsimile: (580) 326-6032

Friday, December 30, 2005        *Attorneys for the Chickasaw Nation*
                                                  *and the Choctaw Nation*

---

[9]     Mr. Pedigo is not yet licensed in the Western District of Oklahoma, but will either obtain his licensure in this Court or request admission pro hac vice before service is made on this complaint.