IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE CHICKASAW NATION and THE CHOCTAW NATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. Civ-05-01524-W |
| THE DEPARTMENT OF THE INTERIOR, et al., | ) ) | |
| Defendants. | ) ) ) | |

## THIRD AMENDED COMPLAINT

The Plaintiffs herein (alternatively, "the Nations") file this, their Third Amended Complaint, and in support thereof would show as follows:

## I. INTRODUCTION

1.     This lawsuit is intended to resolve accounting and related equitable claims that the Chickasaw Nation and the Choctaw Nation (herein together the "Nations") bring against the United States of America and a number of its agencies and bureaus directly and through the agencies' and bureaus' directors acting in their official capacity relating to the United States' management of the Nations' assets and funds.  This case involves the Nations seeking only to invoke their right to an accounting as a beneficiary of the United States' trusteeship.  While this is a discrete matter, the resolution of these claims is intended to strengthen the existing positive working relationship between the Nations and the United States and thereby further the opportunity for development and progressive activities that benefit the Nations, the communities in which the Nations are located, and the United States generally.

2.     The Chickasaw and Choctaw Nations have enjoyed peaceful and beneficial relationships with the United States government as well as with the early immigrants from across the Atlantic Ocean.  The Chickasaw and Choctaw citizens fought beside the early English colonists.  During the War of 1812, Choctaw and Chickasaw citizens fought to repel the British during the Battle of New Orleans.  The Choctaws and Chickasaws fought in every American conflict since the establishment of the United States.  They have served proudly in the armed services and were among the service men and women who made the ultimate sacrifice for our country when called upon in World War I, World War II, Korea, Vietnam, the First Gulf War, Afghanistan, and Iraq.

3.     This action is brought for the purpose of further strengthening the longstanding and mutually beneficial close relationships the Chickasaw and Choctaw Nations have enjoyed with the United States.  The immediate goal of this action is to secure a full accounting for the trusts held by the United States for the benefit of the Nations.  By obtaining such an accounting and finally resolving these disputes, it is expected that the historic ties and good relations between the Nations and the United States will grow even stronger.

## II.  PARTIES

4.     The Chickasaw Nation's boundaries encompass all or part of 13 counties in what is now south-central Oklahoma.  The Chickasaws have a vibrant and unique cultural, social, and military heritage.  The Nation is one of the so-called "Five Civilized Tribes," along with the Cherokees, Choctaws, Creeks, and Seminoles.

5.     The Choctaw Nation's boundaries encompass ten and one-half counties in the southeastern part of what is now Oklahoma.  The Choctaws likewise have a unique and

vibrant cultural, social and military heritage, and, as referenced above, is one of the so-called "Five Civilized Tribes."

6.      The Department of the Interior (the "Interior") is a federal agency with the responsibility to provide for the effective management of accounting for and the proper discharge of the federal government's trust responsibilities to Indian tribes, including the Nations.  The trust responsibility of Interior includes the obligation to properly manage assets held in trust for the Nations, and to account, manage, and reconcile the Nations' trust accounts and records.  This responsibility is delegated, in part, to many of the "sub-bureaus" and "sub-agencies" of Interior, listed in this action as Defendants.  Ken Salazar is currently the Secretary of Interior.  Defendant Salazar is sued in his official capacity.

7.      The Bureau of Indian Affairs is a sub-bureau, an agency within the Department of Interior, responsible for executing the United States' substantial trust responsibilities to the Nations.  Larry Echohawk is the Assistant Secretary for Indian Affairs and heads the Bureau of Indian Affairs.  Defendant Echohawk is sued in his official capacity.

8.      The Office of the Special Trustee is a sub-agency within the Department of Interior responsible for executing the substantial trust responsibilities to the Nations.  Donna M. Erwin is currently the Acting Special Trustee for American Indians.  Defendant Erwin is sued in her official capacity.

9.      The Office of Trust Fund Management is a sub-agency within the Department of Interior that has substantial responsibility for the management of the Nations' trust accounts.  Dianne Moran is currently the Acting Director of Trust Fund Management.  Defendant Moran is sued in her official capacity.

10.     The Bureau of Land Management is a sub-agency within the Department of Interior that has substantial responsibility for the management of the Nations' trust assets. Mike Pool is the Acting Director of the Bureau of Land Management.  Defendant Pool is sued in his official capacity.

11.     The Minerals Management Service is a sub-agency within the Department of Interior that has substantial responsibility for the management of the Nations' trust assets. Walter Cruickshank is the Acting Director of the Minerals Management Service. Defendant Cruickshank is sued in his official capacity.

12.     The Department of the Treasury (the "Treasury") is a federal agency with the responsibility to provide for more effective management of, and accountability for, the proper discharge of trust responsibilities to Indian tribes, including the Nations.  The trust responsibility of Treasury includes the responsibility to properly manage the Nations' funds, and to account for, manage, and reconcile the Nations' trust accounts.  Timothy Geithner is currently the Secretary of the Treasury.  Defendant Geithner is sued in his official capacity.

13.     The United States of America is the legal entity constituted on September 17, 1787, whose Articles of Constitution came into effect on March 4, 1789, and have thereafter been amended and modified from time to time.  Pursuant to Article I, Section 8, Clause 3 of such Constitution, the United States Congress has the authority for the United States of America "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  Pursuant to that power, the United States of America has pervasively managed and controlled many of the affairs, properties and funds of the Nations.  The United States of America has acknowledged its obligation to

account to the Nations for the management and control of the Nations' assets, including

in federal statutes and by the decisions of its Courts.  As used herein, "United States"

refers collectively to the United States of America and the other defendants.

### III.  JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1362; 28 U.S.C. §§ 2201 and 2202; and 5 U.S.C. §§ 702 and 706.  The Nations make no

claim here for compensatory money damages.  The Nations make no claims relating to

the terms of the Joint Resolution of June 24, 1948, 62 Stat. 596, except to the extent that

the United States has not accounted for the management of the funds allegedly paid to the

Nations pursuant to the Resolution.

15.     Venue is proper in this Court under 28 U.S.C. § 1391.  This action arises out of

the events, acts and omissions which occurred in the United States District Court for the

Western District Oklahoma, as well as some of the lands, interests and funds managed by

Defendants are or have been located within the Western District of Oklahoma.

### IV.  RELEVANT HISTORY OF THE NATIONS

16.     The peoples of the Chickasaw and Choctaw Nations resided in the southeastern

part of what is now the United States well before European settlement of North America.

They met Hernando de Soto during his exploration of the lower Mississippi River (*circa*

1540).  The formal relationship between the United States and these Nations extends to

the earliest beginnings of United States' history.  In fact, the first treaties between the

Nations and the United States were negotiated in 1786 while the United States was still

operating under the Articles of the Confederacy.  *See:* Treaty of Hopewell with the

Choctaw Nation, January 3, 1786 (7 Stat. 21); and Treaty of Hopewell with the Chickasaw Nation, January 10, 1786 (7 Stat. 24).

17.      With growing immigration into the rich homelands of these tribes and the purchase of the Louisiana Territory in 1803, there was mounting pressure on these Nations to relocate from their ancestral homelands east of the Mississippi River to what is now southern Oklahoma.

18.      Under pressure from the United States, the Choctaws in 1820 entered into the Treaty of Doak's Stand, surrendering their ancestral lands in exchange for lands to the west.  In 1830, the Treaty of Dancing Rabbit Creek provided that in exchange for the remaining land owned by the Choctaws in Mississippi, the Choctaw Nation was to be given title to land in the present State of Oklahoma.  This was followed by the Treaty of Doaksville in 1837, when the Chickasaws agreed to cede the majority of their eastern land for the right to settle in the Choctaw Nation in Oklahoma.  In 1842, President John Tyler granted the Choctaws the Patent to the land that had been promised by the earlier treaties.[1]  The Treaty of 1855, and later interpretations of the law of the two Nations, established that the lands which encompassed the two Nations were to be held jointly, with the Choctaw Nation owning 75% and the Chickasaw Nation 25%.

19.      The Trail of Tears for the Choctaws began in 1831 when they were removed from their ancestral land to Indian Territory.  The removal took place under the harshest of conditions with many people dying before reaching the new land to the west.  The Trail of Tears for the Chickasaws began in 1837 and was similarly harsh and deadly.  Once resettled, both Nations quickly went about organizing their governments and

---

[1]      It is significant that the Nations held their land in Indian Territory by fee title in contrast to the more common practice of Indian tribes being moved onto reservations where the title of the land remained in the United States.

reestablishing their way of life in the new land.  Exemplifying a spirit of the determined

hope that is reflected even today, one of the first governmental acts of the Nations in their

new homelands was the establishment of schools.

20.     The land encompassed in the Choctaw Nation is described as:

> [B]eginning near Forth Smith where the Arkansas boundary crosses the
> Arkansas River, running thence to the source of the Canadian fork, if in
> the limits of the United States, or to those limits; thence due south to Red
> River, thence down Red River to the western boundary of the State of
> Arkansas; thence north along that line to the beginning: the boundary of
> the same to be agreeable to the Treaty made and concluded at Washington
> City in the year 1825.

Constitution of the Choctaw Nation, November 10, 1842, Preamble.

21.     The land encompassed in the Chickasaw Nation is described as:

> Beginning on the north bank of the Red River, at the mouth of Island
> Bayou, where it empties into the Red River, about twenty-six miles on a
> straight line, below the mouth of False Wachitta, thence running a
> northwesterly course, along the main channel of said bayou to the junction
> of three prongs of said bayou nearest the dividing ridge between Wachitta
> and Low Blue rivers, as laid down upon Capt. R. L. Hunter's map; thence,
> northerly along the eastern prong of Island Bayou to its source; thence,
> due north to the Canadian River, thence west, along the main Canadian, to
> one hundred degrees of west longitude; thence south to Red River, running
> and down Red River to the beginning; *Provided, however,* if the line
> running due north from the eastern source of Island Bayou to the main
> Canadian shall not include Allen's or Wa-pa-nacka academy within the
> Chickasaw district, then an offset shall be made from said line so as to
> leave said academy two miles within the Chickasaw district, north, west,
> and south from the lines of boundary.

Treaty with the Choctaw and Chickasaw, November 4, 1854, 10 Stat. 1116 at Art. 1.

22.     By the treaty of 1866, 14 Stat.769, the Nations' lands north of the Red River and

between the 100th and 98th degrees of west longitude, known as the Leased District, were

leased to the United States for the settlement of Wichita and other Kansas tribes.  After

decades of litigation, ownership of the Leased District was finally resolved and the Nations were compensated for transferring all of their interests in the Leased District.

## V. TRUSTEESHIP OF THE UNITED STATES

23.     Since the original treaties were signed in 1786, wherein the United States promised that the Nations were "to be under the protection of the United States" (Hopewell Treaties, Article 2), the United States has held in trust for the Nations vast resources including, *inter alia*, land, minerals, and monetary funds.  In 1852 the United States agreed: "Regular semiannual accounts of receipts and disbursements of the Chickasaw fund shall be furnished the Chickasaw Council by the Government of the United States."  Treaty of 1852, 10 Stat. 974, Article 8.  As trustee, the United States has managed a wide variety of resources that belonged to and continue to belong to each of the Nations, by granting leases of land and receiving profits earned by the Nations from their resources, including agricultural land, oil and gas leases, and other minerals, including coal, sand and gravel.  The United States has also sold many of the Nations' assets, including valuable timber and the land on which it grows.

24.     The United States, pursuant to its laws and its treaties with the Nations, is specifically charged with a duty to fully and completely account for its fidelity in the management of trust assets to the plainly stated requirements of the trust indenture.  Such trust indentures are found in the United States' laws, regulations, bylaws, policies, and manuals.  The United States has never accounted to the Nations for its management of any of these lands, assets or funds, or for its fidelity with the various trust responsibilities arising out of its full control of the Nations' governments, officials, lands, funds and claims, including the indentures found in the 1906 Act for the Five Tribes, 14 Stat. 137

(April 26, 1906).   As an example, the United States never accounted to the elected governments of the Nations for its management of the assets of the Nations during the critical period extending from 1906, when the United States illegally usurped the constitutional processes of the Nations, until 1983 when the constitutional governments of the Nations were restored.

## VI.  CONSTITUTIONAL GOVERNMENT OF THE NATIONS

25.     Both Nations have a strong tradition of organized self government.   Before removal, both Nations had highly developed systems of government and law.   These traditions were brought with them when they were relocated to Indian Territory.

26.     In 1838 the Choctaw Nation began operating under a written constitution.   The Chickasaw Nation first adopted a written document outlining their government organization in 1846.

27.     The original 1838 Choctaw Nation Constitution was replaced by Constitutions in 1842 and 1857.   In 1860, the Choctaw Nation made changes in the 1857 Constitution and adopted the Constitution which would remain in effect until it was replaced in 1983.   The 1860 Choctaw Constitution provided for the election of a Principal Chief to serve as its Chief Executive with "supreme executive authority."   Article V, Section 1.   The Choctaw Principal Chief was elected for a two-year term and was only permitted to serve two consecutive terms.[2]   *Id.*   There was also a detailed procedure for replacing the Principal Chief if he was rendered unable to continue to serve.   Article V, Section 4.   The 1860 Choctaw Constitution further provided for a bicameral legislature comprised of a House of Representatives and a Senate.   Senators were elected for two-year terms and members

---

[2]        The 1860 Constitution was amended in 1862 to provide for the election of a National Secretary, National Treasurer, National Auditor and National Attorney who were to be elected to two-year terms.

of the House were required to stand for election every year. Article III, Sections 2 and 4. The two houses together formed the General Council which exercised legislative authority. Article III, Section 1. The 1860 Constitution also provided that all male citizens over the age of eighteen were entitled to vote. Article VII, Section 7.

28.     The original 1846 Chickasaw Nation document of governmental organization was amended on several occasions. In 1856, following a constitutional convention, a new Constitution was ratified at Tishomingo. In 1867, the Chickasaw people adopted a new Constitution which would continue in effect until it was replaced in 1983. Following the general framework of the Constitution of the United States, the 1856 and 1867 Constitutions of the Chickasaw Nation divided governmental powers amongst three branches: legislative, judicial and executive. It required the election of executive and legislative officers and established terms of office for tribal officials. The 1867 Constitution provided that "supreme executive power" was vested in the Governor of the Chickasaw Nation. Article V, Section 1. The Governor was to be elected by the Nation's citizens for a two-year term. Article V, Section 2. It also provided for a process to replace a Governor in the event that he could no longer serve. Article V, Section 14. Similar to the United States Constitution and the 1860 Choctaw Nation Constitution, the 1867 Chickasaw Nation Constitution established bicameral legislature comprised of a House of Representatives and a Senate. Article IV, Sections 2 and 4.

29.     The Nations' Constitutions recognized that the Tribal or General Councils had the power to order the commencement of legal and equitable claims when necessary to protect the Nations' rights, privileges or interests. Prior to their being illegally dissolved by the United States in 1911, the legislatures of both the Chickasaw and Choctaw Nations

authorized the hiring of attorneys to prosecute claims and sought to protect the assets of the Nations from loss and exploitation.

30.     From 1860 in the case of the Choctaw Nation, and from 1867 in the case of the Chickasaw Nation, until 1906, the Nations' governments functioned as required by their organic laws.  Elections were held, laws were enacted, claims pursued and agreements with the United States were negotiated.  It was, in fact, actions of these legislatures that authorized the negotiations which resulted in the Atoka Agreement setting out in detail the allotment process for the citizens of these Nations.

## VII.  <u>ALLOTMENT OF THE NATIONS' LANDS</u>

31.     In 1898 Congress passed the Curtis Act, 30 Stat. 495, ratifying the Atoka Agreement and providing for the Dawes Commission to establish a process for assembling rolls of tribal members, allotting of the lands owned by the Nations to the enrolled members, and then the sale of the unallotted land, all with the clear intent of achieving the eventual termination of the Nations.  The Curtis Act was supplemented in 1902, 32 Stat. 641 (1902 Act), wherein the Congress ratified and further defined the terms of the Atoka Agreement.  Under both the Curtis Act and the 1902 Act there was a continuing role contemplated for the constitutional governments of both Nations.  Confirmation of this continuation is implicit in the classification of portions of the Nations' lands as "reserved from allotment" - which were also reserved from sale.  1902 Act § 14.  The lands reserved from allotment and sale included the capitol buildings of both Nations as well as a number of academies, orphanages, and "[one] acre each for all Choctaw and Chickasaw schools under the supervision of the authorities of the Choctaw or Chickasaw Nations and officials of the United States."  1902 Act § 26.  The Act

further specified that "all tribal court-houses and jails and other tribal public buildings" were to be reserved from allotment and sale.[3]  *Id.*  The specific lands that were not reserved from allotment were to be sold and the proceeds distributed to the enrollees.

32.  The Dawes Commission was charged with overseeing the process of allotment and conducting a survey of the Nations' lands.  The Commission identified land that was principally valuable for agriculture, timber, and minerals.  The Commission identified approximately 1.256 million acres of land principally valued for "timber purposes" (hereinafter referred to as the "Timber Lands" or "Timber Assets," as the case may be).

33.  The Dawes Commission also proceeded to assemble rolls of the Nations' members.  In the process, numerous disputes arose as to who was entitled to be listed on the rolls with a number of persons attempting to be fraudulently listed to participate in allotments and proceeds from the sales of unallotted lands.  The tribal rolls were closed as of March 4, 1907.  The allotment process was substantially completed at the same time.

34.  There was significant corruption in the enrollment and allotment processes.  In addition to people fraudulently seeking enrollment, there were major swindles involving both the allotment process and the sale of Tribal Assets.  Dawes Commission insiders, including Tams Bixby, the acting chair of the Commission, identified the most desirable land and then manipulated tribal members to choose that land with the purpose of affecting a quick transfer of the land to private ownership.  Fortunes were made by illegal manipulations of the auction process.  As set forth *infra*, the Dawes Commission also assured that the Timber Lands were not allotted.  The Commission actively facilitated the

---

[3]     Section 10 of the 1906 Act, 34 Stat. 137, provided for the continuation of the schools and for their continued funding until a public school system is established for the "education of Indian children of said tribes."  Section 15 of that act provided authority to the Department of Interior to sell various schools and government buildings.  The United States has never accounted to the governments of the Nations for those assets or sales.

unlawful transfer of large portions of the Timber Lands to the politically powerful timber cartel.

## VIII.  THE FIVE TRIBES ACT

### A.      Statutory Preservation of the Nations' Governments

35.     In 1906, Congress again considered the possible termination of the Nations.  The 1906 Act, also known as the Five Tribes Act, 34 Stat. 137, made several significant additions and modifications to previous acts.  To the extent the 1906 Act was inconsistent with previous acts, those acts were repealed.  § 29.

36.     While the Department of Interior was pressing for a final end to the Nations' governments and the quick disposal of all of the Nations' assets, Congress acted to further extend the Nations' governments.  In Section 28 of the Five Tribes Act, Congress provided:

> [T]he tribal existence and present tribal governments of the Choctaw, Chickasaw, Cherokee, Creek and Seminole tribes or nations are hereby continued in full force and effect for all purposes authorized by law, until otherwise provided by law, but the tribal council or legislature in any of said tribes shall not be in session for a longer period than thirty days in any one year.

At the same time that Congress was clarifying that the Nations' governments were to continue operating into the indefinite future, it also established clear rules on how the Nations' property was to be managed by the United States.  The 1906 Act created specific indentures guiding the sale of specific lands – while imposing a duty to retain other lands – and requiring the DOI to prosecute all claims for revenues owed to, and lands claimed by, the Nations.

37.     With respect to the chief executives of the Nations' governments, the Five Tribes Act provided in Section 6 that under limited circumstances the President could appoint a

Chief for the Choctaw Nation or Governor for the Chickasaw Nation.  In relevant part Section 6 provides:

> That if the principal chief of the Choctaw . . . tribe, or the governor of the Chickasaw tribe shall refuse or neglect to perform the duties developing upon him, he may be removed from office by the President of the United States, or if any such executive becomes permanently disabled, the office may be declared vacant by the President of the United States, who may fill any vacancy arising from removal, disability or death of the incumbent, by appointment of a citizen by blood of the tribe.

### B.        Tribal Land's Statutory Prescriptions

38.      In addition to perpetuating the governments of the Nations, the 1906 Act also modified the terms governing the sale of unallotted land.[4]  Section 16, addressing the sale of the lands in all five nations, granted the Secretary of Interior general authority to sell those lands.  The same section also specifically addressed the sale of the lands of the Chickasaw and Choctaw Nations and limited the Secretary's authority to sell certain categories of that land: (i) a general limitation on the sale of land to parcels not larger than 640 acres to "any one person" was imposed; and (ii) the lot size of the agricultural land which could be sold to "any one person" was limited to 160 acres.  Section 16 further withdrew from the Secretary the authority to sell the Timber Lands and Mineral Lands and required both Timber and Mineral Lands be retained.  Specifically, the relevant part of Section 16 provides:

> The Secretary of Interior is hereby authorized to sell, whenever in his judgment it may be desirable, any of the unallotted land in the Choctaw and Chickasaw Nations, which is **not** principally valuable for mining, agriculture, or timber purposes, in tracts of not exceeding six hundred and forty acres to any one person, for a fair and reasonable price, not less than

---

[4]        For example, the "Supplemental Agreement" of 1902, 32 Stat. 641, at 642, did not prohibit the sales of certain unallotted land of the Nations.  To the extent the 1902 Act, Atoka Act, 30 Stat. 495, or any other act authorized the sale of the Timber Lands, such provision or provisions were repealed by Section 29 of the 1906 Act which provided:  "That all Acts and part of Acts inconsistent with the provisions of this Act be, and the same are hereby, repealed."

the present value. . . . Provided further, [t]hat agricultural lands shall be
sold in tracts of not exceeding one hundred and sixty acres to any one
person.

(Emphasis provided.)

39.      In 1948, Congress authorized the sale of the Mineral Lands.  62 Stat. 596.[5]

Congress has never authorized the sale of the Timber Lands.

### C.      Federal Obligation to Prosecute Claims on Behalf of the Nations

40.      In addition to (1) perpetuating the Nations' constitutional governments; (2)

placing a hold on the sale of the lands valuable for minerals and timber; and (3) acting in

furtherance of the longstanding trust obligation to provide protection to the Nations and

their assets, the 1906 Act imposed a clear, nondiscretionary duty on the Secretary of the

Interior to insure the prosecution of all claims of the Nations.  Section 11 of the 1906 Act

provided:

> That all revenues of whatever character accruing to the Choctaw,
> Chickasaw . . . tribes whether before or after dissolution of the tribal
> governments, shall, after approval thereof, be collected by an officer
> appointed by the Secretary of the Interior under rules and regulations to be
> prescribed by him.

In addition, the 1906 Act provided overlapping authority for the Secretary of the Interior

"to bring suit in the name of the United States . . . for the collection of any moneys or

recovery of any land claimed by any of said [Nations.]"   § 18.  The United States has

never brought a claim to recover the Nations' Timber Lands or to account for the

revenues from the illegal sales.

---

[5]      The Nations are not asserting a claim for an accounting as this settlement was ratified by
Congress, other than a request for an accounting for the disposition of the funds received pursuant to this
Act.

### D.      The "Public Lands" Prohibition in the 1906 Act

41.      In addition to these changes, the 1906 Act also prohibited any of the lands of these Nations becoming public lands.  As to this prohibition, § 27 provides:

> That the lands belonging to the Choctaw [and] Chickasaw . . . tribes, upon the dissolution of the said tribes, shall not become the public lands nor property of the United States, but shall be held in trust by the United States for the use and benefit of the Indians respectively comprising each of said tribes, and their heirs as the same shall appear by the rolls. . .

### IX.  ACTIONS FOLLOWING THE PASSAGE OF THE 1906 ACT

42.      In the face of the 1906 Act's mandates requiring the continuation of the constitutional governments of the Nations and establishing trust duties for the management of the Nations' assets, the Department of the Interior, *inter alia*, in what was described by the Court in *Harjo v. Morris*, 420 F.Supp. 1110, 1130 (D.D.C. 1976), *aff'd as to relief, Harjo v. Andrus*, 581 F.2d 949 (C.A.D.C. 1978), as "bureaucratic imperialism," prohibited popular election of the Governor of the Chickasaw Nation and Chief of the Choctaw Nation and disbanded the Nations' legislatures.  In spite of the fact that none of the conditions set forth in Section 6 of the Five Tribes Act had taken place, the Secretary of the Interior disregarded the results of the Choctaw election and secured a presidential appointment of Green McCurtain to continue as Chief of the Choctaw in clear violation of the Choctaw Constitution.  Under the term limits set out in the Choctaw Constitution, Green McCurtain, having just completed two terms as Chief, was not eligible to hold the office.  Similarly, without a vote of the Chickasaw citizens, the Secretary secured a presidential appointment of Douglas Johnston to serve as Governor of the Chickasaw Nation.  The practice of federal appointment of chief executives of these Nations continued until 1970 when the right of the citizens of the Nations to elect

their own executives was again reaffirmed by Congress.  *See* Act of October 22, 1970, 84 Stat. 1091.

43.     Despite the mandates of the 1906 Act, the Department of Interior also unlawfully interfered with the Councils of the two Nations.  Council elections were also eventually suspended and the last meetings of the elected councils for the Choctaw and Chickasaw Nations were in 1911.  Federal interference in the Nations' council elections did not cease until 1983, and only then as a result of federal court order.  *See Morris v. Watt*, 640 F.2d 404 (D.C. Cir. 1981)

## X.  THE NATIONS' "TIMBER LANDS"

44.     Within the boundaries of the lands, which the Nations received in exchange for their ancestral lands, were hundreds of thousands of acres of valuable Timber Lands. Before the 1906 federal takeover, the constitutional governments of the two Nations made concerted efforts to protect the Timber Lands, passing laws to limit the exploitation of the timber and to preserve the assets.

45.     The harvesting of the Choctaw and Chickasaw timber began early with the first lumber mills being relatively small operations.  The scale of the timber operations on these lands changed with the arrival of the railroads and accelerated further as the governments of the Nations were systematically incapacitated.  In 1907, a year after the federal appointment of the Chief of the Choctaws and Governor of the Chickasaws, Dierks Lumber and Coal Company began large-scale operations along the route of the Kansas City Southern Railroad.

46.     The survey conducted by the Dawes Commission classified approximately 1.256 million acres as being land principally valued for its timber.  The survey maps strongly

suggest that this was the minimum acreage of commercially valuable Timber Lands.  The final Commission map suggests that some of the lands, where valuable timber has been found, were never surveyed.  In addition to its timber, significant mineral deposits, including oil and gas, have been found on the land originally classified by the Dawes Commission as land valuable for "timber purposes."

47.     With only limited exceptions, all of the lands within the Nations' boundaries were to be open for allotment.  *See*: 1902 Act § 26; and, 1906 Act § 7.  As a general matter, the Timber Lands were not amongst those lands reserved from the allotment process and should have been open for selection by the Nations' citizens.  In contravention of the Curtis Act and the 1902 Act and in an apparent attempt to either serve private interests or to secure the Timber Lands for a "Forest Preserve," the Department of Interior took a number of steps to remove lands that had been classified as valuable for their timber from the allotment process.  In 1903, at the beginning of the allotment process, the Dawes Commission withdrew 1,247,473 acres of the Timber Lands from the allotment process. This withdrawal was reversed in 1904 but Timber Lands were again withdrawn from the allotment process in 1906.  Efforts by the executive branch, spearheaded by the Department of Interior to prevent the Timber Lands from being allotted to the Nations' citizens, were pursued until the allotment process effectively concluded in 1907.

48.     The United States began the sale of the Nations' Timber Land in 1911 in contravention of the 1906 Act.  A significant portion of these lands were sold prior to 1937.  By the time the Nations' constitutional governments were re-established in 1983, all of the Timber Lands had been sold or transferred out of the trust.  The United States has never provided an accounting to the Nations' constitutional governments for the

wrongful disposition of these trust resources.  While some revenues from the sales of some timber assets may have been distributed to enrolled members of the tribes, such distributions were unauthorized given that the Timber Lands were to remain the property of the Nations.

49.    At some undetermined time after the United States usurped the governmental powers of the Nations and before the governments of the Nations were reconstituted, the United States established the Ouachita National Forest (hereinafter "ONF"), with approximately 400,000 acres of it located within the State of Oklahoma.  The Oklahoma portion of the ONF is entirely within the boundaries of the Nations' lands, and a majority of those ONF lands were qualified by the Dawes Commission as being "land principally valued as timber."

## XI. <u>FEDERAL CONTROL OF THE NATIONS 1902 – 1970s</u>

50.    Beginning in 1902, when the United States took control of the Nations' assets; following in 1906 when the United States illegally began the process of appointing the chief executives of these Nations; and subsequently when the federal government illegally disbanded the Nations' legislatures, the United States had total control over the Nations, their governments, their property, their funds and their claims.  During this entire period, the Governor of the Chickasaws and Chief of the Choctaws served at the pleasure of the President.  The federal government treated its federally appointed chief executives as the sole repository of the Nations' governmental authority.  The United States exercised complete control over tribal budgets, the expenditure of tribal funds, the sale or lease of tribal assets, collection of debts and prosecution of claims.  The citizens of the Nations were denied the right to choose their public officials by free and open

elections.  They were also denied the right to remove officials who failed in their duties. There were no duly elected officials for the Nations to act on behalf of the Nations or to protect the interests of the Nations and their people.

51.     There were repeated efforts by citizens of both Nations to have their right to elect their own leaders restored.  All of these efforts were rebuffed by the Department of Interior.

52.     Prior to the Act of 1970, 84 Stat. 1091, the closest the citizens of either Nation came to having their right to elect their own government officials restored came in 1948 as the result of petitions from members of the Choctaw Nation.  Similar efforts and petitions from the Chickasaws were completely rejected.

53.     In 1948, the Department of Interior provided an opportunity for **some** Choctaw citizens to vote in what amounted to little more than a straw poll.  The sole purpose of the vote was to allow some Choctaws **an opportunity to suggest** who they recommended for appointment as Chief.  The United States retained the right to actually appoint the Chief. The appointed Chief was to continue to serve solely by virtue of his presidential appointment and was accountable only to the United States for the performance of his duties.

54.     There were fundamental problems with the Department of Interior's voting process.  Under the Choctaw Constitution, all male citizens over the age of 18 were entitled to cast a vote.  The Department of Interior, however, limited voters to only males whose names appeared on the original 1907 rolls.[6]  As a result, all citizens under 41 years of age were barred from casting a ballot.  The only polling stations were located within the boundaries of the Choctaw Nation and no provision was made to accommodate

---

[6]     In order to be listed on the rolls, one had to have been born before March 4, 1906.

Choctaws who had moved away from the Nation.  Only 1,534 votes were cast.  Harry Belvin was declared the winner while receiving only 531 votes, barely a third of the votes cast.  The President did appoint Harry Belvin as the Chief of the Choctaws.

55.     In 1952, a second opportunity was provided to some of the Choctaws to recommend who might be appointed as their Chief.  This vote was conducted exclusively by mail.  Again, only those males on the Dawes' rolls were allowed to vote, meaning this time, citizens under the age of 45 were barred from casting a vote.  There was not a process for nominating candidates, and therefore the voters were left to write in their choice of who to recommend.  Harry Belvin was again the person recommended for this appointment and the President again appointed him.  He continued to serve as Chief of the Choctaws, pursuant to federal appointments, until the election of 1971 when he was actually elected by the citizens of the Choctaw Nation.  Since that time, all Choctaw Chiefs have been elected by a majority vote of the qualified voters of the Nation.

56.     The Chickasaws continued to push for the right to elect their governor.  After 1948, when some Choctaws were granted a limited opportunity to propose individuals to be considered for appointment as their chief, the Chickasaws pursued a similar opportunity to be heard on this subject.  However, the Chickasaws were denied even this limited opportunity to have any influence in this fundamental government process.  It was not until 1971 that the Chickasaws were allowed to participate in the selection of their governor when Overton James was elected Governor of the Chickasaw Nation by popular vote.

57.     The United States did not require the succession of its appointed chiefs and governors maintain any records of their actions on behalf of the Nations.  In 1906, when

the United States took control of the Nations' governments, it also took control of the Nations' records.  When the constitutional governments of the Nations were restored in the 1970s, there were few, if any, records memorializing the actions taken by these federally appointed executives on behalf of the Nations, nor were there complete records from times prior to 1906.  The United States has never provided the Nations with a record of the actions taken in the name of the Nations after the United States illegally usurped the Nations' governmental powers, nor has the United States sought to restore the historical records which existed before its takeover.

## XII.  PROCEDURES FOR FILING THE NATIONS' CLAIMS

### A.    The Jurisdictional Act of 1924

58.    On June 7, 1924, Congress enacted a Jurisdictional Act authorizing the Court of Claims to hear claims of the Choctaw and Chickasaw Nations against the United States.  43 Stat. 537.  This Act was amended twice.  In May 1926, the Act was amended to authorize the prosecution of claims jointly or severally and in one or multiple actions.  44 Stat. 568.  In 1929, the Act jurisdiction was extended to June 30, 1930.

59.    At all times relevant to the Jurisdictional Act of 1924, the Choctaw and Chickasaw Nations were without duly elected officials.  The Jurisdictional Act provided for this eventually.  Section 2 required:

> The claim or claims of each of said Indian Nations shall be presented separately or jointly by petition in the Court of Claims, and such action shall make the petitioner party plaintiff or plaintiffs and the United States party defendant.   The petition shall be verified by the attorney or attorneys' employer to prosecute such claim or claims under contract approved by the Commissioner of Indian Affairs and the Secretary of Interior, and said contract with such Indian tribe shall be executed in behalf of the tribe by the governor or principal chief thereof, or, **if there be no governor or principal chief, by a committee chosen by the tribe**

**under** the direction and approval of the Commissioner of Indian Affairs and the Secretary of the Interior.

(Emphasis added.)  The Department of Interior officials failed to secure a committee chosen by the Choctaw and Chickasaw citizens to contract with counsel to represent the Nations in filing claims before the Court of Claims.

60.    The Jurisdictional Act authorized the Secretary of Interior, for a period of six years, to file the Nations' claims including for the unauthorized sales of their assets, including Timber Lands.  The United States failed to file the Nations' claims as required by the 1906 Act or to secure an accounting of assets, including for Timber Lands, and revenues.

61.    Without securing approval of the Nations' citizens as required by the Jurisdictional Act, claims purporting to be claims of the Nations were filed.  Amongst those claims, the federally appointed officials of the Choctaw Nation filed Claim K-260 before the Court of Claims seeking an "accounting with respect to its property and funds under certain treaties, agreements, and acts of Congress."  *Choctaw v. United States,* 91 Ct.Cl. 320 (Ct.Cl. 1940).

62.    In response to Claim K-260, the Government Accounting Office prepared a report at the Attorney's General's request.  That report did not account for the Timber Lands or their sales.  As reflected in the transmittal letter, the GAO merely prepared a "report . . . of **disbursements** made by the United States for the benefit of the Choctaw Nation of Indians."  Letter from Comptroller General of the United States to the Attorney General (June 23, 1933) (emphasis provided).  The report, by its clear terms, **did not** account for the Timber Lands.

63.     As set forth in the report, the "accounting features" of this report were divided

into two parts, designated as follows:

> Part I.  Summary of disbursements made by the United States for the
> benefit of the Choctaw Nation of Indians, during the period from
> December 17, 1801 to June 30, 1929.

> Part II.  Disbursements made by the United States for the benefit of the
> Choctaw Nation of Indians pursuant to and in connection with various
> treaties, agreements, and acts of Congress, during the period from
> December 17, 1801 to June 30, 1929.

Receipts were included in the report, exceeding 800 pages, on 4 pages for the purpose of

disclosing the "source of receipts . . . as carried on the official receipts contained in the

disbursing officers' accounts."   GAO report for K-260, Statement No. 103, at 678-681.

The Timber Lands are mentioned twice:

> Sale of improvements on
>       town lots, segregated,
>       unallotted and timber
>       lands                                         192,382.44

at 679, and

> Sale of timber lands:
>       Principal                         5,595,785.32
>       Interest                            720,190.98

at 680.  The GAO report **does not** provide an accounting of the Nations' more than 1.2

million acres of Timber Lands.  The report notably does not identify what land was sold,

when or for what price, and under what authority.  It also fails to identify what lands and

other assets the United States continued to hold in trust.  These types of aggregated

entries in the GAO report of sale receipts do not constitute an adequate accounting.  *See*

*Blackfeet and Gros Ventre Tribes of Indians v. United State,* No. 279, 32 Ind. Cl. Comm.

65, 78-79 (1923).  The report "accounts" for disbursements from Treasury funds and is

not an accounting of the Nations' property or assets, including Timber Lands.  Moreover, this report was never provided to the Nations' constitutional governments, nor were the required procedures utilized for the appointment of counsel as required by the Jurisdictional Act.  The "accounting features" do not provide information from which "the [Choctaw Nation] can determine whether there has been a loss"  *See, e.g*., Pub. L. No. 109-54, 119 Stat. 499 (2005).

64.     To the extent that the United States purports to have accounted to the Nations with the presentation of the GAO report, it breached its duty when it failed to object to the lack of an appropriate accounting for the Nations' assets, including the Timber Lands.  Furthermore, the United States has never provided an accounting to the constitutional governments of the Nations.

65.     The United States did not file claims on behalf of the Chickasaw and Choctaw Nations, as required by the 1906 Act, to account for the loss of the Timber Land assets.

> **B.**     **The "Indian Claims Commission Act"**

66.     Upon passage of the Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat. 1049 (formerly codified at 25 U.S.C. § 70a (1976) ("ICCA" or "1946 Act"), the Nations were given five years to file all claims for any matter arising before the passage of the Act.  The Act provided for the establishment of the Indian Claims Commission ("ICC") to adjudicate all of these claims.  The ICC was designated the sole forum where such claims could be heard.  By the time the Nations were reorganized and operating pursuant to their respective constitutional government mandates, it had been more than thirty years after the deadline for filing claims had expired and perhaps a decade since the ICC had completely gone out of existence.

67.     Section 13(a) of the 1946 Act required the United States to provide a written explanation of the Act to the "recognized head of each tribe" as well as a detailed statement of claims suitable for adjudication before the ICC.  The constitutional officers of both Nations had previously been eliminated by the United States, so there was no legally authorized representative of either Nation to serve such an explanation upon.  Neither a duly elected official of the Nations nor their citizens were provided a copy of the required notice.

68.     Due to the illegal takeover of the constitutional governments of the Nations, there were no duly elected officials to the Nations to act on behalf of the Nations or to protect the interests of the Nations and their people.

69.     With the full control of the Nations' governments and the duty: to protect their assets and interests; and to prosecute claims on behalf of the Choctaw and Chickasaw Nations, the United States had a responsibility to prosecute claims before the ICCA for the illegal sale of the Timber Lands[7] and to secure an accounting of the Nations' assets and revenues.

70.     The federally appointed executives for the Nations did file some claims with the ICC, but these claims were primarily the reassertion of longstanding claims that had been asserted prior to the dissolution of the tribal councils and the illegal federal appointment of the Chief and Governor.  The federally appointed executive of the Choctaws filed Petition Number 249.

---

[7]     At least as early as 1936, the United States had knowledge that the Nations had claims for the illegal sale of their Timber Lands.  *See* Memorandum from Nathan R. Margold, Solicitor, Dep't of Interior to the Assistant Comm'r of Indian Affairs (May 19, 1936), *available at* http://thorpe.ou.edu/sol_opinions/p626-650.html at 640.

71.     In response to Petition No. 249, twelve years later a report was prepared by the GAO.   As reflected in the report, Petition No. 249 alleged the Choctaw Nation was "entitled to an accounting of its trust funds," and sought "an accounting showing all sums received and disbursed from June 30, 1929 to date."   United States General Accounting Office Report re: Petition of the Choctaw Nation, Indian Claims Commission No. 249, dated September 25, 1964, at 2.   The report focused on funds held by the U.S. Treasury. The account "Proceeds of Lands, etc., Five Civilized Tribes, Oklahoma (Choctaw)" is a listed item in the report.   Disclosure of revenues is limited to warrant numbers.   This report fails to meet the minimal requirements for a fiduciary's accounting.   *See, e.g., Cobell v. Norton,* 283 F.Supp.2d 66, 143-144 (D.D.C. 2003) (an adequate accounting must include all of the trust corpus and sufficient information for the beneficiary to determine if the trust has been "faithfully" executed); and Pub. L. No. 109-54, 119 Stat. 499 (2005) (sufficient information to "determine whether there has been a loss").

72.     While this Petition provided an opportunity for the United States to account for the Timber Lands, it failed on multiple fronts.   First, the report does not account for the Nations' property or assets.   The status of the Nations' Timber Land assets is not disclosed.   Revenues from the illegal sales of the Nations' Timber Lands were not disclosed or identified.   Second, the report was never presented to the Choctaw Nation's government.   Third, the Chickasaw Nation was not a party to this proceeding.

73.     While purporting to respond to the Petition on its request for an accounting of receipts and disbursements, the GAO report does **not** account for the Nations' assets, including the Nations' Timber Lands.[8]   The GAO report does not provide information

---

[8]        It is noteworthy that, although the federally appointed officials of the Choctaw Nation did not object to the failure to account for the Nations' assets, including Timber Lands, similar accounting

from which "the [Choctaw Nation] can determine whether there has been a loss" *See, e.g.*, Pub. L. No. 109-54, 119 Stat. 499 (2005).  To the extent this report purports to be an accounting of the Timber Lands, it is wholly inadequate, and the United States' appointed officials did not object to the facially inadequate reports, dates and amounts.

74.     In spite of the fact that history demonstrates there was massive corruption in the administration of the allotment process and the sale of tribal assets, suggesting the partisan nature of the federally appointed executives, no claims were filed to address any of the illegal actions taken from 1906 through 1946.

75.     The United States failed to protect the interests of the Nations as required and similarly failed to assure that the illegally appointed executives of the Nations acted to protect the Nations' interests, particularly during the period 1946 through 1951. Specifically, the United States and/or its federally appointed tribal executives failed to timely file claims with the ICC to recover the **assets** of the Nations, including, but not limited to, the Timber Lands, as required by Sections 11 and 18 of the 1906 Act and its trust obligations to the Nations.  The United States also failed to secure an accounting for the Nations' assets and revenues from the illegal sales of the Nations' Timber Lands.

## XIII.  NATURAL RESOURCE TRUST MANAGEMENT

76.     In addition to its management and sale of the Timber Lands, the United States, as part of its trust responsibilities to the Nations, has also managed and controlled other land and the assets related to it.  The United States has managed these trust fund assets for the Nations since at least 1902.

---

deficiencies were raised by other tribes.  *See, e.g., Maricopa-ag Chin Reservation Indians v. United States,* 667 F.2d 980, 1001 (Ct. Cl. 1981).

77.     The United States' management of these lands and the related assets has been subject to certain trust duties that can be fairly interpreted as requiring the management of a land-related asset, and may take the form of statutes, regulations, and executive or agency orders, directives or guidance, and judicial opinions.

78.     The United States' management of land-related assets has included the creation of encumbrances on the Nations' lands, which include encumbrances from, *inter alia*, (1) patents of land to non-tribal members; (2) various stripes of "deeds" to non-tribal members; (3) allotment patents to tribal members; (4) easements; (5) rights of way; (6) permits for the extraction of gravel and timber; (7) leases for oil and gas (and related products) extraction; (8) geophysical exploration permits; (9) grazing permits; (10) grazing leases; (11) farming permits; (12) farming leases; (13) commercial/business leases; (14) residential leases; (15) coal leases; (16) coal permits; and (17) assessing injuries to Natural Resources.

79.     This management and these encumbrances were intended to, were expected to, or, in fact, did generate money owing to the Nations' trust funds, or have compromised the revenue-generating ability or use of the resources, impairing the value of the Nations' trust funds.

80.     The United States has never accounted to the Nations for the management of these assets or these encumbrances in violation of its historic trust duty and obligations under, *inter alia*, 25 U.S.C. §§ 162a and 4011.

81.     In spite of the failure of the United States to account, the Nations are aware of examples of the United States' management of these assets where there is sufficient information currently available to cause the Nations to reasonably believe that an

accounting would yield findings that the United States failed to faithfully execute its trust responsibilities. For example:

### A. The McAlester Watershed Area

82. The "McAlester Watershed Area" (herein the "MWA") includes approximately 2,500 acres north of the city of McAlester. The land is held in trust for the Nations and has been, at all times, since the Atoka Agreement.

83. In 1903, the United States created an encumbrance of what has come to be known as the MWA. The 1903 encumbrance is an easement, created by judicial decree that allows McAlester to place water supply equipment on the MWA.

84. Since then, the MWA has been overburdened by various uses, which currently include roads, housing for local sheriff's deputies, a shooting range, a fish hatchery, hay mowing, and oil and gas leasing. The United States has failed to protect the MWA from being overburdened.

85. Accordingly, regarding the MWA, the United States has failed to comply with its trust duties, both by not accounting to the Nations for monies received from the encumbrance of the MWA, and by failing to account for its mismanagement of the encumbrance of the MWA in compliance with the 1903 easement.

### B. Oil and Gas Royalty Collection and Lease Management

86. The United States has breached its trust responsibility and failed to account for its leasing of the Nations' oil and gas assets which are part of the trust fund investments of the Nations.

87 Due to this failure to account, the Nations have limited knowledge of the various oil and gas assets they own, including those which may be currently producing, or those

that may not be currently producing but are otherwise available for production or exploration.

88.     The United States is responsible for keeping records of the Nations' assets (25 C.F.R. pt. 150) and making the Nations' oil and gas assets available for leasing (25 C.F.R. pt. 211). It is also responsible for collecting the proper royalty rates (*id.*)

89.     The failure of the United States in this regard extends to its failure to maintain an accurate register of the Nations' oil, gas and other mineral leases, and its failure to defend and protect leased properties from environmental abuse, neglect and pollution.

90.     The United States has further failed to account for the collection of the proper amount of royalties from leases. It has further failed to collect the proper amounts of royalties due to the Nations.

### C.     Coal and Asphalt Lease Management

91.     Until the sale of the coal assets to the United States in 1948, the Nations' coal assets, along a belt in southeastern and central Oklahoma, produced a significant quantity of coal used locally, regionally and in both World Wars.

92.     Eventually, 445,052.23 acres of coal and asphalt land were reserved from allotment, and later the bulk of the surface was sold, while the minerals were reserved to the Nations. A U.S. Geological Survey Report from approximately 1903 is reported to value the coal resources of the Nations in excess of $160,000,000.00.

93.     These coal and asphalt resources were exploited under a variety of permits and leases, and some production was involuntary.

94.     The United States, as trustee for the Nations, received vast amounts of money for coal and asphalt production from the Nations' lands. For instance, in 1900-1901, the

United States reports that it received $199,663.55 from coal and asphalt royalties from the Nations' coal assets.  Later reports and other records obtained by the Nations from the National Archives indicate that the royalties received for coal and asphalt ranged from approximately $150,000 to $250,000 per year.

95.     Ultimately, the United States sold the surface of the coal lands to third parties, and in 1948, the United States took title to the coal mineral assets pursuant to a joint resolution of Congress and in exchange for the payment of $8.4 million to the Nations.

96.     The United States has never accounted to the Nations the funds actually received and compared such funds with the amounts owed, or the value of the assets acquired by the United States.

### D.     Land Disposal

97.     At the time of the Atoka Agreement, together the Nations held fee title to 11,660,951 acres of land.  This land included significant acreages, in addition to the Coal and Asphalt Lands, which were reserved from allotment and sale.  With the exception of the United States' purchase of the Coal and Asphalt Lands, it was the express duty of the United States to reserve for the Nations the mineral interests of those lands.

98.     While there are a number of reports which purport to describe the sale of these lands, those reports are incomplete and inconsistent.  The United States has never fully accounted for the sale of the lands of these Nations, the proceeds of those sales and the mineral interests reserved.

### E.     Kulihoma Natural Resource Management

99.     Kulihoma is a preserve in the northeast quadrant of the Chickasaw Nation.  It is more than 1,000 acres, held in trust by the United States, and is an important place where

the Nation's citizens meet both formally and informally for cultural and recreational activities. In addition to these uses, the Nation permits its citizens to hunt and use the land for various related purposes.

100.    Each of the various uses of Kulihoma requires the use of water. Currently, the Nation purchases water from a nearby rural water district due to the salt pollution of ground water, making it unfit for human consumption. This pollution is the apparent result of nearby oil and gas operations.

101.    The United States has failed to account to the Nations for its appropriate management of Kulihoma, the Nations' related groundwater resources (§ 162a), nor has it reported to the Nations any intention to assess or repair the injuries.

## F.    Tuskahoma Natural Resource Management

102.    Tuskahoma is a preserve of more than 2,500 acres in the east-central portion of the Choctaw Nation. The original Choctaw Council House in Oklahoma is located there, and it is the site of the Annual Choctaw Festival celebration. Tuskahoma is also a working ranch and is the home of the Choctaw buffalo herd, among other things.

103.    Tuskahoma contains Lake Nanih Waiya, which has an important cultural and spiritual significance to the Choctaw Nation. Nearby oil and gas operations, some of which have been subject to recent Clean Water Act enforcement actions, pose an immediate threat to the environment generally and Lake Nanih Waiya specifically. There have been releases or threatened releases to the environment from these well sites.

104.    The United States has failed to meet its trust obligations by protecting these trust assets, failed to account for its management of these trust assets, and failed to pursue the

restoration of the Nation's injured natural resources that may have resulted from the releases at these well sites.

## XIII.  RELEVANT FEDERAL FINANCIAL AND ACCOUNTING CONCEPTS

105.    As recited herein, the United States committed to provide an accounting to the Nations of the Nations' trust assets, and in the case of the Chickasaw Nation, at least twice per year.  Specifically, Interior, Treasury, the Bureau, the Office of the Special Trustee (the "OST"), and the Office of Trust Fund Management (the "OTFM") each have substantial responsibilities for the management of the Nations' trust funds, assets, and accounts.

106.    In 1994, Congress required the United States to provide the Nations, and all other Native American Indian Tribes, with reconciled account statements for their Tribal Trust Accounts by September 30, 1995.  This duty to account was called for by the 1994 Reform Act, codified at 25 U.S.C. § 4044, and which states:

> The Secretary shall transmit to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate, by May 31, 1996, a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995.   In carrying out this section, the Secretary shall consult with the Special Trustee.  The report shall include—
>
> (1) a description of the Secretary's methodology in reconciling trust fund accounts;
>
> (2) attestations by each account holder that—
>
> (A) the Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary; or

(B) the account holder disputes the balance of the account holder's account as reconciled by the Secretary and statement explaining why the account holder disputes the Secretary's reconciled balance; and

(3) a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute.

107.    The 1994 Act reaffirmed Defendants' historical duty to account to the Nations for the assets, including the Timber Lands, held in trust. *Cobell v. Norton,* 240 F.3d 1089, 1098 (C.A.D.C. 2001). That duty arose upon the United States assuming full control and supervision of the Choctaw and Chickasaw Nations' property and funds. The United State's accounting duty is to provide an accounting from which "the [Nations] can determine whether there has been a loss" *See, e.g.*, Pub. L. No. 109-54, 119 Stat. 499 (2005).

108.    Notwithstanding the obligations owed to the Nations by each of the departments and/or agencies listed above, it is the General Accounting Office ("GAO"), an agency of the United States, which issues accounting pronouncements relevant to various departments and activities of the federal government.

109.    Interior has requested GAO provide guidance as to reporting financial activity involving Indian trust funds, and this response was issued by GAO as Statement of Federal Financial Accounting Standards ("SFFAS") No. 7, Interpretation No. 1.

###    A.    Reporting and Disclosing the Nations' Property Transactions

110.    This SFFAS interpretation applicable to Interior (and other federal financial reporting functions) states: Tribal "dedicated collections" were to be reported as specific budget items of DOI (for years after 1996) and by BIA (for periods prior to 1996). "While the Indian tribal funds might appear to meet the criteria for inclusion as a

component of the federal reporting entity [in the instant case, Department of Interior], the sovereignty of the Indian tribes . . . and the fiduciary relationship between the Government and the Indians" should instead be disclosed in the footnotes to the Department of Interior's "basic financial statements."

111.     On information and belief, when the United States received funds in respect to transactions involving the Nations' property interests, such as the Timber Assets, the appropriate financial and accounting records necessary to accurately report these transactions by the United States to the Nations were not created or maintained.

112.     Accordingly, the United States must correct all erroneous (and incomplete) accounting and financial records to accurately reflect details of transfers, deposits, and all other transactions involving the Nations' properties held in trust by the United States and thereby provide the accounting owed by the United States to the Nations as required by federal law.

**B.      Reporting and Disclosing Environmental Remediation Liabilities**

113.     Interior, the Bureau of Land Management (the "BLM"), and the Minerals Management Service (the "MMS") are charged with the responsibility for managing the Nations' trust resources, including the management of mineral exploration and development, and the use of trust lands for economic development.

114.     SSFAS No. 5 is one source of federal financial regulations that addresses the accounting obligations of the United States for environmental remediation liabilities.  The financial guidance in SSFAS No. 5 requires disclosure of, for example, the contingent liability of the United States for its failure to properly manage the Nations' trust resources and, in particular, the liability associated with the costs of environmental remediation of

the Nations' property resulting from the United States' breach of its duty to properly supervise energy exploration and development activities thereon.

## XIV.  CAUSES OF ACTION

## CLAIM 1:  THE FEDERAL TRUST RESPONSIBILITY

115.    Paragraphs 1 through 114 are incorporated by reference.

116.    Where the United States takes on or has control or supervision over the Nations' monies or properties, a fiduciary relationship exists with respect to such monies and assets, and the obligation to manage the Nations' resources must, at a minimum, comport with statutory directives, including particularly those directives relating to obligations on the United States to account for its management of assets, claims and funds.

### A.    Accounting

117.    25 U.S.C. § 4011 provides:

a) Requirement to account

The Secretary shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a).

(b) Periodic statement of performance

Not later than 20 business days after the close of a calendar quarter, the Secretary shall provide a statement of performance to each Indian tribe and individual with respect to whom funds are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a).  The statement, for the period concerned, shall identify—
(1) the source, type, and status of the funds;
(2) the beginning balance;
(3) the gains and losses;
(4) receipts and disbursements; and
(5) the ending balance.

(c) Annual audit

> The Secretary shall cause to be conducted an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a), and shall include a letter relating to the audit in the first statement of performance provided under subsection (b) of this section after the completion of the audit.

118.   25 U.S.C § 4044 requires the Secretary of Interior to report to the Congress of the United States that it has provided the Nations with full and complete accounting of the trust funds it manages on behalf of the Nations and to further report as to whether the Nations have accepted or disputed the report.

119.   The Department of Interior has failed to provide to the Nations any of the accounting required by 25 U.S.C. § 4011, as required also by 25 U.S.C § 4044; the United States has failed to provide the accounting required by the Treaty of 1854, Article 8; and, the United States has failed to provide the trust accounting arising from its full control and supervision of the Nations' lands, funds, officials and claims.  The accounting information provided in GAO reports to the federally appointed officials of the Choctaws does not discharge the Defendants' duty to account.   An adequate accounting must provide information needed to "determine whether there has been a loss."  *See, e.g.,* Pub. L. No. 109-54, 119 Stat. 499 (2005).  The constitutional governments of the Nations have never received an adequate accounting of their trust assets.

### B.      Failure to File Claims

120.   Sections 11 and 18 of the 1906 Act required the Secretary of Interior to file claims to collect "all revenues of whatever character" and "for the collection of any money or recovery of any land claimed" by the Choctaw or Chickasaw Nations.  Pursuant to the 1906 Act, the Defendants had total control and supervision of all of the Nations' claims for revenue and lands.

121.    In contravention of Section 28 of the 1906 Act, the United States usurped control of the Nations' governments, taking full control and supervision of the Nations' officials.

122.    Protecting the assets of the Nations, including through prosecution of its claims under the ICCA and Jurisdictional Act of 1924, was under the exclusive control of the United States.   Defendants failed to facilitate the selection by tribal members of a committee to secure counsel for the Nations as required by the Jurisdictional Act of 1924, once again usurping the rights and control of the Choctaw and Chickasaw people.   The Secretary of Interior did not prosecute the Nations' claims for the Timber Lands or require the United States to account for the loss of the Timber Land assets.

123.    Upon passage of the ICCA in 1946, the Secretary of Interior failed to file claims for the Nations' Timber Lands and failed to secure an adequate accounting of the Timber Land assets.  These failures occurred after 1946 and are not barred by § 12 of the ICCA.

124.    The United States breached its fiduciary duties through its failure to secure the Nations' claims for an adequate accounting of the Nations' trust assets and to recover the assets which were lost.

### C.    Managing Natural Resources and Other Assets in the Nations' Best Interests

125.    The Department of Interior generally, and its sub-agencies specifically, have been and are currently charged with the trust responsibility of appropriately managing the natural resources within the boundaries of the Nations that are held in trust.  25 U.S.C § 162a(d)(8).  The Department of Interior is further charged with fully accounting for that management and for other trust assets.  25 U.S.C. § 162a(d).

126.    The Department of Interior has failed to appropriately manage the natural resources it has held in trust and has instead allowed the waste of those assets, including,

but not limited to, failing to receive appropriate royalties and other compensation for the exploitation of those resources and failing to appropriately protect the environment.

127.     The United States has failed to properly account for the management of the natural resources held in trust for the Nations.  This includes, but is not limited to, failure to provide adequate systems for accounting for and reporting of trust fund balances; providing adequate controls over receipts and disbursements; providing periodic, timely reconciliations to assure accuracy of accounts; determining accurate cash balances; preparing and supplying the Nations with periodic statements of their account performance, including making the balances of such accounts available on a daily basis; establishing consistent, written policies and procedures for trust fund management and accounting; providing appropriate staffing, supervision, and training for trust fund management and accounting; and otherwise assuring the appropriate management of the natural resources held in trust.

## CLAIM 2:  DUTY TO RETAIN THE TIMBER LANDS

128.     Paragraphs 1 through 127 are incorporated by reference.

129.     Section 16 of the 1906 Act required the United States to retain in trust both the lands valuable for timber, the Timber Lands, and those valuable for minerals, the Coal and Asphalt Lands.  In 1948 the United States, with the express approval of Congress, purchased the Coal and Asphalt Lands from the Nations' trust.  62 Stat. 596.  The Congress has never authorized the sale or purchase by the United States of the Timber Lands.  Further, the Congress has never modified the trust duty of the United States to retain the Timber Lands.

130.    In the face of the explicit duty to retain the Timber Lands within the trusts of the Nations, the United States has sold, transferred, purchased or otherwise lost these assets out of trust.  It has done so without the permission of legally authorized representatives of the Nations and without the authorization of the Congress of the United States.  The United States has never accounted for the loss of the Timber Assets from the Nations' trusts, causing injury to the Nations.

131.    The United States has never accounted for its trust management of the Timber Lands as required by law.

## CLAIM 3:  DUTY TO ACCOUNT FOR OTHER ASSETS

132.    Paragraphs 1 through 131 are incorporated by reference.

133.    Beginning in 1902 the United States assumed a trusteeship over all of the assets of the Nations, including the lands, buildings, farms, furnishings, records, roads, bridges, natural resources and funds of the Nations.  Upon taking control of these assets, the United States commenced the management of the same.  Following the completion of the allotment process, the United States, acting as trustee for the Nations, held these assets for varying periods of time, managed them and disposed of many of them.

134.    With the exception of the sale of the Coal and Asphalt Lands which is excluded from this action, the United States has never accounted to the Nations for its management and/or disposal of these assets as required by law.

## CLAIM 4:  DEPRIVATION OF PROPERTY IN VIOLATION OF THE LAWS, TREATIES AND CONSTITUTION OF THE UNITED STATES

135.    Paragraphs 1 through 134 are incorporated by reference.

136.     The Nations have or had substantial interests in resources, lands and funds that were held and managed by the United States, or which have been the subject of the trusteeship managed by the United States for the Nations.  These interests were obtained by the Nations and placed within the trusteeship of the United States through treaties, including the treaties which granted title to the lands in present-day eastern Oklahoma as described in ¶¶18, 20 and 21.  These interests were also obtained by the Nations and placed in the trusts of the Nations by other agreements, judicial decisions, congressional action or administrative decisions.

137.     The United States has failed to account for these assets, and by failing to do so, has impermissibly impacted the Nations' ability to govern themselves and their people, or to provide greatly needed services and economic development in the Nations' communities in violation of the laws and treaties of the United States, including the Fifth Amendment of the Constitution of the United States.

### CLAIM 5:  ADMINISTRATIVE PROCEDURE ACT CLAIM

138.     Paragraphs 1 through 137 are incorporated by reference.

139.     The United States has breached individually and collectively each of the duties set forth herein.  In doing so, the United States, through its agencies and sub-bureaus, has acted contrary to its constitutional and statutory obligations.  Specifically, the United States acted arbitrarily, capriciously, abused its discretion and otherwise was not in compliance with its specific legal obligations when it failed to retain assets in trust for the Nations, including, but not limited to, the Timber Lands; failed to appropriately manage the natural resources that it has held in trust for the Nations; and failed to account for its

management of the trust assets held by it on behalf of the Nations, including land, other natural resources and moneys.  *See* 5 U.S.C. § 706(2).

140.    The United States has further unlawfully withheld and unreasonably delayed compliance with the Constitution, laws and regulations of the United States and the treaties between the Nations and the United States.  *See* 5 U.S.C. § 706(1).

141.    The Nations have suffered injury as the result of the actions and failure to act by the United States and its agencies and sub-agencies.  The Nations have been adversely affected and aggrieved by these actions and failures to act.  Their trust funds have been impaired and their assets have been subject to waste.  *See* 5 U.S.C. § 702.

142.    The actions of the United States, as set forth herein, constitute final agency actions.  *See* 5 U.S.C. § 704.

143.    The Nations are entitled to a review of these actions and appropriate orders compelling compliance with the laws, treaties and regulations of the United States.  *See* 5 U.S.C. § 701 *et seq.*

## XV.  RELIEF REQUESTED

Wherefore, the Nations request the Court to order a full and complete accounting by the United States, its agencies and sub-bureaus, for all assets, including all funds, assets, lands, investments, claims, and natural resources placed into the trust of the United States for the benefit of these Nations.  The Nations also request that this Court order the United States to make whole, restore, replenish, reconstitute or repair the trust property wasted, lost or unaccounted for when the required accounting is completed.  The Nations also request this Court to order the United States to establish a method of accounting that is in full compliance with federal laws and regulations.  The Nations seek

their costs of suit, including, without limitation, attorneys' fees, as well as the fees and

costs of expert assistance as allowed under the Equal Access to Justice Act and general

principles of law and equity.  The Nations also request that this Court provide all other

relief as this Court deems necessary and equitable.

Respectfully submitted,

/s/ Louis W. Bullock
Louis W. Bullock, OBA #1305
lbullock@bullock-blakemore.com
Bullock  Bullock & Blakemore
110 West 7th Street, Suite 707
Tulsa, OK  74119-1031
(918) 584-2001

Jason B. Aamodt, OBA #16974
jason@aamodt.biz
1723 South Boston
Tulsa, OK 74119
(918) 347-6169

Bob Rabon, OBA #7373
rawol@sbcglobal.net
Rabon, Wolf & Rabon
P.O. Box 726
Hugo, OK 74743
(580) 326-6427

K. Lawson Pedigo, TX Bar #15716500
klpedigo@mkp-law.net
Miller, Keffer & Pedigo, PLLC
8401 North Central Expressway
Suite 630
Dallas, TX 75225
(214) 696-2050

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I certify that on the 19th day of March, 2010, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

> R.D. Evans, Jr.
> Don.Evans@usdoj.gov
> Assistant United States Attorney
> Western District of Oklahoma
> 210 Park Avenue, Suite 400
> Oklahoma City, OK 73102
>
> Anthony P. Hoang
> Anthony.Hoang@usdoj.gov
>
> Matthew Marinelli
> Matthew.Marinelli@usdoj.gov
>
> Jessica Held
> Jessica.Held@usdoj.gov
> United States Department of Justice
> Environmental and Natural Resources Division
> Natural Resources Section
> P.O. Box 663
> Washington, D.C. 20044-0663

s/ Louis W. Bullock
Louis W. Bullock