IN THE UNITED STATES DISTRICT COURT FOR **FILED**

THE WESTERN DISTRICT OF OKLAHOMA

APR 1 6 2014

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY_____*ink*_____DEPUTY

| | |
|---|---|
| THE CHICKASAW NATION and THE CHOCTAW NATION, | ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| THE DEPARTMENT OF THE INTERIOR et al., | ) ) |
| | ) |
| Defendants. | ) |

No. CIV-05-1524-W

## ORDER

Since the Treaty of Hopewell was signed on January 3, 1786, by The Choctaw Nation ("Choctaw Nation") and on January 10, 1786, by The Chickasaw Nation ("Chickasaw Nation"), wherein the United States of America acknowledged that the Choctaw Nation and the Chickasaw Nation were "to be under [its] . . . protection," 7 Stat. 21, Article 2; e.g., 7 Stat. 24, Article 2, "the United States has held in trust for the[se] Nations vast resources including, inter alia, land, minerals, and monetary funds."  Doc. 91 at 8, ¶ 23.      In the third amended complaint filed in this matter, plaintiffs Chickasaw Nation and Choctaw Nation (collectively "Nations") have alleged that despite this protective trust relationship and although "specifically charged with a duty to fully and completely account for its fidelity in the management of trust assets," id., the federal government has "never accounted to the Nations for its management of any of these lands, assets or funds[.]" Id. ¶ 24.  It instead

> illegally began the process of appointing the [Nations'] chief executives . . . and subsequently . . . illegally disbanded the Nations' legislatures, . . . [thereby gaining] total control over the Nations, their governments, their property, their funds and their claims[,]

id. at 19, ¶ 50,

> did not require . . . its appointed chiefs and governors [to] maintain any
> records of their actions on behalf of the Nations[,]

id. at 21, ¶ 57, and as to any documents that did exist, "took [such] control," id. at 22, ¶ 57,

of the same that by

> the 1970s, there were few, if any, records memorializing the actions taken
> by these federally appointed executives on behalf of the Nations.

Id.

"[I]nvok[ing] their right . . . as a beneficiary of th[is] . . . trusteeship," id. at 1, ¶ 1, the

Nations have brought this action "to resolve accounting and related equitable claims[1] . . .

[arising from] the [federal government's] . . . management of the Nations' assets and

funds." Id.  In their prayer for relief, the Nations have requested both declaratory and

injunctive relief, including an order that compels the defendants to provide "a full and

complete accounting . . . [of] all funds, assets, lands, investments, claims, and natural

resources placed in[ ] . . . trust . . . for the [Nations'] benefit . . . ." Id. at 43.

On May 4, 2010, the Court divided the litigation into phases.  The instant phase,

Phase I, concerns the Nations' "trust accounting and trust management claims that pre-

date 1946," Doc. 100 at 1, ¶ (1)(b), and the matter now comes before the Court on the

Motion for Dismissal or, in the Alternative, for Summary Judgment[2] filed pursuant to Rules

---

[1] The Nations have not sought compensatory damages, see Doc. 91 at 5, ¶ 14, and
likewise have "ma[d]e no claims relating to the terms of the Joint Resolution of June 24, 1948, 62
Stat. 596, except to the extent that [they have alleged that] the United States has not accounted
for the management of the funds allegedly paid to the Nations pursuant to th[is] Resolution." Id.

[2] Also pending is the defendants' Motion to Strike Certain Portions of Plaintiffs' Declarations
[Doc. 125] and the plaintiffs' Motion to Supplement the Record [Doc. 175]. In connection with the
former, based upon the Nations' response [Doc. 128], the defendants' reply [Doc. 192] and the
parties' supplemental papers, see Docs. 160-4, 161-2, 169-2, Doc. 170-2, the Court DENIES as

12 and 56, F.R.Civ.P., by the defendants, as named in the third amended complaint: United States of America, Department of Interior ("DOI"), Kenneth Salazar, then-Secretary of the Interior ("Secretary"), Bureau of Indian Affairs ("BIA"), Larry Echohawk, then-Assistant Secretary for Indian Affairs, Office of the Special Trustee for American Indians, Donna M. Erwin, Principal Deputy Special Trustee for American Indians, Office of Trust Fund Management, Dianne Moran, Acting Director of Trust Fund Management, Bureau of Land Management, Bob Abbey, then-Director of the Bureau of Land Management, Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"),[3] Michael

---

MOOT the defendants' motion.

In support of their response to the defendants' Motion for Dismissal, or in the Alternative, for Summary Judgment on All Claims in Phase I, the plaintiffs submitted the Declarations of Gregory Pyle, Chief of the Choctaw Nation, see Doc. 119-1, and Bill Anoatubby, Governor of the Chickasaw Nation. See Doc. 119-2. Portions of these declarations have been challenged by the defendants on the grounds they contain allegations that are not based on the declarants' personal knowledge and are inadmissible hearsay and legal conclusions.

Rule 56(e)(1), F.R.Civ.P., requires that an affidavit "opposing [a motion for summary judgment] [ ] be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Case law further teaches that affidavits and declarations have to meet the same standards as those standards that apply to trial testimony. In particular, the affidavit or declaration has to be based upon personal knowledge, and it has to set forth facts that would be admissible in evidence. E.g., Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995). In this connection, Rule 602, F.R.E., states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

The defendants have challenged in particular Paragraph 2 and Paragraphs 4 through 19 of Governor Anoatubby's Declaration and Paragraphs 2 through 16 and Paragraph 18 of Chief Pyle's Declaration. In ruling on the defendants' Motion for Dismissal, or in the Alternative, for Summary Judgment on All Claims in Phase I, the Court has not relied on these paragraphs; rather, the historical facts cited by the Court in this Order are found in the parties' exhibits (other than these two declarations) and/or in public records.

In connection with the latter motion, the plaintiffs' Motion to Supplement the Record [Doc. 175], the Court GRANTS the same so that the record will be complete, but ADVISES the parties that the Court did not rely in the instant Order upon the document attached to the plaintiffs' motion. See Doc. 175-1.

[3]Pursuant to Department of Interior Secretarial Orders 3299 (May 19, 2010) and 3302 (June 18, 2010), the Minerals Management Service was renamed the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE") and was restructured into three separate

Bromwich, BOEMRE Director, Department of the Treasury and Timothy F. Geithner, then-Secretary of the Treasury.

The defendants' jurisdictional challenges are governed by Rule 12(b)(1), F.R.Civ.P.[4] A motion filed under this rule is considered ""a "speaking motion" and can include references to evidence extraneous to the [third amended] complaint' without converting [the motion] . . . to a motion [governed by Rule 56, supra]." Breakthrough Management Group, Inc. v. Chukchansi Gold Casino and Resort, 629 F.3d 1173, 1188 (10th Cir. 2011) (quoting Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987))(other citation omitted). The Court may therefore exercise "wide discretion . . . [and] allow affidavits[ and] documents . . . to resolve disputed jurisdictional facts under [Rule] 12(b)(1)[, supra]." Wheeler, 825 F.2d at 259 n.5.

The defendants have also cited Rule 12(c), F.R.Civ.P. A motion for judgment on the pleadings filed pursuant to this rule is analyzed under the same standard applicable to a motion to dismiss for failure to state a claim for relief filed pursuant to Rule 12(b)(6), F.R.Civ.P. E.g., Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000). Under Rule 12(b)(6), supra, and thus, under Rule 12(c), supra, the Court must accept all well-pleaded factual allegations in the plaintiffs' amended pleading as true

---

bureaus: the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE") and the Office of Natural Resources Revenue ("ONRR"). Its functions and responsibilities were reassigned accordingly.

The revenue and royalty management functions were transferred to ONRR, and it acts as trustee of royalty assets from Indian trust properties. BSEE assumed responsibility for safety and environmental oversight of offshore oil and gas operations, and BOEM is responsible for the development of offshore resources.

[4]The defendants have also cited Rule 12(h)(3), F.R.Civ.P., which requires the Court, "[i]f . . . [it] determines at any time that it lacks subject-matter jurisdiction, . . . [to] dismiss the action."

and construe those allegations, and any reasonable inferences that might be drawn from them, in the light most favorable to the Nations. To survive a request for dismissal under Rules 12(b)(6) and 12(c), supra, the third amended "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[5]

As to those matters that are governed by Rule 56, supra, also cited by the defendants, summary judgment must be granted "if the . . . [defendants, as the moving parties,] show[ ] that there is no genuine dispute as to any material fact and [that they are] . . . entitled to judgment as a matter of law." Rule 56(a), supra. At this stage of the litigation, the Court does "not . . . weigh the evidence and determine the truth of the matter . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Rather, the Court must only decide "whether there is a genuine issue for trial . . . [and] there is no [triable] issue . . . unless there is sufficient evidence favoring the nonmoving part[ies] for a jury to return a verdict for th[ose] part[ies]. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The

---

[5]"The [C]ourt's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.'" Swoboda v. Dubach, 992 F.2d 286, 290 (10th Cir. 1993)(quotation omitted)(emphasis deleted). That is to say, "the sufficiency of a complaint must rest on its contents alone." Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted).

Exceptions to this rule occur when a complaint incorporates documents by reference, e.g., id. (citations omitted), when submitted documents referred to in the complaint are central to a plaintiff's claims and the authenticity of those documents is not in dispute, e.g., id. (citation omitted), and when matters exist of which a court should take judicial notice. E.g., id. (citation omitted). In these limited instances, the Court is not required to restrict itself to examination of the allegations in the challenged pleading.

Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," id. at 254, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.[6]

"In making this determination, . . . [the Court must] 'examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the [Nations, as the] non-moving part[ies].'" Pinkerton v. Colorado Department of Trans-portation, 563 F.3d 1052, 1058 (10th Cir. 2009)(quoting T-Mobile Central, LLC v. Unified Government of Wyandotte County, 546 F.3d 1299, 1306 (10th Cir. 2008)(citations omitted)). That is to say, in addition to the undisputed facts, the Court must accept the Nations' version of the facts but only to the extent the disputed facts are supported by the record and are not based upon mere conclusory allegations. In addressing the issues raised by the parties, the Court, to the extent applicable, has followed the outline set forth in the parties' proposed findings of fact and conclusions of law, as revised and supplemented. See Docs. 169, 170, 173, 174.

The Chickasaw Nation first adopted a written constitution that outlined its government organization in 1846. That document was thereafter amended on several

---

[6]As to those matters on which the defendants have the burden of proof, such as the affirmative defenses they have asserted, "a more stringent summary judgment standard applies." Pelt v. Utah, 539 F.3d 1271, 1280 (10th Cir. 2008). In such instances, "to obtain summary judgment, [the defendants] . . . cannot force the [Nations, as the] nonmoving part[ies] to come forward with 'specific facts showing there [is] a genuine issue for trial' merely by pointing to parts of the record that [the defendants] . . . believe[ ] illustrate the absence of a genuine issue of material fact." Id. (citing Mudrick v. Cross Services, Inc., 200 Fed. Appx. 338, 340 (5th Cir. 2006) (citing Celotex v. Catrett, 477 U.S. 317, 323 (1986)). The defendants, instead, "must establish, as a matter of law, all essential elements of the issue before the . . . [Nations] can be obligated to bring forward any specific facts alleged to rebut the movant[s'] . . . [defense]." Id. (citation omitted).

occasions. In 1867, a new constitution was adopted that remained in effect until 1983 ("1867 Constitution"). See Doc. at 91 at 10, ¶ 28; Doc. 119-6.

Under the 1867 Constitution, "[t]he powers of the [g]overnment . . . [were] divided into three distinct departments." Id. at 5, Article III, Section 1. The judicial department was comprised of a supreme court, district courts, and if necessary, county courts. See id. at 14, Article VI, Section 1. "The Supreme Executive power . . . [was] vested in a Chief Magistrate, who [would be called] . . . 'The Governor of the Chickasaw Nation,'" id. at 10, Article V, Section 1, and who had the "power to enforce the laws . . . ." Id. at 11, Article V, Section 6.

The third department created by the 1867 Constitution had two branches, a house of representatives and a senate. E.g., id. at 7, Article IV, Section 1. The house of representatives and the senate formed "the [l]egislature of the Chickasaw Nation," id., which, the Nations have alleged, was empowered inter alia "to order the commencement of legal and equitable claims when necessary to protect the [Chickasaw] Nation['s] rights, privileges or interests." Doc. 91 at 10, ¶ 29. Such power, according to the Nations, included authorizing prior to 1911 "the hiring of attorneys to prosecute claims . . . to protect the assets of the [Chickasaw] Nation[ ] from loss and exploitation." Id. at 10-11, ¶ 29; e.g., Doc. 160-2.

The Choctaw Nation began operating under a written constitution in 1838. That document, which was thereafter twice amended, was replaced in January 1860, and that version of the constitution remained in effect until 1983 ("1860 Constitution").[7] See Doc.

---

[7]The 1860 Constitution was amended in 1862 to provide for the election of a National Secretary, National Treasurer, National Auditor and National Attorney. See Doc. 91 at 9 n.2.

91 at 9, ¶ 27; Doc. 119-5.  The 1860 Constitution, like the Chickasaw Nation's 1867 Constitution, distributed the "powers of government . . . into three . . . departments," id. at 5, Article II, Section 1–the judicial department, the legislative department and the executive department.  See id. at 6.

"The judicial power . . . [was] vested in one Supreme Court, [and] in circuit and county courts," id. at 8, Article IV, Section 1, while "[t]he supreme executive power of the Choctaw Nation . . . [was] vested in one principal chief."  Doc. 119-5 at 10, Article V, Section 1.  The principal chief would serve two-year terms and would "not be eligible for . . . office for more than two terms in succession."  Id.

"The legislative power . . . [was] vested in a general council which . . . consist[ed] of a senate and house of representatives . . . ."  Id. at 6, Article III, Section 1.  The Nations have alleged that the Choctaw Nation's general council like the legislature of the Chickasaw Nation "had the power to order the commencement of legal and equitable claims when necessary to protect the [that] Nation['s] rights, privileges or interests," Doc. 91 at 10, ¶ 29, and it too, according to the Nations had authorized, prior to 1911, "the hiring of attorneys to prosecute claims and . . . protect the assets of the [Choctaw] Nation[ ] from loss and exploitation."  Id. at 10-11, ¶ 29; e.g., Doc. 160-3.

While the Choctaw Nation's 1860 Constitution and the Chickasaw Nation's 1867 Constitution were in force and effect, the United States Congress in 1893 created a three-member commission, commonly referred to as the "Dawes Commission" after United States Senator Henry L. Dawes, the Commission's chairman and a "leading congressional proponent of allotment and assimilation."  Harjo v. Kleppe, 420 F. Supp. 1110, 1111 (D.D.C. 1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C. Cir. 1978).  The purpose

of the Dawes Commission was to negotiate with the Nations as well as the Cherokee, Creek and Seminole Nations, "the so-called 'Five Civilized Tribes,'" Doc. 91 at 2, ¶ 4, regarding the allotment and allocation of tribal land. E.g., Seminole Nation v. United States, 78 Ct. Cl. 455, 1933 WL 1802 *8 (1933)(Dawes Commission clothed with jurisdiction to negotiate with Five Civilized Tribes); Act of March 3, 1893, § 16, 27 Stat. 612, 645 (President authorized to appoint commission to enter into negotiations with Five Civilized Tribes).

The negotiations proved unsuccessful, and Congress thereafter passed the Curtis Act, 30 Stat. 495, 646, in June 1898. This legislation, officially named "An Act for the protection of the people of the Indian Territory, and for other purposes," ratified the Atoka Agreement[8] as well as enabled the then-five members of the Dawes Commission to "assembl[e] rolls of tribal members, allot[ ] . . . the lands owned by the Nations to the enrolled members,[9] and . . . [sell] the unallotted land . . . ." Doc. 91 at 11, ¶ 31. In performing these tasks, the Commission was charged with "identif[ying] land that was principally valuable for agriculture, timber, and minerals," Doc. 91 at 12, ¶ 32, and according to the Nations, "approximately 1.256 million acres of land . . . valued for 'timber purposes,'" id.; e.g., id. at 17, ¶ 46,[10] was so classified.

---

[8]The Atoka Agreement had been signed on April 23, 1897, by members of the Dawes Commission and representatives of the Nations and had been approved by Congress and the President on June 28, 1898. The agreement provided for the allotment of tribal lands. Coal and asphalt lands were to be reserved from allotment and sold or leased for the benefit of the Nations. The Atoka Agreement also provided for the termination of the Nations' governments "eight years from the fourth day of March, eighteen hundred and ninety-eight," or March 4, 1906.

[9]See Curtis Act, § 29, 30 Stat. at 647-48.

[10]According to the Nations, "[i]n addition to . . . timber, significant mineral deposits, including oil and gas, ha[d] been found on the land originally classified by the Dawes Commission as land

The Curtis Act also abolished the Nations' tribal courts, 30 Stat. at 653, and further

decreed

> that no act, ordinance, or resolution of the council of either the Choctaw or Chickasaw tribes, in any manner affecting the land of the tribe, or of the individuals, after allotment, or the moneys or other property of the tribe or citizens thereof (except appropriations for the regular and necessary expenses of the government of the respective tribes) . . . shall be of any validity until approved by the President of the United States.

Id. at 654.

In incorporating and ratifying the Atoka Agreement, the Curtis Act further decreed

that

> in view of the modification of legislative authority and judicial jurisdiction [t]herein provided, and the necessity of the continuance of the tribal governments so modified, in order to carry out the requirements of this agreement, that the . . . [tribal governments] shall continue for the period of eight years from the fourth day of March, eighteen hundred and ninety-eight.

Id. The Curtis Act expressly provided that "[t]his stipulation . . . [was] made in the belief

that the tribal government so modified will prove so satisfactory that there will be no need

or desire for further change till the lands now occupied by the Five Civilized Tribes shall,

in the opinion of Congress, be prepared for admission as a State to the Union. . . ." Id.

Before any allotments were made, the Nations and the United States entered into

a supplemental agreement in July 1902, e.g., Act of July 1, 1902, 32 Stat. 641 ("1902 Act"

or "Supplemental Agreement"), which provided "a more comprehensive scheme for the

allotment of [the Nations'] . . . lands and the sale of the residue, or unallotted lands[.]"

Choctaw and Chickasaw Nations v. Seay, 235 F.2d 30, 34 (10th Cir. 1956). In ratifying and

confirming this Supplemental Agreement, Congress acknowledged (a) that the Nations'

---

valuable for 'timber purposes.'" Doc. 91 at 18, ¶ 46.

tribal lands would be allotted to the Nations' individual members "as soon as practicable," 1902 Act, § 11, 32 Stat. at 642, (b) that "the residue of lands not . . . reserved . . . shall be sold at public auction," id. § 14, 32 Stat. at 642, and (c) that the proceeds of these sales "shall be paid into the Treasury of the United States to the [Nations'] credit . . . and distributed per capita [to the Nations' members] as other funds of the [Nations] . . . ." Id.

The 1902 Act also contemplated the continuation of the Nations' governments, see Doc. 91 at 11, ¶ 31, as evidenced by the lands reserved from allotment and sale: academies, seminaries and orphanages, e.g., 1902 Act, § 26(e)-(h), (j)-(n), 32 Stat. at 645; "[f]ive acres for [the Choctaw Nation] capitol building[,]" id. § 26(i), 32 Stat. at 645; "[f]ive acres for the [Chickasaw Nation] capitol building[,]" id. § 26(o), 32 Stat. at 645; "[o]ne acre each for all Choctaw or Chickasaw schools under the supervision of the authorities of the Choctaw or Chickasaw [N]ations and officials of the United States," id. § 26(v), 32 Stat. at 646; and "[a] reasonable amount of land . . . to include all tribal court-houses and jails and other tribal public buildings." Id. § 26(s), 32 Stat. at 645.

In April 1906, Congress passed legislation known as the Five Tribes Act, 34 Stat. 137 ("Five Tribes Act" or "1906 Act"), "[t]o provide for the final disposition of the affairs of the Five Civilized Tribes . . . ." 1906 Act, 34 Stat. at 137. To the extent this legislation was "inconsistent with the provisions of," id. § 29, 34 Stat. at 148, any previous legislation, the former enactments were repealed. See id.

Significantly, even though the title of the 1906 Act reflected Congress' contemplated dissolution of the Nations, Section 28 of that same legislation nevertheless not only recognized that the "[t]ribal governments continued," id. § 28, 34 Stat. at 148, but also delayed termination of the Nations' governments. That section read

11

> [t]hat the tribal existence and present tribal governments of the Choctaw[
> and] Chickasaw . . . [N]ations are hereby continued in full force and effect for
> all purposes authorized by law, until otherwise provided by law[.]

Id.[11] Cf. Harjo, 420 F. Supp. at 1130 (intent and effect of Section 28 was to permit Creek

Nation to continue to operate under its constitution).

The Nations' tribal courts remained abolished, see 30 Stat. at 653, and Section 28,

while recognizing the continuation of the Nations' governments, further restricted the

legislative authority vested by the Choctaw Nation's 1860 Constitution and the Chickasaw

Nation's 1867 Constitution in its respective bicameral legislatures, see Doc. 119-5 at 6,

Article III, Section 1; Doc. 119-6 at 10, Article IV, Sections 2, 4.; id. at 6, Article IV, Section

1, by decreeing that

> the tribal council or legislature in [either] . . . of said . . . [N]ations shall not be
> in session for a longer period than thirty days in any one year[ ] . . . [and] no

_____

[11]In the DOI Annual Report of the Commissioner to the Five Civilized Tribes for the year
ending on June 30, 1913 ("1913 Annual Commissioner Report"), the Commissioner outlined the
circumstances giving rise to the 1906 Act: "[p]rior to June 28, 1898, [the Nations each] . . . had a
constitution modeled after the constitution of the United States, and had a full set of executive,
legislative, and judicial officers . . . ," Doc. 119-3 at 5; although subsequent "agreements with the
. . . [Nations] provided that the tribal governments should be abolished March 4, 1906," id.,
enrollment, allotment and other circumstances made it "impracticable to abolish the tribal
governments on [that date] . . . , as it was necessary at least for each principal chief [or governor]
to continue in order to execute conveyances, etc.," id., and "Congress, therefore, by joint resolution
on March 2, 1906, continued the existence of the tribal governments, [through] . . . [S]ection 28
. . . ." Id. (citing 1906 Act, § 28, 34 Stat. at 148); e.g., S.J. Res. 37, Act of March 2, 1906, 59th
Cong., 34 Stat. 822 (1906)("the tribal existence and present tribal governments . . . are . . .
continued in full force and effect for all purposes under existing laws until all property . . . , or the
proceeds thereof, shall be distributed").
The Commissioner further noted that despite the continuation of the existence of the tribal
governments, "tribal officials had been divested of practically all government functions, and since
the passage of the [1906] [A]ct . . . , the tribal governments ha[d] consisted only of the principal
chief or governor [and necessary] . . . clerical assistants . . . ." Doc. 119-3 at 5. He found "[t]here
being no governmental machinery in the [Nations] . . . to hold elections, . . . [that] none [had been]
held since the passage of the [1906] [A]ct . . . , and as such [A]ct continued the tribal governments
existing at the time, the acting officers on that date continued to fill their respective positions." Id;
e.g., Exhibit 6, Report of the Commissioner to the Five Civilized Tribes to the Secretary of the
Interior for the Fiscal Year Ended June 30, 1913 at 5.

act, ordinance, or resolution . . . of the tribal council or legislature of [either]
. . . of said . . . [N]ations shall be of any validity until approved by the
President of the United States[.] . . .

1906 Act, § 28, 34 Stat. at 148.[12]

In addition, while Section 6 of the Five Tribes Act authorized the President to

remove the Nations' chiefs and governors, that authority was expressly limited to the

following circumstances:[13]

---

[12]In that same report, the Commissioner, citing the Indian Appropriation Act of August 24, 1912, § 18, 37 Stat. 518, 542-545, wrote that while this appropriation act authorized certain payments, including payment to "'attorneys for . . . [the Nations] employed under contract approved by the President,'" Doc. 119-3 at 6 (citation omitted), the appropriation act "contained no provision for the meeting of the tribal councils or legislatures, nor the payment of expenses of such meetings," id., noting that "[s]uch councils . . . had not met for several years prior thereto, except in the Choctaw Nation." Id.; e.g., Exhibit 6, Report of the Commissioner to the Five Civilized Tribes to the Secretary of the Interior for the Fiscal Year Ended June 30, 1913 at 6.
And, as a DOI area director in a letter dated June 30, 1953, to the House of Representatives Committee on Interior and Insular Affairs conceded, the1906 Act by such language in Section 28 had, in particular, effectively abolished the Choctaw Nation's "former legislative . . . bodies[.]" Doc. 119-10 at 2, ¶ 1(a).

[13]As set forth in Harjo, Section 6 as originally proposed by DOI and submitted for approval by the House Committee on Indian Affairs, H.R. No. 183, 59th Cong. 1st Sess. (January 11, 1906), "contemplated the continuance of the titular office of [p]rincipal [c]hief [or governor] after the dissolution of the tribal government for the purpose of signing deeds and patents . . . ." 420 F. Supp. at 1127 n.41; e.g., H.R. No. 59-74 (December 7, 1905)(as proposed, Section 6 "continues in office the chief executives of the several tribes after dissolution of the tribal governments for the purpose of executing conveyances and representing the tribes in such matters as may be referred to them by the Secretary").
As drafted, Section 6 read in relevant part:

"That the principal chiefs of the Choctaw, Cherokee, Creek, and Seminole tribes, and the governor of the Chickasaw tribe, recognized by the Secretary . . . at the time of the dissolution of the tribal governments, are hereby continued in office for the purpose of executing patents, deeds, and other conveyances affecting lands belonging to said tribes, respectively, and to represent the tribes in such matters as may be referred to them by the Secretary . . . ."

Harjo, 420 F. Supp. at 1127 n.41 (citation omitted).
As the court in Harjo noted,

it was decided during the debate of the bill not to dissolve the tribal governments, and [Section] 28 was added . . . [added "over the strenuous objections of the

> [I]f the principal chief of the Choctaw . . . tribe, or the governor of the
> Chickasaw tribe shall refuse or neglect to perform the duties devolving upon
> him, he may be removed from office by the President . . . , or if any such
> executive become permanently disabled, the office may be declared vacant
> by the President . . . , who may fill any vacancy arising from removal,
> disability or death of the incumbent, by appointment of a citizen by blood of
> the tribe.

Id. § 6, 34 Stat. at 139.[14]

Accordingly, the President was "empower[ed by Section 6] . . . to fill the office of

principal chief [or governor] in only three limited circumstances: the removal, disability, or

death of the incumbent[,]" Harjo, 420 F. Supp. at 1127, thereby "ensur[ing] that the office

whose occupant was charged by statute with signing the allotment deeds[15] would at all

───────────────

Secretary . . . ," id. at 1129,] to assure their continuance; this obviously necessitated
a major change in the quoted draft provisions, and that change resulted in the final
form of . . . [S]ection [6]. Without the change in the intent of Congress, the tribal
government of the Creeks would have been dissolved, and the President would
have had the authority to perpetuate a nominal Principal Chief through the
appointment authority, since the constitutional election process would have been
eliminated in the dissolution of the tribal government and its underlying constitution.

Id. at 1127 n.41. The court further recognized, however, that DOI "behaved as though it had been
successful in its efforts to prevent the enactment of [Section 28] and the Congressional changes
made in its draft of [Section 6]." Id. at 1130.

[14]As the court in Harjo further noted,

[b]ecause . . . the [tribal] government[s] [were] not to be dissolved, . . . Congress
intended the appointment authority of . . . [S]ection [6] to be used only when a
vacancy arose in the [p]rincipal [c]hief's [or governor's] office resulting from removal,
disability, or death of the incumbent (without timely replacement by tribal
constitutional processes). The section was not intended therefore to have any
impact on the normal constitutional process of election of the . . . [p]rincipal ]c]hief[s]
[or governors] as long as the constitutional tribal government[s] continued to exist.

Id. at 1127 n.41.

[15]See Exhibit 9, Report of the Superintendent for the Five Civilized Tribes of Oklahoma to
the Secretary of the Interior for the Fiscal Year Ended June 30, 1916 at 25 ("The duties of the
principal chiefs and governors of the various nations composing the Five Civilized Tribes are to
represent the respective nations pending a settlement of tribal affairs and to sign deeds and other

times be filled, and . . . the tribes [would not be deprived] of the right to continue electing their [p]rincipal [c]hiefs [or governors] . . . as long as their tribal governments continued to exist." Id. (footnote omitted).

Nevertheless, as evidenced by the documents submitted by the parties, the Choctaw Nation's principal chiefs and the Chickasaw Nation's governors, during all relevant times, were not elected;[16] instead, in direct contravention of the terms of Section 6 and the 1860 and 1867 Constitutions, they were appointed to the position by the President and recognized by "[t]he United States . . . as the sole embodiment of the government[s] of the . . . Nation[s] with complete power to control all governmental affairs," Morris v. Andrus, No. 77-1667, slip op. at 2 (D.D.C. 1979), aff'd sub nom. Morris v. Watt, 640 F.2d 404 (D.C. Cir. 1981); e.g., Cravatt v. Andrus, No. 77-1664, slip op. at 1 (D.D.C. 1979), aff'd sub nom. Morris v. Watt, 640 F.2d 404 (D.C. Cir. 1981), including legislative affairs.[17]

---

tribal documents"); Exhibit 10, Report of the Superintendent for the Five Civilized Tribes of Oklahoma to the Secretary of the Interior for the Fiscal Year Ended June 30, 1917 at 14.

[16]Despite Section 6's express language restricting the President's authority to fill the office of principal chief or governor in only three limited circumstances, the DOI area director in his letter dated June 30,1953, to the House of Representatives Committee on Interior and Insular Affairs opined that prior to 1948, "the Principal Chief [of the Choctaw Nation] had been appointed to the position by the President of the United States, under authority of the [1906] Act . . . ." Doc. 119-10 at 2, ¶ 1(a).

[17]As the court in Harjo found,

[t]he available evidence clearly reveals a pattern of action on the part of . . . [DOI] and . . . [BIA] designed to prevent any tribal resistance to . . . [DOI's] methods of administering those Indian affairs delegated to it by Congress. This attitude, which can only be characterized as bureaucratic imperialism, manifested itself in deliberate attempts to frustrate, debilitate, and generally prevent from functioning the tribal governments expressly preserved by [Section] 28 . . . .

Harjo, 420 F. Supp. at 1130 (footnote omitted).

As stated, the 1860 Constitution vested "[t]he supreme executive power of the Choctaw Nation . . . in one principal chief," Doc. 119-5 at 10, Article V, Section 1, who would "not be eligible for . . . office for more than two terms in succession." Id. "In case of death, resignation or removal of the principal chief, the president of the senate shall exercise the duty of principal chief until the next regular election of that office . . . ." Id., Article V, Section 4.

Elected in 1898 and in 1904, Green McCurtain served as Principal Chief of the Choctaw Nation for two terms. See Docs. 124-14, 124-15. Despite the election of Wesley Anderson in 1906, see Doc. 169-1 at 35, ¶ 41, and despite "having just completed two terms as Chief . . . [and thus,] not eligible to hold the office," Doc. 91 at 16, ¶ 42; e.g., Doc. 119-5 at 10, Article V, Section 1, United States presidential appointee McCurtain continued to serve as Principal Chief until his death in 1910.

David C. McCurtain was thereafter appointed by the President on January 3, 1911, to succeed his father and "to serve 'during the pleasure of the President . . . for the time being.'" Doc. 111-8 at 2. That appointment "was recalled since . . . [he] did not qualify," id., and President William Howard Taft appointed Victor M. Locke Jr., to be Principal Chief in February 1911. See id.

Locke served in that capacity until October 1917. In July 1918, President Woodrow Wilson appointed William F. Semple as Principal Chief; he served until July 1922, when President Warren G. Harding appointed William H. Harrison as Principal Chief of the Choctaw Nation. Chief Harrison served until his death in September 1929.

16

In February 1930, Ben H. Dwight was appointed by President Herbert Hoover, and he served in that position through 1936.[18]  Principal Chief Dwight was succeeded by presidential appointee William A. Durant in January 1937.  Chief Durant served until his death in August 1948,[19] and that year, by joint resolution ratifying a contract between the United States and the Choctaw Nation, Congress recognized Chief Durant as the Choctaw Nation's Principal Chief.  See Act of June 24, 1948, 62 Stat. 596.[20]

---

[18]See Exhibit 29, Annual Report of the Superintendent to the Five Civilized Tribes for the Fiscal Year Ended June 30, 1935 (Dwight reappointed by President as Chief, effective August 18, 1934, for a period of two years); Exhibit 30, Annual Report of the Superintendent to the Five Civilized Tribes for the Fiscal Year Ended June 30, 1937 (Dwight reappointed by President as Chief, effective August 18, 1936, for a period of two years).

[19]In a memorandum dated August 8, 1946, W.H. Flanery, Acting Solicitor, wrote to the Secretary regarding the recommended reappointment of Principal Chief Durant in 1946.  See Doc. 119-29.  Flanery noted a petition by members of the Choctaw Nation asking that a nomination convention or election be called and challenging the President's authority under Section 6 of the 1906 Act.  Asserting that "Section 6 . . . vest[ed] the power of appointment of Principal Chiefs . . . in the President," id. at 3, and that "[n]o limitations, reservations or conditions [had been] . . . imposed or implied by . . . Congress with respect to such appointment, except that the appointee must be a citizen by blood of the tribe," id., Flanery wrote:

> It is believed that the President's present authority in this matter stems from the time his appointing powers were invoked by reason of the occurrence of one of the contingencies provided by the statute, i.e., the refusal or neglect of a Principal Chief to perform his duties or the disability or death of such officer.  An examination of [DOI's] . . . files discloses that as early as February 5, 1911, the President had occasion to invoke the terms of the statute, at which time he appointed . . . Locke . . . as Principal Chief . . . to fill the position vacated by the death of . . . McCurtain.  Successive Presidential appointments were made from time to time at the recommendation of th[e] . . . [DOI], such appointment extending "during the pleasure of the President . . . for the time being."  Upon the death of Principal Chief . . . Harrison on September 25, 1929, . . . [DOI] initiated the practice of recommending to the President that he appoint Principal Chiefs of the Choctaw Nation for fixed terms.

Id. at 2-3 (footnotes omitted).  Flanery noted that Principal Chief McCurtain "was the last tribally elected Chief of the Choctaws."  Id. at 3 n.2.

[20]As the Nations have argued, there is no evidence that such recognition modified or was intended to modify Section 28 of the 1906 Act.

Harry J.W. Belvin "was elected [in 1948] by special referendum authorized by [DOI, receiving 531 of the 1,1534 votes cast, see Doc. 91 at 21, ¶ 54,][21] . . . and again in 1952."[22] Doc. 119-10 at 2; e.g., Doc. 111-8 at 2.  Principal Chief Belvin, either through reelection or reappointment, or both, served until 1975.[23]  He was replaced, after election, by C. David Gardner.

The Chickasaw Nation's 1867 Constitution, as stated, vested "[t]he Supreme Executive power . . . in a Chief Magistrate, who [would be called] . . . 'Governor . . . .'"  Doc.

---

[21]Belvin's election in 1948 was held under DOI regulations, see Doc. 119-24; e.g., Doc. 119-25, the purpose of which was allegedly to enable the selection of "a candidate for recommendation to the President . . . for appointment as [p]rincipal [c]hief . . . ," id. at 2, Section 1, and they differed from the Choctaw Nation's 1860 Constitution; they limited the number of eligible voters by failing to provide for absentee voters, see Doc. 119-26, and by disenfranchising tribal members under the age of 43.  See Doc. 119-24 at 3, Section 9; id. at 7-8, Section 22.  See also Doc. 91 at 20, ¶ 54 (DOI limited voters to only males whose names appeared on the original 1907 rolls; as a result, all citizens under 41 years of age were barred from casting a ballot).
   The Nations have described the 1948 election as "little more than a straw poll," Doc. 91 at 20, ¶ 53, and have contended that

[t]he sole purpose of the vote was to allow some Choctaws an opportunity to
suggest who they recommended for appointment as Chief.  The United States
retained the right to actually appoint the Chief.  The appointed Chief was to continue
to serve solely by virtue of his presidential appointment and was accountable only
to the United States for the performance of his duties.

Id.; e.g., Doc. 111-12.

[22]The Nations have claimed that the 1952 election "was conducted exclusively by mail[, and] [a]gain, only those males on the Dawes[ Commission's] rolls were allowed to vote, meaning this time, citizens under the age of 45 were barred from casting a vote."  Doc. 91 at 21, ¶ 55.  The Nations have alleged that there was no "process for nominating candidates, and therefore the voters were left to write in their choice of who to recommend.  Harry Belvin was again the person recommended for this appointment and the President[, Harry S. Truman,] again appointed him."  Id.

[23]The Nations have conceded that as a result of "the election of 1971 . . . [Principal Chief Belvin] was actually elected by the citizens of the Choctaw Nation[, and that] [s]ince that time, all Choctaw Chiefs have been elected by a majority vote of the qualified voters of the Nation."  Id.  See Pub. L. 91-45 ("An Act to authorize each of the Five Civilized Tribes of Oklahoma to popularly select their principal officer, and for other purposes").

119-6 at 10, Article V, Section 1.   That individual was to be "elected by the qualified electors of the Nation," id., Article V, Section 2, for a two-year term, see id., and could "not be eligible [for office] for more than four years in any term of six years." Id.  If the office of the Governor became "vacant by death, resignation, removal from office or otherwise, the President of the Senate . . . [would] exercise the office of Governor until another Governor [could] . . . be duly qualified[.]" Id. at 12, Article V, Section 14.

During the time period relevant to this lawsuit, Douglas H. Johnston was twice elected Governor of the Chickasaw Nation, first serving in 1898 and again in 1902.  In 1906, Governor Johnston, faced with the uncertainty created by DOI's "refus[al] to divulge its interpretation [of Section 28,]" Harjo, 430 F. Supp. at 1131 n.56, suspended elections[24]

---

[24]On July 20, 1906, Indian Inspector J. George Wright wrote to Governor Johnston that DOI had notified him (Wright) that it "knew of no reason why [the] . . . election [of tribal officers] should not be held as usual." Doc. 124-10 at 3.  Wright asked Governor Johnston to advise him "if it [was Governor Johnston's] . . . purpose to call the election as usual . . . ." Id.

Governor Johnston in turn sought guidance from then-Congressman Charles Curtis, a member of the Committee on Indian Affairs and a sponsor of the 1906 Act.  Governor Johnston wrote: "I am anxious to follow the law in this matter,–please advise me the intention of Congress in passing the [1906] Act continuing the present tribal governments." Doc. 124-11 at 2.  Curtis responded by telegram that "[t]he Act was so worded to make it unnecessary for an election to be held[;] this was the intention of the Committee[.]" Doc.  124-12 at 2.

On July 24, 1906, Governor Johnston sent Curtis' telegram to Wright and commented in a letter written that date that "[i]t ha[d] been pretty generally understood, and conceded by all except a very few, that the present tribal organization or administration would continue 'in full force and effect for all purposes authorized by law until otherwise provided' . . . ." Doc. 124-8 at 3.  At the same time, Governor Johnston inquired whether it was "the opinion of [DOI] . . . [that] another election [was] . . . necessary." Id.

In response, Wright quoted a statement from DOI that advised: "'[DOI] . . . deems it unnecessary and inadvisable to interfere in the matter or to express an opinion as to proper construction of Section [28] . . . continuing the present tribal governments.'" Doc. 124-9 at 2-3.

In September 1906, Governor Johnston, in addressing the Chickasaw Nation legislature, provided his interpretation of the language of the 1906 Act "in the light of the . . . intention of Congress," Doc. 111-4 at 3, and stated that since "the[ ] duties [of the Chief executives] were being satisfactorily performed by the officers of the present tribal governments and there appeared to be no good reason for forcing the tribes to undergo the trouble and expense of other elections[,] . . . the present tribal governments were continued." Id. at 4 (emphasis deleted).  See Exhibit 30 at 5, 1937 Annual Report of the Superintendent for the Five Civilized Tribes (Governor Johnston "has

and, despite being ineligible under the 1867 Constitution, see Doc. 119-6 at 10, Article V, Section 2, served as Governor until his death in 1939.[25]   Congress, through an appropriations act, recognized Governor Johnston as Governor of the Chickasaw Nation in 1912. See Act of August 24, 1912, 37 Stat. 518, 543.[26]

Floyd E. Maytubby succeeded Johnston as Governor in 1939, and he served in that position until he died in 1963.   Congress, again by joint resolution ratifying a contract between the United States and the Chickasaw Nation, also recognized Governor Maytubby as Governor of the Chickasaw Nation. See Act of June 24, 1948, 62 Stat. 596.[27]

E.B. "Hugh" Maytubby, his nephew, was appointed as Governor immediately upon Governor Maytubby's death, and he served from May 1963 to October 1963.   E.B. Maytubby was succeeded in that position by presidential appointee Overton James. James served from 1963 to 1987, but was not elected as Governor by popular vote until 1971.[28] See Doc. 91 at 21, ¶ 56.

---

been acting as Governor . . . since prior to statehood.   Under the law the existing chiefs or governors continued in office").

[25]An election involving a small number of Chickasaw citizens had been held in 1906 without the support of either the United States or the Chickasaw Nation.   Peter Maytubby was elected, but never held office.

[26]See n.20 supra.

[27]Id.

[28]According to the plaintiffs, "[t]he practice of federal appointment of chief executives of these Nations continued until 1970 . . . ." Doc. 91 at 16, ¶ 42.  That year, Congress passed the Act of October 22, 1970, 84 Stat. 1091, which authorized that "the principal chief[ ] of the . . . Choctaw . . . Tribe[ ] of Oklahoma and the governor of the Chickasaw Tribe of Oklahoma shall be popularly selected . . . in accordance with procedures established by the officially recognized tribal spokesman and/or governing entity[,] . . . subject to approval by the Secretary . . . ." Id. § 1, 84 Stat. at 1091.

According to the Nations, "[a]t the same time that Congress was clarifying that the Nations' governments were to continue operating into the indefinite future [through the passage of Section 28 of the Five Tribes Act],[29] it [was] also establish[ing] clear rules [in the 1906 Act] on how the Nations' property was to be managed by the United States." Doc. 91 at 13, ¶ 36.[30] An initial draft proposed by DOI read in pertinent part "[t]hat when allotments . . . ha[d] been made to all members and freedmen of the Choctaw[ and] Chickasaw . . . tribes, the residue of lands in each of said nations not reserved or otherwise disposed of," H.R. No. 59-74 at 8, Section 16 (December 7, 1905), including "all coal and asphalt lands . . . [through] public auction," id. Section 13, "shall be sold by the Secretary . . . , and the proceeds of such sales deposited in the United States Treasury to the credit of the respective tribes." Id. at 8-9, Section 16.  As recommended, there were no limitations on type of unallotted land–whether it was used for mining, agricultural or timber purposes–that could be sold.

Thereafter, H.R. Report No. 59-183, dated January 11, 1906, and accompanying H.R. No. 59-76, likewise "provide[d] for the sale of the unleased coal and asphalt lands,"

---

[29]To the extent, if any, the title of the 1906–"An Act to provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory, and for other purposes," 34 Stat. 137, arguably demands a different interpretation, the Court is mindful "that the title of a statute . . . cannot limit the plain meaning of the text." Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad, 331 U.S. 519, 528-29 (1947)(citations omitted).  That is to say, titles "are but tools available for the resolution of doubt. But they cannot undo or limit that which the text makes plain." Id.

[30]The 1906 Act provided "[t]hat the lands belonging to the Choctaw[ and] Chickasaw . . . [Nations], upon dissolution of said tribes, shall not become public lands nor property of the United States, but shall be held in trust by the United States for the use and benefit of the Indians respectively comprising each . . . tribe[ ]." 1906 Act, § 27, 34 Stat. at 148.

H.R. Report 59-183 at 2,[31] and "for the sale of all surplus lands." Id. H.R. Report 59-183 noted, however, that "the timber on certain sections in the . . . Choctaw Nation[ ] . . . [had been] reported as being very valuable," id., and that it was "the judgment of [DOI] . . . and of the Dawes Commission that it would be in the best interests of the [Choctaw Nation] . . . to ascertain its value before it [was] . . . placed upon the market." Id.

Section 16 of the Five Tribes Act, as ultimately adopted and enacted, together with Sections 7 and 13, defined the Secretary's limited authority to sell the Nation's unallotted lands. Section 16 first provided that after allotments had been made and except for the Choctaw Nation's tracts identified in Section 7,[32] "the residue of [the Nations'] lands . . . not reserved or otherwise disposed of shall be sold by the Secretary . . . ," 1906 Act, § 16, 34 Stat. at 143, "and then directed that the proceeds of such sales [be] deposited in the United States Treasury to the credit of the respective [Nations] . . . ." Id.; e.g., id. § 17, 34 Stat. at 143-44 (remaining funds from sales shall be distributed per capita to Nations' members).

Section 16 next provided that the Secretary's authorization

to sell, whenever in his judgment it may be desirable, any of the unallotted land in the . . . [N]ations, [was restricted to that unallotted land] which [was] not principally valuable for mining, agricultural, or timber purposes, in tracts of not exceeding six hundred and forty acres to any one person, for a fair and reasonable price, not less than the present appraised value.

[31]The report noted that "[t]he Secretary ha[d] been unable to sell [the unleased coal and asphalt lands] . . . under existing laws for what [they were] . . . worth, and the change . . . provided for in this section [was] . . . believed to be absolutely necessary." Doc. 119-18 at 3.

[32]Section 7 segregated and reserved from allotment certain tracts of the Choctaw Nation and directed the Secretary to estimate and appraise the standing pine timber on the land and then sell the segregated land and the pine timber thereon at public auction or by sealed bids for cash. See 1906 Act, § 7, 34 Stat. at 139. Except for these tracts, Congress has never authorized the sale of the Nations' timber lands.

22

Id. § 16, 34 Stat. at 143 (emphasis added).[33]

Section 13 of the 1906 Act further expressly reserved from sale the Nations' "coal and asphalt lands, whether leased or unleased . . . until the existing leases . . . shall have expired or until such time as may be otherwise provided by law." Id. § 13, 34 Stat. at 142.[34]

Section 18 of the 1906 Act also authorized the Secretary "to bring suit in the name of the United States, for the use of the Choctaw[ and] Chickasaw . . . [Nations], respectively, either before or after the dissolution of the tribal governments, for the collection of any moneys or recovery of any land claimed by . . . [the Nations] . . . , whether such claim shall arise prior to or after the dissolution of the tribal governments[.]" 1906 Act, § 18, 34 Stat. at 144; e.g., § 11, 34 Stat. at 141. The Nations have alleged, despite this "clear, nondiscretionary duty," Doc. 91 at 15, ¶ 40, to prosecute claims on behalf of the Nations, "[t]he United States has never brought a claim to recover the Nations' [t]imber [l]ands or to account for the revenues from [any] . . . illegal sales." Id.

Before 1906, the two Nations had allegedly "made concerted efforts to protect the [t]imber [l]ands, passing laws to limit the exploitation of the timber and to preserve the assets." Doc. 91 at 17, ¶ 44. However, after the passage of the 1906 Act, those efforts were limited because, as the parties' documents have established, the Chickasaw Nation's legislature was not functioning and the Choctaw Nation's legislature had ceased any meaningful activity after 1911.

---

[33]Because Section 29 of the 1906 Act, id. § 29, 34 Stat. at 148, repealed all inconsistent provisions of earlier enactments, any prior legislative provisions authorizing the sale of unallotted timber lands had been repealed. See, e.g., 1902 Act, § 14, 32 Stat. at 642.

[34]It was not until 1948 that Congress authorized the sale of coal and asphalt lands. See 62 Stat. 596.

In October 1907, the Choctaw Nation general council passed a bill entitled "A Memorial Protesting Against the Proposed Timber Reserve," which was approved by Principal Chief McCurtain. See Doc. 155-1. The Choctaw Nation protested therein that DOI in violation of the 1902 Act, § 14, 32 Stat. at 642, had withdrawn from allotment a tract of land for the purpose of making a timber preserve and that the creation of the preserve would harm tribal members whose allotments were included within that tract.[35] The Choctaw Nation general council urged Congress to refuse to authorize the preserve and to respect the agreements regarding allotments and the disposition of residue lands between the Nations and the United States. See Doc. 155-1 at 2.

Principal Chief McCurtain, himself, also continued to address the delay in the allotment process and in the sale of unallotted land in his Annual Message to the Choctaw Nation General Council on October 5, 1908. See Doc. 155-2. He complained about the federal government's failure to complete the final distribution of the Choctaw Nation's property, see id. at 2, in light of the Choctaw Nation's "deep interest," id. at 4, in the

---

[35]The Nations have complained that "[w]ith only limited exceptions, all of the lands within the Nations' boundaries were to be open for allotment," Doc. 91 at 18, ¶ 47 (citations omitted), and that the timber lands "should have been open for selection by the Nations' citizens." Id. The Nations have alleged that

in an apparent attempt to either serve private interests or to secure the [t]imber [l]ands for a "Forest Preserve," [DOI] . . . took a number of steps to remove lands that had been classified as valuable for their timber from the allotment process. In 1903, . . . the Dawes Commission withdrew 1,247,473 acres of the [t]imber [l]ands from the allotment process. This withdrawal was reversed in 1904 but [t]imber [l]ands were again withdrawn from the allotment process in 1906. Efforts . . . spearheaded by [DOI] . . . to prevent the [t]imber [l]ands from being allotted to the Nations' citizens[ ] were pursued until the allotment process effectively concluded in 1907.

Id.

"remaining unsettled," id., matters, which included "the sale of the leased [and unleased] coal and asphalt lands," id., "the sale of the surplus as residue of lands . . . ," id., and " the final allotment of land . . . ." Id.

Principal Chief McCurtain further urged the general council to "insist upon . . . [the] sale of," id. at 7, the approximately two million acres of surplus or unallotted land; he repeated his disfavor with DOI's "suggestion . . . of making a forest reserve out of a large portion of . . . [the] unallotted lands," id. at 7, and his opinion that "the sale of the[se] lands as agreed upon would bring more money . . . ." Id.

Finally, Principal Chief McCurtain considered the disposition of the coal and asphalt lands, which he deemed "the most valuable part of [the Choctaw Nation's] . . . property[.]" Id. at 16. He noted that the Nations were the joint owners in fee-simple of approximately 450,000 acres of coal and asphalt lands and that the members of "the Choctaw [Nation] . . . , for several years, ha[d] been practically united upon a plan for the disposition of these lands, and ha[d] repeatedly made recommendations upon the subject." Id. at 17. He further noted, however, that despite DOI's agreement in the 1902 Act "that the[ ] coal and asphalt lands and deposits should be sold [at public auction] and the proceeds divided among the members of the . . . tribes," id., DOI had disagreed with the manner of sale due to its preference for sealed bids and "withdrew the . . . lands from sale." Id. at 18.

Principal Chief McCurtain further reported that through the 1906 Act, DOI had withdrawn both the leased and unleased coal and asphalt lands from sale, "notwithstanding the desire of the [Nations] . . . to dispose of said lands . . . and the promise and agreement of the United States Government that the same should be sold in accordance with the [Nations'] desires . . . ." Id. He opined that the coal and asphalt lands

25

should be sold in the manner upon which DOI and the Nations had agreed, urged the passage of legislation authorizing that sale and outlined the manner in which the proceeds be distributed. See id. at 19-20.[36]

Between 1907 and 1946, DOI published announcements and regulations that either advertised or governed, or both, the sale of segregated, unallotted lands–including, according to the Nations, "unallotted land . . . principally valuable for . . . timber purposes," 1906 Act, § 16, 34 Stat. at 143[37]–and pine timber through sealed bids or public auction. See Docs. 105-1 to 105-11. The regulations were allegedly "prescribed for the purpose of carrying into effect the provisions of [S]ection 7 of the [1906] [A]ct . . . ,"[38] Doc. 105-1 at 2, and the sales provided for therein were alleged to be "authorized by Section 14[ ] of the

_____

[36]That Principal Chief McCurtain may have expressed his own views of the allotment process and the sale of certain tracts or advocated on behalf of the Choctaw Nation does not diminish the Nations' argument that despite the election of Wesley Anderson in 1906, see Doc. 169-1 at 35, ¶ 41, and despite "having just completed two terms as Chief . . . [and thus,] not eligible to hold the office," Doc. 91 at 16, ¶ 42; e.g., Doc. 119-5 at 10, Article V, Section 1, United States presidential appointee McCurtain continued to serve as Principal Chief. Nor do such actions weaken the Nations' argument that DOI had total control over the Nations' governments. See Doc 155-2 at 44 (wherein Principal Chief McCurtain in his annual message on October 5, 1908, to the Choctaw Nation general council complained: "As you know, I have no funds at my disposal, and my authority is so limited that I am almost powerless to do anything."); e.g., id. at 46-47 (in response to inquiries about the Choctaw Nation's finances, Chief McCurtain reported: "[N]o officer of the Choctaw government handles any of the funds of the Nation, this being a matter entirely under the control of [DOI]").

[37]As the Nations have alleged in their third amended complaint, "[t]he United States began the sale of the Nations' [t]imber [l]and in 1911[, and by 1937,] . . . [a] significant portion of these lands were sold . . . ." Doc. 91 at 18-19, ¶ 48.

[38]Section 7 of the 1906 Act, as stated, provided "[t]hat the Secretary . . . shall, by written order, . . . segregate and reserve from allotment [certain identified sections of] Choctaw Nation, Indian Territory," 1906 Act, § 7, 34 Stat. at 139, and directed "[t]he Secretary . . . [to] cause to be estimated and appraised the standing pine timber on all of said land . . . ." Id. Section 7 further provided, as stated, that "[s]aid segregated land and the pine timber thereon shall be sold and disposed of a public auction, or by sealed bids for cash, under the direction of the Secretary . . . ." Id.

[1902] Act[39] . . . and Section 16 of the [1906] Act[40] . . . ."  Doc. 105-2 at 2.  The published documents described the tracts to be sold (by county, if appropriate, and in certain instances, the acreage), e.g., Doc. 105-1 at 3-5; Doc. 105-2 at 2;[41] they also listed the appraised value of the land, and if appropriate, the estimated amount of, and the appraised value of, the pine timber.  E.g., id.  Pursuant to these regulations and as a result of these advertisements, DOI, after allotting the Nations' tribal lands to their members, sold over three million acres of the Nations' remaining lands, including over one million acres of the Nations' timber lands, see Doc. 148-1, and distributed the proceeds of these sales.

According to the defendants, these regulations and announcements together with the Annual Reports of the Commissioner to the Five Civilized Tribes to the Secretary of the Interior and the Annual Reports of the Office of the Superintendent for the Five Civilized Tribes (collectively "Annual Reports") not only detailed the status of the allotments and the sale of the unallotted lands,[42] identified the tracts and timber lands to be sold and totaled

---

[39]Section 14 of the 1902 Act provided that after the allotments had been made to the Nations' members, "the residue of lands not . . . reserved or otherwise disposed of . . . [would] be sold at public auction . . . ."  1902 Act, § 14, 32 Stat. at 642.

[40]Section 16 of the 1906 Act, as stated, likewise provided that after allotments had been made to the Nations' members, "the residue of [the Nations'] lands . . . not reserved or otherwise disposed of shall be sold by the Secretary . . . ."  1906 Act, § 16, 34 Stat. at 143.

[41]"For detailed information," Doc. 105-6 at 2, interested buyers and bidders in certain instances were directed to contact the Commissioner to the Five Civilized Tribes in Muskogee, Oklahoma, who possessed "descriptive lists and maps showing location and accessibility to railroads[.]" Id.  Other buyers and bidders were advised that "[l]ists of the[ ] lands . . . ha[d] been prepared by counties showing the terms of sale, descriptions of various tracts by subdivisions and minimum price of each tract[,]" Doc. 105-7 at 2, because it was "impracticable to furnish all of these lists to each inquirer . . . ." Id.; e.g., id. (blue print maps showing location of each tract of unallotted land, railroads, principal towns and drainage were available for fifty cents).

[42]As the Nations' documents demonstrate, members of the Choctaw and Chickasaw Nations had notice of, and attended, the sale of various tracts and challenged the bids thereon. See, e.g., Doc. 164-1 (wherein tribal representatives identified by tract that property "not receiving

the acreage, but also reflected the sale prices and the amounts collected. See Doc. 148-1,

Exhibits 1-33.[43]

The Nations have challenged the defendants' reliance on these Annual Reports on

the grounds that they "do not provide information sufficient to determine whether the United

States faithfully carried out its trust responsibilities or whether there have been losses to

or mismanagement of the Nations' trust assets." Doc. 169-1 at 57-58, ¶ 88. Even if the

Annual Reports were as informative as suggested by the defendants[44] and provided

sufficient notice[45] to tribal members,[46] neither these documents nor any other submitted

---

any bid, and all tracts not receiving a bid commensurate with the actual value thereof").

[43]These exhibits were filed under seal. See Doc. 104. Much of the information, however, contained in the Reports of the Commissioner for the Five Civilized Tribes to the Secretary of the Interior is parroted in the Reports of the Department of the Interior for each fiscal year and is available for public review. Accordingly, the Court to certain limited extent has quoted from, and referred to, these sealed documents.

[44]See Vol. II, Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1911 at 398 ("Each [N]ation had a representative at the sales who was familiar with lands, so that objection could be made if deemed propr to the sale of any tract.").

[45]By 1926, attorneys, employed under contracts approved by the principal chiefs and governors of the Nations, either had in their possession or had access to a majority of the Annual Reports of the Commissioner to the Five Civilized Tribes to the Secretary of the Interior and Annual Reports of the Office of the Superintendent for the Five Civilized Tribes. See Doc. 105-13 at 2. These attorneys deemed such documents "absolutely necessary in getting . . . the correct data in regard to the claims which the [Nations] . . . desire[d] to have investigated and suits brought." Id.; e.g., Doc. 105-14.

[46]As DOI reported:

There is a vast amount of detail work in connection with the sale of the unallotted lands in these two [N]ations, because many of the tracts are scattered and interspersed with allotted lands. This work includes preparing descriptive lists and maps preparatory to advertising, furnishing desired information to the public, conducting the sales, checking and platting the sale of each tract, making separate ledger accounts for each tract sold, preparing and delivering certificates of purchase, receiving payments and computing interest thereon, and finally preparing deed, having same executed by the proper principal chief on behalf of the tribe,

documents[47] cast doubt on the plaintiffs' overarching theory in this lawsuit,[48] as evidenced

by their well-pleaded factual allegations, that the Nations' tribal courts had been abolished,

their legislatures displaced and their federally-appointed principal chiefs and governors

controlled by the federal government.[49]

---

approved by the department, recorded in this office, and delivered to the purchaser.

Vol II, Reports of the Department of the Interior for the Fiscal Year Ended June 30, 1913, Report of the Commissioner to the Five Civilized Tribes at 418.

[47]See Doc. 164-2 (Governor Johnston advising Superintendent for the Five Civilized Tribes in 1926 in response to objections to the sale of 104 tracts of land: "As I have no way to determine the value of the lands, I am in doubt as to whether or not these tracts of land would bring an additional amount over the amount offered in the last sale to justify the expense of a resale. I do not feel justified in disregarding the suggestions made by the Chickasaw representative. However, since [DOI] . . has had much experience in selling land and these tracts have been offered for sale several times, if [DOI] . . . believes these sales should be approved I shall have no objection thereto."); Doc. 164-3 (Principal Chief Harrison likewise advising Superintendent regarding these same 104 tracts: "I do not feel justified in arbitrarily setting aside and disregarding report made by . . . [the] Choctaw Representative, but if in the opinion of [DOI] . . ., under all circumstances, the sale of these tracts should be approved, I will not interpose any objections . . . .").

[48]As alleged in the third amended complaint,

[b]eginning in 1902, when the United States took control of the Nations' assets[,] following in 1906 when the United States illegally began the process of appointing the chief executives of these Nations[ ] and subsequently when the federal government illegally disbanded the Nations' legislatures, the United States had total control over the Nations, their governments, their property, their funds and their claims. During this entire period, the Governor of the Chickasaws and Chief of the Choctaws served at the pleasure of the President. The federal government treated its federally appointed chief executives as the sole repository of the Nations' governmental authority. The United States exercised complete control over tribal budgets, the expenditure of tribal funds, the sale or lease of tribal assets, collection of debts and prosecution of claims. The citizens of the Nations were denied the right to choose their public officials by free and open elections. They were also denied the right to remove officials who failed in their duties. There were no duly elected officials for the Nations to act on behalf of the Nations or to protect the interests of the Nations and their people.

Doc. 91 at 19-20, ¶ 50.

[49]See Doc. 169-1 at 32, ¶ 35 ("Whether federal officials illegally imposed a form of government on the Nations in contravention of Section 28 of the 1906 Act and the Nations'

Prior to 1946, Indian "tribes had no forum for pursuing claims against the federal government absent congressional action authorizing litigation on behalf of individual tribes.[50] The [United States] Court of Claims was expressly prohibited from entertaining suits based on treaties.[51]" Cohen's Handbook of Federal Indian Law § 5.06[2] at 437-48 (2012 ed.). "During this period, tribes petitioned Congress to obtain special jurisdictional statutes granting the Court of Claims jurisdiction, waiving sovereign immunity, and often also waiving otherwise applicable statutes of limitations for specific claims." Id. at 438; e.g., United States Indian Claims Commission Final Report (August 13, 1946-September 30, 1978) at 3.

In this connection, from 1907 to 1927, Charles D. Carter, a former Chickasaw Nation House of Representatives member who represented the State of Oklahoma in the United States House of Representatives, sought the passage of a jurisdictional act that would open the Court of Claims to the Nations. As a member of the Committee on Indian Affairs, Carter introduced legislation that would enable the Nations to bring suit against the United States for any dispute arising out of any agreement between the Nations and the federal government. See H.R. 5325 (January 12, 1924).

On June 7, 1924, Congress enacted that legislation, as amended; it conferred

---

constitutions is central to the Nations' assertions that the actions and inactions of the federally appointed officials . . . cannot be used to bar their claims for an accounting. In particular at issue is the legality of federal officials' assignment of legislative power to the Nations' chiefs and governors, including legislative powers to file actions and expend funds to hire attorneys.")

[50]E.g., Oglala Sioux Tribe of Pine Ridge Indian Reservation v. U.S. Army Corps of Engineers, 570 F.3d 327, 331 (D.C. Cir. 2009)(citations omitted)(before 1946, tribes were unable to pursue claims against federal government without express congressional authorization).

[51]Act of March 3, 1863, § 9, 12 Stat. 765.

jurisdiction . . . upon the Court of Claims, notwithstanding the lapse of time or statutes of limitation, to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Choctaw and Chickasaw Indian Nations or Tribes, or either of them, or arising under or growing out of any Act of Congress in relation to Indian affairs which said Choctaw and Chickasaw Nations or Tribes may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States.

Act of June 7, 1924, § 1, 43 Stat. 537, 537 ("1924 Act").

Section 2 of the 1924 Act further provided that

[a]ny and all claims against the United States within the purview of [this legislation] . . . shall be forever barred unless suit be instituted or petition filed . . . in the Court of Claims within five years from the date of [its enactment] . . . .[52]

Id. § 2, 43 Stat. at 537.[53]   That section, as amended, also provided that

[t]he claim or claims of [the Choctaw and Chickasaw] . . . Nations shall be presented separately or jointly by petition in the Court of Claims, and such action shall make the petitioner party plaintiff or plaintiffs and the United States party defendant.   The petition shall be verified by the attorney or attorneys' employer to prosecute such claim or claims under contract approved by the Commissioner of Indian Affairs and the Secretary . . . , and said contract with such Indian tribe shall be executed in behalf of the tribe by the governor or principal chief thereof, or, if there be no governor or principal chief, by a committee chosen by the tribe under the direction and approval of the Commissioner of Indian Affairs and the Secretary . . . .

---

[52]The 1924 Act was twice amended, first in May 1926 and then again in February 1929. The first amendment recognized that the 1924 Act should be construed to permit the prosecution of claims jointly or severally and in a single action or in multiple actions.   See H.J. Res. 134, 44 Stat. 568.   The latter amendment extended the time within which suits may be instituted under the 1924 Act to June 30, 1930.   See 45 Stat. 1229.

[53]The attorneys under contract approved by the Chickasaw Nation governors "appreciate[d] that [the 1924 Act] . . . provide[d] that all claims upon which suit [was] . . . not brought within the five years from [its] passage . . . bec[a]me barred by the statutes of limitations," Doc. 105-14 at 3, and that they were therefore charged with the responsibility "to bring suits upon all claims that appear[ed] to have any merit."   Id.

Id. at 537-38.

From 1932 to 1945, proceedings "purporting to be claims of the Nations were filed[,]" Doc. 91 at 23, ¶ 61, against the United States in the Court of Claims under the 1924 Act.[54] And while the Nations have conceded that these actions were commenced, see, e.g., Doc. 91 at 23, ¶ 61, they have contended inter alia that "approval of the Nations' citizens as required by the . . . [1924] Act [was not secured.]" Doc. 91 at 23, ¶ 61.[55]

In one such case filed on June 3, 1929, In re Petition of the Choctaw Nation of Indians, No. K-260, former Principal Chief Semple and W.B. Johnson, acting in their capacity as special attorneys "employed by the Principal Chief of the Choctaw Nation,"

---

[54]See Chickasaw Nation v. United States, 75 Ct. Cl. 426 (1932)(dispute over title to land in Greer County, Texas, which the Court found to have vested in the United States in 1819); Choctaw and Chickasaw Nations v. United States, 75 Ct. Cl. 494 (1932)(claim challenging railroad lands and rights-of-way); Choctaw Nation v. United States, 81 Ct. Cl. 1 (1935)(claim by the Choctaw Nation that per capita distributions of communal funds of the Nation to the Mississippi Choctaw Indians were made without warrant of law); Choctaw and Chickasaw Nations v. United States, 81 Ct. Cl. 63 (1935)(claim involving rights of freedmen children allotments and preferential purchases); Choctaw Nation v. United States, 83 Ct. Cl. 49 (1936)(claim challenging disbursements of funds for the benefit of Mississippi Choctaw children); Choctaw Nation v. United States, 83 Ct. Cl. 140 (1936)(challenge to the division of per capita payments between the Nations); Chickasaw Nation v. United States, 87 Ct. Cl. 91 (1938)(claim challenging expenditure of educating non-enrolled children); Choctaw Nation v. United States, 91 Ct. Cl. 320 (1940); Chickasaw Nation v. United States, 94 Ct. Cl. 215 (1941); Chickasaw Nation v. United States 103 Ct. Cl. 45 (1945); Chickasaw Nation v. United States, 95 Ct. Cl. 192 (1941); Choctaw Nation of Indians v. United States, 318 U.S. 423 (1943) rev'g Chickasaw Nation v. United States, 99 Ct. Cl. 809 (1943)(claim brought by Chickasaw Nation seeking compensation for one fourth interest in lands allotted to freedmen of the Choctaw Nation); Chickasaw Nation of Indians v. United States, 103 Ct. Cl. 1 (1945)(claim that 136,204 acres had been taken by United States due to erroneous survey that was ratified by Act of Congress on March 3, 1875, as permanent boundary line between Arkansas and the Indian Territory), cert. granted (limited to question of whether particular gratuity items used as offsets should be designated by the judgment), rev'd, 326 U.S. 217 (1945).

[55]The plaintiffs have contended that "[a]t all times relevant to [this lawsuit] . . . , the Choctaw and Chickasaw Nations were without duly elected officials[,]" Doc. 91 at 22, ¶ 59, and, despite the absence of the same, that DOI "failed to secure a committee chosen by the Choctaw and Chickasaw citizens to contract with counsel to represent the Nations in filing claims before the Court of Claims." Id. at 22-23, ¶ 59.

Doc. 124-7 at 15, and under contract approved by the Commissioner of Indian Affairs and

DOI, see id., in accordance with Section 2 of the 1924 Act, sought "a general accounting

. . . covering all transactions had between [the Choctaw Nation and the United States] from

the date of the Treaty in 1805 . . . until the present time." Doc. 124-7 at 3. The petition

alleged "[t]hat at all times [the United States] . . . ha[d] maintained a system of accounting

. . . and ha[d] in its possession the only means known to [the Choctaw Nation] . . . of

ascertaining what [it was] . . . or [was] . . . not due . . . ." Id.

The petition further alleged that between the Treaty of Hopewell entered into on

January 3, 1786, and the enactment of the 1902 Act,

> there ha[d] been numerous transactions between the [Choctaw Nation] . . .
> and the [United States] . . . , and the [United States] . . . alone ha[d] kept the
> accounts between them, and . . . [was] now in possession of all the facts
> concerning said transactions, while the [Choctaw Nation] . . . ha[d] no means
> of knowing from any record kept by it the number and character of said
> transactions, the sums of money involved nor what disposition was made of
> funds belonging to it by [the United States] . . . , and it therefore pray[ed] a
> full, complete and exhaustive accounting and explanation of all funds
> received and had by [the United States] . . . for the use and benefit of [the
> Choctaw Nation] . . . .

Id.; e.g., Doc. 106-1 at 9. In particular, the petition asserted that although DOI had been

statutorily authorized to sell unallotted and timber, e.g., Doc. 124-7 at 12 (citing 1906 Act,

34 Stat. 137; Act of August 24, 1912, 37 Stat. 497), the Choctaw Nation had not been

"advised whether any of such lands and timber [had been] . . sold . . . and if so what [had

been] . . . received therefor and what disposition [had been] . . . made of the purchase

money." Id.

In response to this petition, the United States General Accounting Office ("GAO")

in 1933 prepared an 888-page report, see Doc. 106-1,

33

[t]he accounting features of [which were] . . . divided into two parts:

> Part I. Summary of disbursements made by the United States
> for the benefit of the Choctaw Nation . . . , during the period
> from December 17, 1801 to June 30, 1929.
>
> Part II. Disbursements made by the United States for the
> benefit of the Choctaw Nation . . . pursuant to and in
> connection with various treaties, agreements, and acts of
> Congress, during the period from December 17, 1801 to June
> 30, 1929.

Id. at 10; e.g., id. at 15, 18.

In Part II, GAO "in order to show to what extent the United States ha[d] fulfilled its financial obligations to the Choctaw Nation," id. at 20, identified each treaty, agreement and Congressional act that authorized the appropriations and disbursements and noted whether the same imposed any financial obligations on the part of the United States and thus, whether any accounting was involved or required. See, e.g., id. at 26-27, 38. GAO further noted that pursuant to the treaties, agreements and Congressional acts identified in its report, the United States had among other things "leased and sold the lands not required for allotment purposes[,] collected the revenue arising from the disposition and management of tribal property[ ] and distributed the funds arising therefrom . . . ." Doc. 107-3 at 42;[56] e.g., Doc. 107-2 at 78.

---

[56]GAO reported that "[b]eginning with the fiscal year 1899, all revenues arising from the disposition and management of [the Nations'] . . . tribal property were collected by officers of the United States, and were, with few exceptions, credited to said Indians under the heading 'Indian Moneys, Proceeds of Labor.' Details of said collections, and the disposition thereof, in the approximate proportions of three-fourths to the Choctaw[ ] [Nation] and one-fourth to the Chickasaw[ ] [Nation], [as] . . . set out [therein] . . . ." Doc. 107-3 at 42.

GAO further reported that "[s]ubsequent to the fiscal year 1925, certain classes of receipts formerly deposited to the credit of the Choctaw Nation under the general heading, 'Indian Moneys, Proceeds of Labor,' and carried on . . . [DOI] ledgers under seven subsidiaries, namely, 'Cattle Tax,' 'Choctaw Indians, Indian Territory,' 'Right of Way,' 'Royalties, Grazing, etc.,' 'Stone and Timber,' 'Town Lots,' and 'Unallotted Lands,' were credited to said Indians under 'Proceeds of Land,

The report indicated that "with reference to [the Choctaw Nation's] . . . request for an accounting of the moneys received by [the United States] . . . from royalties on coal mined [from lands belonging to the Nations], . . . the sum of $5,387,750.61 . . . [had been] collected by officers of the United States . . . ." Id. at 49-50; e.g., id. at 64. See also id. (royalties on asphalt collected in the sum of $55,102.01).[57]  GAO's report also identified in the aggregate the sums for the sale of timber lands[58] and timber, respectively, as $5,595,785.32 (with interest thereon in the amount of $720,190.98) and $36,950.44 respectively. See id. at 66; e.g., Doc. 91 at 24, ¶ 63.

The report, however, merely summarized disbursements;[59] it did not "identify what [particular] land was sold, when or for what price[,]" id., or describe "what lands and other

---

etc., Five Civilized Tribes, (Choctaw).'" Id. at 43.

[57]See Doc. 107-3 at 66 (sale of segregated coil and asphalt deposits resulted in principal sum of $1,386,035.99 and $190,902.22 in interest).

[58]According to the Nations, only one transaction regarding timber lands is identified in GAO's report: Wilson Lumber Company's purchase of 10,801.9 acres of timber land in the amount of $287,000.00. See Doc. 107-3 at 52; e.g., Affidavit of Jo Rice (September 13, 2010) at 10, ¶ 12 (hereafter "Rice Affidavit"). See also Doc. 107-3 at 52 (the sale of timber land to McAlester Country Club in the amount of $2,400.00 for 160 acres).

[59]In response to the petition's request for "an accounting of all funds derived from the sale of lands, lots and blocks, timber and from every source whatsoever received by [the United States] . . . since . . . 1898," Doc. 107-3 at 51-52, GAO prepared statements, which "set out the amounts and sources of receipt of all moneys received in connection with the disposition of the Choctaw and Chickasaw tribal property during the years 1898 to 1929," id. at 52, as well as "[t]he disposition of said moneys . . . ." Id. The statements, however, merely identified the type of sale, for example, "Sale of timber, ties, etc.," "Sale of timber lands", see id. at 66, and only listed the categories in which the deposits or disbursements were made, for example, "Indian Moneys, Proceeds of Labor, Choctaw Stone and Timber." See id. at 68.

assets the United States continued to hold in trust." Id.;[60] e.g., Affidavit of Jo Rice (September 13, 2010) at 7-11 (hereafter "Rice Affidavit").[61]

An amended petition was thereafter filed in No. K-260, and in that document, a challenge was lodged against among other things certain expenses that had been incurred in connection with the sale of unallotted land, segregated coal and asphalt lands and coal and asphalt deposits as well as incurred for appraising timber. The United States denied the claims and insisted that all expenses and disbursements had been for the benefit of the Choctaw Nation and authorized by treaties, agreements and Congressional acts.

The Honorable Benjamin H. Littleton, to whom the case was assigned, deemed GAO's accounting reports "full and complete," Choctaw Nation v. United States, 91 Ct. Cl. 320, 1940 WL 3998 *1 (1940); he noted that "[t]he record disclose[d] a great mass of accounting over a long period of time with respect to the management of affairs of the [Choctaw Nation] . . . , the handling and disposition of its property and funds derived from such management, disposition, and sale, and the disbursements made from such funds

---

[60]GAO's report itself noted the lack of pertinent information. See, e.g., id. at 50 ("Due to the fact that the receipts in the fiscal officers' accounts were not sufficiently marked, it was impracticable to attempt to state the amount received on the sale of improvements on segregated lands separately."); id. at 51 ("Due to the fact that the moneys received . . . were deposited with other moneys . . . , it was not possible to segregate disbursements by each class."); id. at 53 ("Due to the fact that said moneys were credited to the Choctaw and Chickasaw Nations with other moneys it was impossible to set out the disposition thereof separately[.]").

[61]Rice has opined that GAO's report in response to the petition filed in K-260 did not

A. identify capital assets of land, minerals or timber;
B. identify land sold, when the sale occurred, to whom the property was sold, the price received or evidence to back the transaction;
C. report sales and leases of timber and minerals; and
D. identify the assets remaining at the end date of the audit.

Rice Affidavit at 11, ¶ 14.

at various times and for various purposes." Id. at ___, 1940 WL 3998 *26. He further noted that "[f]rom the standpoint of accounting the case [was] . . . much involved, difficult to analyze, and more difficult to express[.]" Id.

Judge Littleton recognized that prior to 1897, the Choctaw Nation, "with the recognition and approval of the United States, [had] maintained its own government, enacted its own laws not inconsistent with the treaty provisions and acts of Congress, and . . . managed its own affairs and disbursed its own funds." Id. He further recognized that "[t]he whole purpose of th[e] [Atoka] [A]greement and the [1902] Supplemental [A]greement . . . [was] . . . for the United States . . . to take over the management, control, and administration of the property, affairs, and funds of the . . . [Choctaw] [N]ation theretofore exercised by the tribal government, to continue the tribal government only for limited purposes, and to administer and dispose of the property and funds of the Indians for their benefit." 91 Ct. Cl. at ___, 1940 WL 3998 *27; e.g., id. at ___, 1940 WL 3998 *37 (citing Creek Nation v. United States, 78 Ct. Cl. 474, 490 (1933)(Curtis Act took away from tribes control which they formerly exercised over tribal property and funds, and by clear and necessary implication vested DOI with authority to disburse and expend funds in such manner and for such purposes as would, in DOI's judgment, satisfy tribes' needs).[62]

That same year, 1929, William H. Fuller and Melvin Cornish, attorneys employed by Governor Johnston, see Doc. 108-1 at 6; Doc. 113-7 at 9, and G.G. McVay, National Attorney for the Chickasaw Nation, also brought suit against the United States in the Court of Claims under the 1924 Act. Chickasaw Nation v. United States, No. K-544. The petition

---

[62]See Harjo, 420 F. Supp. at 1124 n.32.

averred that the Chickasaw Nation had previously brought suit, either alone or with the

Choctaw Nation, against the United States and that the United States in response to those

lawsuits had advised that it could not answer the claims asserted therein

> until it ha[d] made a full and complete audit of all the financial transactions
> between the . . . United States . . . and the . . . Nations, arising and growing
> out of the division of the tribal estates and the disposition, by sale and
> otherwise, of all other tribal property, and the disposition, by per capita
> distribution and otherwise, of the proceeds thereof . . . .

Doc. 108-1 at 3.

The petition alleged that the Chickasaw Nation had "reason to believe . . . that, from

time to time, deductions ha[d] been made from the moneys placed to its credit [as

proceeds from the sale of tribal properties], for the payment of . . . expenses [incurred in

the division of the tribal estates]," id. at 5, and

> pray[ed] that an order be made . . . requiring the . . . United States . . . to
> prepare and file . . . a full and complete audit of all the financial transactions
> between the . . . United States . . . and the . . . Chickasaw Nation arising and
> growing out of the division of the tribal estates and the disposition, by sale
> and otherwise, of all other tribal property, and the disposition, by per capita
> distribution and otherwise, of the proceeds thereof, under all treaties and
> Acts of Congress . . . ; and that after such audit shall have been prepared
> and filed . . . , [the Chickasaw Nation] . . . may have a reasonable time for
> the examination of the same for the purposes of ascertaining:
>
> > First: What sum or sums of its moneys, if any, have been
> > deducted and used for the payment of expenses in the division
> > and administration of the tribal estates; and
> >
> > Second:  What sum or sums of money, if any, to which it is
> > entitled, have not been placed to its credit . . . .

Id.; see Doc. 113-7 at 6 (outlining losses disclosed by GAO report and seeking recovery

of illegal disbursements).

In response, GAO produced a report that covered the period of time from 1806 to 1934, and not only addressed the claims in the petition, but also supplemented the report it had produced in response to the petition filed in In re Petition of the Choctaw Nation of Indians, No. K-260. See Doc. 108-2 to Doc. 109-5. In Parts IV and V of its Supplemental Report, GAO summarized by fiscal year the expenses incurred and the disbursements made by the United States that related to surveying, appraising and selling unallotted timber lands and estimating timber. See, e.g., Doc. 108-5 at 30, 34-35, 38, 51; Doc. 109-1 at 2, 34-35; Doc. 109-2 at 6-8, 10-11, 16-23;[63] Doc. 109-4 at 47.

In resolving the issues raised in No. K-544[64] and the United States' claimed offsets, the Honorable Richard S. Whaley, Chief Justice, found that "[a] thorough investigation ha[d] been made in matters of accounting." Chickasaw Nation v. United States, 103 Ct. Cl. 1, 1945 WL 4025 *32 (1945), rev'd in part, 326 U.S. 217 (1945). He observed that "[w]ith the exception of a short deposition the parties [had] rel[ied] entirely on . . . [that] accounting," id. at ___, 1945 WL 4025 *25, and the GAO's report "constitute[d] for all practical purposes the sole source of information." Id.[65]

---

[63]The disbursements made by the United States for the benefit of the Nations were most often reported with those made "[j]ointly with the Creek, Cherokee and Seminole Indians." Doc. 109-2 at 16.

[64]In response to GAO's report, the attorneys acting on behalf of the Chickasaw Nation amended the petition, and in the third amended petition filed on December 22, 1937, see Doc. 113-7, they asserted that the report "disclose[d] losses . . . caused by the handling, by [the United States,] . . . of the treaty and trust funds of [the Chickasaw Nation] . . . ," id. at 7, and they set forth those "items of loss," id. at 8, which totaled $117,479.35, see id., for which the United States was liable. As attorney Cornish averred therein, the allegations asserted in the third amended petition were based only "upon information obtained from [DOI] . . . and the [GAO] report . . . ," id. at 9, and not upon any independent investigation.

[65]Chickasaw Nation v. United States, 326 U.S. 217 (1945)(petition for writ of certiorari granted to question whether particular gratuity items necessarily used as offsets should be

This supplemental report, however voluminous, again was "devoted exclusively to disbursements," Doc. 169-1 at 55, ¶ 79 (citations omitted), and any "information concerning receipts [was] . . . limited to identified appropriation acts under which the disbursements were made." Id. (citation omitted).[66]

In 1945, United States Congressman William G. Stigler, a member of the Choctaw Nation, introduced "[a] Bill [t]o create an Indian Claims Commission, [and] to provide for the powers, duties, and functions thereof . . . ." H.R. 1198, 91st Cong. 126, 1st Sess. (1945); e.g., H.R. 1341, 79th Cong., 1st Sess (1945)(introduced by Charles R. Robertson, U.S House of Representatives (N.D.)). Proponents of these companion bills, H.R. 1198 and H.R. 1341, who testified at the hearings before the House of Representatives Committee on Indian Affairs included Lynn Adams, an attorney for the Chickasaw Nation employed under a contract approved by DOI and the President,[67] see Doc. 112-2 at 12, W.W. Short, a member of the Chickasaw Nation and president of the Choctaw and Chickasaw Confederation, see id. at 19, Honorable Earl Welch, then Associate Justice for

---

designated by judgment; the United States Supreme Court found judgment should be in such form as not to compel unnecessary adjudication of objections on appeal, or unnecessarily foreclose consideration of objections to the use of items as offsets in future litigation; judgment reversed and cause remanded to Court of Claims).

[66]See Rice Affidavit at 12, ¶ 16. Rice has opined that GAO's supplemental report fails to

A. identify beginning capital assets of land, minerals or timber;
B. identify any transactions with respect to those assets during the audit period; and
C. identify assets remaining at the end date of the audit.

Id.

[67]Adams understood that H.R. 1198 "provide[d] a forum, and set a time limit on the filing of claims . . . ," Hearings on H.R. 1198 and H.R. 1341, 79th Cong., 1st Sess. 1, 9 (1945), thereby "forc[ing] . . . [the Chickasaw Nation] to come in and present [its] . . . claims." Id.

the Oklahoma Supreme Court, see id. at 22,[68] former Principal Chief Dwight, then attorney

for the Choctaw Nation, who appeared with instructions from Chief Durant, see id. at 28,[69]

and Chickasaw Nation Governor Maytubby. See id. at 42; e.g., Hearings on H.R. 1198 and

H.R. 1341, 79th Cong., 1st Sess. 8-10, 15-17, 19-28, 39-42 (1945).

On August 13, 1946, Congress enacted the Indian Claims Commission Act ("ICCA"

or "1946 Act"), Pub. L. No. 79-726, 60 Stat. 1049 (codified at 25 U.S.C. § 70 et seq.),

which established the Indian Claims Commission ("ICC"), a "tribunal with power to decide

claims of Indian tribes against the United States." Arizona v. California, 530 U.S. 392, 402

(2000)(footnote and citation omitted).   The 1946 Act "had two purposes.   The 'chief

---

[68]Justice Welch noted that any claims brought before the proposed commission would "involve . . . detailed accounting and balancing of right . . . ." Id. at 23. Congressman Stigler agreed that "[m]ost of the[ ] claims . . . w[ould] result in an audit of the books by [GAO] . . . ," id. at 22, and he further observed that "[m]ost of the information on all these claims, practically all of it, must be obtained and [would] come[ ] through . . . [GAO,]" id., conceding that the Indians tribes did not keep records themselves, but that "the Government ke[pt] the records for them." Id. See Act of May 27, 1908, § 13, 35 Stat. 312, 316 (amending second paragraph of 1906 Act, § 11). See also Vol 11, Reports of the Department of Interior for the Fiscal Year Ended June 30, 1915 at 342; Exhibit 8, Annual Report of the Superintendent for the Five Civilized Tribes for the Fiscal Year Ended June 30, 1915 at 342 (citing Section 13 and advising that in accordance therewith, "the tribal officials . . . [had] delivered into the possession and custody of the Commissioner . . . all of the tribal records which they claimed to have had in their possession, consisting of the records of the various courts of the Five Nations, proceedings of the councils or legislatures, records of the tribal officials, including the governors, principal chiefs, secretaries, auditors, treasurers, and various other officials"); Doc. 119-3 at 5 ("All tribal records, papers, documents, etc., have been turned over to the custody of [the Commissioner of the Five Civilized Tribes]").

[69]Former Chief Dwight stated that in his personal opinion, "the Indians of Oklahoma would have been better off 40 years ago if they had just forgotten about these claims." Id. at 25. He also stated however that certain members of the Choctaw Nation thought "that they ha[d] not been dealt with honorably, that the Government ha[d] not kept its promises and met its obligations, and [that he was] . . . quite sure that the records [would] . . . bear that out." Id. at 26. He also noted that the prior actions between the different Indian tribes and the federal government had only dealt with "different phases of these claims." Id.
During former Chief Dwight's testimony, Congressman Robertson opined that a commission was necessary since "up to [that] . . . date . . . that there ha[d] [not] been very many Indian claims against the Government in which the Indians ha[d] actually had their day in court . . . ." Id. at 27.

purpose [. . . was] . . . to dispose of the Indian claims problem with finality.'" United States v. Dann, 470 U.S. 39, 45 (1985)(quoting H.R. Rep. No. 1466, 79th Cong., 1st Sess. 10 (1945)). "This purpose was effected by the language of . . . [section 70u(a)]: 'When the report of the [ICC] . . . determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of a final judgment of the Court of Claims . . . .'" Dann, 470 U.S. at 45 (footnote omitted). This statutory section "also state[d] that the 'payment of any claim . . . shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.'" Id. (quoting 25 U.S.C. § 70u(a)).

"The second purpose of the [ICCA] was to transfer from Congress to the . . . [ICC] the responsibility for determining the merits of native American Claims," id., that had accrued against the United States before August 13, 1946. E.g., 25 U.S.C. § 70a (no claim accruing after August 13, 1946, shall be considered by ICC).

The ICC was statutorily authorized to

hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. . . .

42

Id.[70]

The ICC was statutorily charged with the responsibility, "[a]s soon as practicable[,]
. . . [of] send[ing] a written explanation of the provisions of th[e] . . . [ICCA] to the
recognized head of each Indian tribe . . . ," 25 U.S.C. § 70l, and "request[ing] that a
detailed statement of all claims be sent to the [ICC] . . . ." Id.[71]

Officials purportedly litigated on behalf of the Nations before the ICC was statutorily
abolished in September 1978,[72] see Pub. L. No. 94-465, 90 Stat. 1990, 25 U.S.C. § 70v

_____

[70]As stated in connection with the 1924 Act, "[p]rior to the enactment of the ICCA, 'no
[Indian Tribes were] able to bring their disputes with the Federal Government before the Court of
Claims without a special act of Congress . . . ." Round Valley Indian Tribes v. United States, 97
Fed. Cl. 500, 505 n.3 (Fed. Cl. 2011)(quoting H.R. Rep. No. 79-1466 at 2 (1945)).
    The United States Supreme Court in United States v. Dann, 470 U.S. 39 (1985), found the
statement of Congressman Henry Jackson, Chairman of the House Committee on Indian Affairs,
during the Congressional hearings on H.R. 1198 and H.R. 1341, made the second purpose of the
ICCA very clear:

> [T]he very purpose of this act, the reason we are coming to Congress, is that we are
> being harassed constantly by various individual pieces of legislation. I do not want
> to act on separate legislation and Congress is being told to act on those bills,
> without knowing the facts, and the purpose of this legislation will be to dispose of
> all those routine claims and let the [C]ommission decide what the obligation is of this
> Government to the Indians; and, acting upon those findings made by the
> Commission, Congress will appropriate the money.

470 U.S. at 45 (quoting Congressional hearings on H.R. 1198 and H.R. 1341 at 68).

[71]The Nations have contended that at this time "there was no legally authorized
representative of either Nation to serve such an explanation upon[,]" Doc. 91 at 26, ¶ 67, and they
have denied that a duly elected official of the Nations was provided a copy of the required notice.
See id.

[72]See Choctaw Nation v. United States/Chickasaw Nation v. United States, 1 Ind. Cl. Comm.
304 (1950)(ICC Nos. 16, 23); Choctaw Nation v. United States, 1 Ind. Cl. Comm. 341 (1950)(ICC
No. 56); Choctaw Nation v. United States, __ Ct. Cl. __ (1951)(ICC No. 50); Choctaw Nation v.
United States, 1 Ind. Cl. Comm. 182 (1950), aff'd, 120 Ct. Cl. 734 (1951)(ICC No. 51); Choctaw
Nation v. United States, 1 Ind. Cl. Comm. 562 (1951), aff'd, 128 Ct. Cl. 195 (1954)(ICC No. 55);
Choctaw Nation v. United States, 2 Ind. Cl. Comm. 597, aff'd, 133 Ct. Cl. 207 (1955)(ICC No. 103);
Chickasaw Nation v. United States, 5 Ind. Cl. Comm. 478 (1957)(ICC No. 267); Chickasaw Nation
v. United States, 7 Ind. Cl. Comm. 79 (1959)(ICC No. 269); Chickasaw Nation v. United States, 10
Ind. Cl. Comm. 313 (1962)(ICC No. 268); Chickasaw Nation v. United States, 20 Ind. Cl. Comm.

(1978)(all claims and cases that remained pending before ICC were transferred to Court

of Claims), and although the Nations have again conceded that these actions were

prosecuted, see Doc. 91 at 26, ¶ 70, they have alleged that "[d]ue to the illegal takeover

of the constitutional governments of the Nations, there were no duly elected officials . . .

to act on behalf of the Nations or to protect the interests of the Nations and their people,"

id. ¶ 68, in these matters.

In April 1952, attorneys purporting to act on behalf of the Choctaw Nation filed suit

before the ICC, Choctaw Nation v. United States, ICC No. 249, asserting "four specific

accounting claims and a demand for a general accounting." Choctaw Nation v. United

States, 32 Ind. Cl. Comm. 286, 286 (December 6, 1973). The first claim related to the use

of tribal funds by the United States for expenses incurred "in carrying out the provisions of,"

Doc. 112-3 at 4, the Atoka Agreement and the 1902 Act. It was alleged that contrary to the

parties' agreements, the United States from June 30, 1929, to June 30, 1951, had

disbursed from tribal funds a total of $200,000.00 for administrative and agency expenses

that resulted from among other things "investigating coal and asphalt deposits," Doc. 112-3

at 4-5, and the "sale of unallotted land . . . ." Id. at 5.

The petition further averred that the United States "in the handling of [the Choctaw

Nation's] . . . properties since June 30, 1929, ha[d] sold many large assets, paid out large

sums of money, and . . . held large sums of money in trust . . . ," id. at 7, and prayed "that

the [United States should] . . . be required to make a statement in the nature of an

accounting for all sums received and disbursed from June 30, 1929, to date, and that [the

247 (1969)(ICC No. 270); Choctaw Nation v. United States, 38 Ind. Cl. Comm. 441 (1976)(ICC No. 249).

Choctaw Nation] . . . have judgment for such amounts as may be justly found to be due on an accounting of [the United States'] . . . administration of [the Choctaw Nation's] . . . funds." Id.; e.g., id. at 8, ¶ (e).

Two of the Choctaw Nation's claims, including the claim challenging the United States' disbursement of moneys from tribal funds, were dismissed.[73] The remaining two claims, including the Choctaw Nation's demand for a general accounting, were resolved by compromise and settlement, and findings documenting the parties' agreement were entered by the ICC Commissioners in 1976. See Choctaw Nation v. United States, 38 Ind. Cl. Comm. 441 (1976)(ICC No. 249).

They noted in their Findings of Fact on Compromise Settlement that the settlement had been "formally approved by a resolution of the [Choctaw Nation's then] Principal Chief, [Belvin,] . . . and his advisory counsel[74] on . . . [June 30,] 1975." Id. at 444. The

---

[73]See Choctaw Nation v. United States, 38 Ind. Cl. Comm. 441, 442 (1976)(ICC No. 249) (citing Choctaw Nation v. United States, 32 Ind. Cl. Comm. 286 (1973)(ICC No. 249))(Choctaw Nation's claims regarding disbursement of expenses from tribal funds dismissed by ICC on December 6, 1973); id. (second claim pertaining to attorney fees dismissed by ICC pursuant to consent order of September 25, 1963).

[74]In the 1953 Report to the House Committee on Interior and Insular Affairs ("1953 Report"), an area director wrote: although "the Choctaw people [in 1934] authorized the creation of the Choctaw Advisory Council[,] . . . this provision was never followed after the demise of the then Chief Will Durant." Doc. 119-10 at 2, ¶ (1)(a); e.g., id. at 3, ¶ (2)(a). See Exhibit 31 at 5, 1938 Annual Report of the Superintendent for the Five Civilized Tribes (wherein it was noted that "[t]he governing body of the Choctaw[ ] [Nation] consists of an Advisory Council of twelve members who are appointed by the Principal Chief[, then Chief Durant,] and [who] meet at irregular intervals upon call by the Chief to transact the business affairs of the tribe").

The area director, conceding that there was "no Choctaw Tribal Council at th[e] time," Doc. 119-10 at 3, ¶ (2)(d), further wrote that "[i]n 1948, under the newly elected Principal Chief, [Harry J.W. Belvin,] the [practice of electing members of the] Choctaw Advisory council was discontinued. The Principal Chief selects such persons as he wishes for his advisory group. They have no relation to the communities of Indians, and there has not been much opportunity for the agency staff to work with this group as is customary with the other four tribes. . . . Many Indians who exercise constructive leadership through the Choctaw Nation are not affiliated with the Chief's group." Id. ¶ (2)(a).

compromise was also "formally approved and ratified . . . ," id. at 445, on February 14, 1976 by Principal Chief Gardner[75] and his advisory council. E.g., id. at 445-46. In documenting the parties' settlement, the ICC Commissioners stated that the parties had stipulated that the "[e]ntry of final judgment . . . shall finally dispose of all rights, claims or demands which [the Choctaw Nation] . . . asserted or could have asserted in [its petition] . . . ." Id. at 451, ¶ 2.

The report produced by GAO in response to this particular petition, see Doc. 112-4 to Doc. 112-7,[76] contained "an accounting [of the treaties, agreements and funds in which the Choctaw Nation had an interest] from July 1, 1929, to June 30, 1951," Doc. 112-4 at 9, and "statements of disbursements made under other than treaty appropriations form July 1, 1947, to June 30, 1951." Id. The document was divided into four parts: a summary of disbursements, an accounting under the various treaties, agreements and acts, disbursements under non-treaty appropriations and a tabulation of appropriations and funds under, or from which, the disbursements had been made.

---

The use of advisory councils continued through the term of Principal Chief Gardner. See Doc. 119-9 at 12.

[75]At the settlement hearing before the ICC on June 28, 1976, Principal Chief Gardner "testified as to the background and authority of the office of the Principal Chief of the Choctaw Nation. He stated that the Choctaw Principal Chief [was] . . . elected in accordance with procedures established by the officially recognized tribal spokesman and approved by the Secretary . . . ." Choctaw Nation, 38 Ind. Cl. Comm. at 452 (ICC No. 249).

[76]GAO reports were produced in response to other petitions filed by the Nations. See, e.g., Doc. 113-1 to Doc. 113-5. The 1950 report that addressed the petitions filed in Choctaw Nation v. United States, ICC No. 16, and Chickasaw Nation v. United States, ICC No. 23, on November 18, 1947, and February 4, 1948, respectively, provided a summary of disbursements made from April 28, 1866, to June 30, 1947. See Doc. 112-4 at 10.

In discussing these reports, Rice has averred that the 1950 report failed to "identify beginning or ending capital assets of land, minerals or timber and does not reflect any transactions with respect to those assets during the audit period." Rice Affidavit at 16, ¶ 20.

The GAO report listed multiple categories of payments and indicated among other things the "[e]xpenses, care and sale of timber," e.g., Doc. 112-6 at 31, 42, 43, 48, 51, and the "[p]roceeds from the sale of lands, etc.," id. at 35; e.g., Doc. 112-7 at 44-49, as well as certain interest thereon. E.g., id. at 41-42. As the Nations have asserted, however, the "[d]isclosure of revenues . . . [in GAO's report was] limited to warrant numbers," Doc. 91 at 27, ¶ 71, dates and amounts.[77]

That "[t]he federal government has substantial trust responsibilities toward [the Nations] . . . is undeniable. Such duties are grounded in the very nature of the government -Indian relationship." Cobell v. Norton, 240 F.3d 1081, 1086 (D.C. Cir. 2001)("Cobell VI"). The United States, however, "assumes [its] Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." United States v. Jicarilla Apache Nation, 131 S. Ct. 2313, 2325 (2011) (footnote omitted); e.g., United States v. Navajo Nation, 556 U.S. 287, 302 (2009).

To this end, the Nations have sought an accounting for the defendants' compliance with their trust duties imposed by the 1906 Act and have contended the trust-creating statutes are, and their right to an accounting for the pre-1946 period arises under, the American Indian Trust Fund Management Reform Act of 1994 ("1994 Reform Act"), 25 U.S.C. § 4001 et seq.,[78] and title 25, section 162a of the United States Code, which "define

---

[77]As Rice has stated, inter alia this "report does not identify [exactly] what was sold, when the sale occurred, to whom the property was sold, the price received, date of payments or the evidence to back the transactions." Id. at 14, ¶ 18.

[78]"Beginning in 1988, Congress held oversight hearings on [DOI's] . . . management of the Indian trust accounts. These hearings led to a report, Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. Rep. No. 102–499 (1992), which harshly criticized [DOI's] . . . mishandling of the trust accounts. Consistent with prior analyses, the report found, 'significant, habitual problems in [BIA's] ability to fully and accurately account for trust fund

'the trust responsibilities of the United States' with respect to tribal funds." Jicarilla Apache Nation, 131 S. Ct. at 2325 (quotation omitted).

The 1994 Reform Act not only "recognized the federal government's preexisting trust responsibilities," Cobell VI, 240 F.3d at 1090 (footnote omitted), and "fiduciary duty to perform a complete and historical accounting of trust fund assets," id. at 1102, but also "identified some of [DOI's] . . . duties to ensure 'proper discharge of the trust responsibilities of the United States.'" Id. (quoting 25 U.S.C. § 162a(d))(emphasis deleted),

> Its purpose
>
> is to allow tribes an opportunity to manage tribal funds currently held in trust by the United States . . . , that, consistent with the trust responsibility of the United States and the principles of self-determination, will–
>
> (1) give Indian tribal governments greater control over the management of such trust funds; or
>
> (2) otherwise demonstrate how the principles of self-determination can work with respect to the management of such trust funds, in a manner consistent with the trust responsibility of the United States.

25 U.S.C. § 4021.

The 1994 Reform Act requires DOI to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe . . . which are deposited or invested pursuant to section 162a . . . ." 25 U.S.C. § 4011. It further demands that the Secretary

---

moneys, to properly discharge its fiduciary responsibilities, and to prudently manage the trust funds.'" Cobell VI, 240 F.3d at 1090 (quoting H.R. Report No. 102-499 at 2).

The report, prepared by the House of Representatives Committee on Government Operations and submitted on April 22, 1992, recognized that "[t]he most fundamental fiduciary responsibility of the government . . . is the duty to make a full accounting of the property and funds held in trust . . . ," H.R. Report No. 102-499 at 7, and "[t]he [g]overnment's obligation to account for Indian trust funds requires it to 'affirmatively establish that it [has] properly discharged its trust.'" Id. (footnote omitted).

transmit to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate . . . a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995,

id. § 4044, and include in that report,

(1) a description of the Secretary's methodology in reconciling trust fund accounts;

(2) attestations by each account holder that–

(A) the Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary; or

(B) the account holder disputes the balance of the account holder's account as reconciled by the Secretary and statement explaining why the account holder disputes the Secretary's reconciled balance; and

(3) a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute.

Id.

"[T]o inform . . . [the Court's] interpretation of [these] statutes and to determine the scope of liability that Congress has imposed," Jicarilla Apache Nation, 131 S. Ct. 2325 (citation omitted), the Court may look to common law, e.g., United States v. White Mountain Apache Tribe, 537 U.S. 465, 475-76 (2003); but common law trust principles "are relevant only when applied to a 'specific, applicable, trust-creating statute or regulation.'" Jicarilla Apache Nation, 131 S. Ct. at 2329 (citation omitted); e.g., Cobell v. Norton, 392 F.3d 461, 472 (D.C. Cir. 2004)("Cobell XIII")(once statutory obligation is identified, court may look to common law trust principles to particularize obligation). Therefore, while section 162a(d) "delineates 'trust responsibilities of the United States' that . . . [DOI] must

discharge," Jicarilla Apache Nation, 131 S. Ct. at 2329, including trust responsibilities "not limited to," 25 U.S.C. § 162a(d), those duties enumerated, "Congress [did not] intend[ ] . . . to include a general common-law duty to disclose all information related to the administration of Indian trusts." Jicarilla Apache Nation, 131 S.C. at 2930.

On the other hand, Congress did intend that "the Secretary . . . provide[ ] . . .as full and complete accounting as possible . . . to the earliest possible date," 25 U.S.C. § 4044(2)(A), and these statutes "'necessarily require a full disclosure and description of each item of property constituting the corpus of the trust at its inception.'" Cobell VI, 240 F.3d at 1103 (quotation and further citation omitted). They also demand that the United States' accounting "'contain sufficient information for the [the Nations, as] beneficiar[ies] [to] readily . . . ascertain whether the trust has been faithfully carried out.'" Id. (quotation omitted).[79]

As the Nations have argued, this duty to account encompasses trust assets, including non-monetary assets. E.g., Cobell v. Norton, 283 F. Supp.2d 66, 176-77 (D.D.C. 2003)("Cobell X"), partially vacated on other grounds, 392 F.3d 461 (D.C. Cir. 2004) (allotted lands themselves are the "trust corpus" or "trust assets" or "trust property" held in trust by United States and are indispensable element of trust);[80] Otoe-Missouria Tribe

---

[79]E.g., Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555, 1563 (10th Cir. 1984) (Seymour, J., concurring in part and dissenting in part)(DOI's actions must not merely meet minimal requirements of administrative law, but also pass scrutiny under more stringent standards demanded of fiduciary). See Cobell VI, 240 F.3d at 1099; Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1348 (Fed. Cir. 2004)(because of treaty and statutory obligations to tribal nations, United States must be held to "most exacting fiduciary standards" in its relationship with Indian beneficiaries).

[80]The court in Cobell X relied in part on the United State Supreme Court's decision in United States v. Mitchell, 463 U.S. 206 (1983)("Mitchell II"). See Cobell X, 283 F. Supp.2d at 176 n.58. In Mitchell II, the Supreme Court noted that

of Oklahoma v. Kempthorne, 2008 WL 5205191 *5 (W.D. Okla. 2008)(regardless of whether duty to account for non-monetary trust assets arises from statute or common law, it does exist), abrogated on other grounds, Gilmore v. Weatherford, 694 F.3d 1160 (10th Cir. 2012); Blackfeet and Gros Ventre Tribes of Indians v. United States, 32 Ind. Cl. Comm. 65, 76 (1973)(ICC No. 279-C)(holding that federal government is accountable for trust assets other than money, such as grazing lands, timber resources, oil and gas and riprap).

Having made these findings, the Court must now consider the defendants' arguments regarding sovereign immunity and applicable statutes of limitations. In this connection, the defendants have argued that "[t]he limited waiver of sovereign immunity that allowed [the Nations] . . . to bring their Phase I claims expired decades ago," Doc. 103-1 at 10, and this Court therefore lacks jurisdiction over the Nations' claims that predate August 13, 1946. E.g., Robbins v. United States Bureau of Land Management, 438 F.3d 1074, 1080 (10th Cir. 2006)(sovereign immunity defense is jurisdictional in nature).

It is well-established that the United States is immune from suit, and may be sued only if, and to the extent, it consents. E.g., United States v. Sherwood, 312 U.S. 584, 586 (1941). Any "waiver of sovereign immunity must be strictly construed in favor of the sovereign and may not be extended beyond the explicit language of the statute." Fostvedt v. United States, 978 F.2d 1201, 1202 (10th Cir. 1992)(citation omitted); e.g., United States

---

a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds).

463 U.S. at 225.

v. Idaho ex rel. Director, Idaho Department of Water Resources, 508 U.S. 1, 6 (1993)

(waivers of sovereign immunity must be "unequivocally expressed" in statutory text).[81]

The general jurisdictional statutes cited by the Nations, 28 U.S.C. §§ 1331 and

1362,[82] see Doc. 91 at 5, ¶ 14, do not waive sovereign immunity. E.g., Muscogee (Creek)

Nation v. Oklahoma Tax Commission, 611 F.3d 1222, 1228 n.2 (10th Cir. 2010)(while

section 1331 grants federal court jurisdiction over civil actions arising under Constitution,

laws or treaties of the United States, it does not independently waive sovereign immunity);

Paiute-Shoshone Indians of Bishop Community v. City of Los Angeles, 637 F.3d 993, 999-

1000 (9th Cir. 2011)(section 1362 grants jurisdiction to adjudicate civil actions by Indian

tribes where matter in controversy arises under Constitution, laws or treaties of the United

States, but provides no waiver of sovereign immunity).

On the other hand, the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et

seq.–in particular, section 702[83] of the APA,[84] also cited by the Nations, see Doc. 91 at 5,

---

[81]The Indian canon of construction–"statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985)(citations omitted), does not dictate that waivers of sovereign immunity must be broadly construed. Cf. DeCoteau v. District County Court for Tenth Judicial District, 420 U.S. 425, 447 (1975)(canon of construction not a license to disregard clear expression of congressional intent).

[82]The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, also cited by the Nations, "is not an independent source of federal jurisdiction," Schilling v. Rogers, 363 U.S. 666, 677 (1960)(citation omitted), nor a waiver of sovereign immunity. E.g., Muirhead v. Mecham, 427 F.3d 14, 18 n.1 (1st Cir. 2005); Neighbors for Rational Development, Inc. v. Norton, 379 F.3d 956, 961 (10th Cir. 2004).

[83]Section 702 provides, in part that

[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as

¶ 14—operates as a waiver of sovereign immunity, e.g., Cobell VI, 240 F.3d at 1094, and

in an attempt to circumvent the waiver of immunity provided by section 702, the defendants

have relied upon the second proviso to that statute, which reads:

> [n]othing herein (1) affects other limitations on judicial review or the power
> or duty of the court to dismiss any action or deny relief on any other
> appropriate legal or equitable ground; or (2) confers authority to grant relief
> if any other statute that grants consent to suit expressly or impliedly forbids
> the relief which is sought.

5 U.S.C. § 702.

As the United States Court of Appeals for the Tenth Circuit has stated, the waiver

of sovereign immunity found in section 702 of the APA must be read "in conjunction with

other jurisdictional statutes waiving sovereign immunity in order to determine whether those

statutes forbid the relief sought in the case at hand." Rural Water Sewer and Solid Waste

Management v. City of Guthrie, 654 F.3d 1058, 1070 (quoting Robbins v. United States

Bureau of Land Management, 438 F.3d 1074, 1080 (10th Cir. 2006)(internal quotation

marks omitted)). And in this connection, the defendants have argued that the Nations'

Phase I claims are barred by two different statutes: the 1924 Act and the ICCA.

The 1924 Act, described as "a special jurisdictional act," Doc. 103-1 at 26, that the

defendants have contended bars the Nations' claims that predate 1924, conferred (as such

language has been previously set forth herein)

---

a defendant in any such action, and a judgment or decree may be entered against
the United States.

5 U.S.C. § 702.

[84]E.g., City of Albuquerque v. United State Department of Interior, 379 F.3d 901, 906 (10th
Cir. 2004)(section 702 does not confer subject matter jurisdiction).

jurisdiction . . . upon the Court of Claims, notwithstanding the lapse of time or statutes of limitation, to hear, examine, and adjudicate and render judgment in any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Choctaw and Chickasaw Indian Nations or Tribes, or either of them, or arising under or growing out of any Act of Congress in relation to Indian affairs which said Choctaw and Chickasaw Nations or Tribes may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States.

1924 Act, § 1, 43 Stat. at 537.

The 1924 Act further provided in Section 2, as stated, that

[a]ny and all claims against the United States within the purview of [this legislation] . . . shall be forever barred unless suit be instituted or petition filed . . . in the Court of Claims within five years from the date of [its enactment] . . . .

Id. § 2, 43 Stat. at 537.

The Nations have argued that whether the 1924 Act now operates to bar the Nations' Phase I claims, depends upon whether Section 2 applied to claims that had accrued, and thus, is a statute of limitations, or whether Section 2 applied to all claims,

regardless of accrual date, and is therefore a statute of repose.[85]  As the Nations have

suggested, the Court finds the 1924 Act was intended to be a statute of limitations.

"Statutes of limitations are enacted because,

'in the judgment of most legislatures and courts, there comes a point at
which the delay of a plaintiff in asserting a claim is sufficiently likely either to
impair the accuracy of the fact-finding process or to upset settled
expectations that a substantive claim will be barred without respect to
whether it is meritorious.'"

United States v. Thompson, 941 F.2d 1074, 1079 (10th Cir. 1991)(quotation omitted).

The five-year limitations period in the 1924 Act was extended by the Act of August

16, 1937, 50 Stat. 650, and as case law instructs, Congress, in doing so, removed the

jurisdictional barrier of the 1924 Act to permit a final resolution of these unresolved accrued

disputes.  See Seminole Nation v. United States, 316 U.S. 286, 289 n.2 (1942).

The ICCA, as the defendants have described as an "exceptionally broad," Doc. 103-

1 at 28, grant of jurisdiction and waiver of sovereign immunity, "encompassed claims not

otherwise cognizable in federal courts, including all legal, equitable, and moral claims." Id.

---

[85]"A statute of repose is similar to an ordinary statute of limitations in that both types of
provisions 'function as filing deadlines.'"  National Credit Union Administration Board v. Nomura
Home Equity Loan, Inc., 727 F.3d 1246, 1255 (10th Cir. 2013)(quoting Iacono v. Office of Personnel
Management, 974 F.2d 1326, 1328 (Fed. Cir.1992)).  "A statute of repose typically bars the right
to bring an action after the lapse of a specified period, unrelated to the time when the claim
accrued.  The bar instead is tied to an independent event . . . . A statute of limitations generally
bars the bringing of an action after the passage of a given period of time following the accrual of
the claim."  Alexander v. Beech Aircraft Corp., 952 F.2d 1215, 1218 n.2 (10th Cir. 1991)(citations
omitted).
Thus, "'[t]he distinguishing feature between the two is the time at which the respective
periods commence. . . .  Unlike an ordinary statute of limitations, which begins running upon
accrual of the claim, the period specified in a statute of repose begins when a specific event
occurs, regardless of whether a cause of action has accrued or whether any injury has resulted.'"
National Credit Union, 727 F.3d at 1255 n.11 (quotation omitted).

It expired on August 13, 1951.[86] E.g., 25 U.S.C. § 70k (ICC "shall receive claims for a period of five years . . . and no claim existing before such date but not presented within such period may thereafter be submitted").

The Nations have likewise argued that whether the ICCA now operates to render untimely the Nations' Phase I claims depends upon whether section 70k applied to claims that had accrued, and thus, is a statute of limitations, or whether that statutory section applied to all claims, as the defendants have argued, regardless of accrual date, and is therefore a statute of repose. As the Nations have argued, the Court again finds that the ICCA, which speaks to a "claim existing," 25 U.S.C. § 70k, applies only to "accrued claims," e.g., Round Valley Indian Tribe v. United States, 97 Fed. Cl. 500, 520 (Fed. Cl. 2011)(ICCA does not bar claims that accrued after August 13, 1946), and is therefore a statute of limitations. See United States Indian Claims Commission Final Report (August 13, 1946-September 30, 1978) at 21 (ICC "was unique among courts in its jurisdiction over 'moral claims' and having no statute of limitations except the requirement that the claims must have accrued prior to 1946").

Because both the 1924 Act and the ICCA operate as statutes of limitations, the Court for purposes of the defendants' arguments regarding statutes of limitations must determine the accrual date of the Nations' claims. In this connection, the Court has considered the decision in Otoe-Missouria Tribe of Oklahoma v. Kempthorne, 2008 WL

---

[86]See Oglala Sioux Tribe of the Pine Ridge Indian Reservation, 570 F.3d at 331 (citations omitted)(Congress deliberately used broad terminology to permit tribes to bring all potential historical claims and thereby prevent them from returning to Congress to lobby for further redress); id. (citations omitted)(to balance this permissiveness and ensure finality, ICCA established 5-year limitation on all claims existing before 1946; any claim not presented within 5-year period may not be submitted to any court or administrative agency).

5205191 (W.D. Okla. 2008), abrogated on other grounds, Gilmore v. Weatherford, 694 F.3d 1160 (10th Cir. 2012), wherein the Honorable Robin J. Cauthron rejected the United States' argument that the ICCA in that case was both an "exclusive jurisdictional grant and time-based jurisdictional bar," Doc. 103-1 at 30, after "find[ing] that Congress [had] deferred accrual of the statute of limitations including any limitation arising from the ICCA by passage of . . . various Tribal Trust Accounting Statutes." 2008 WL 5205191 *4. Judge Cauthron determined that "[t]he plain language of the [ICCA] . . . clearly expresse[d] an intent to suspend all statutes of limitations until an accounting ha[d] been provided," id. *5, and because the Otoe-Missouria Tribe of Oklahoma had asserted that "it ha[d] never received an accounting, its claims ha[d] not yet accrued," id.; thus, such claims "[were] not barred by the ICCA." Id.

The "Tribal Trust Accounting Statutes," to which Judge Cauthron referred, and which are a series of DOI appropriations acts, provide in pertinent part:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds,[87] until the affected tribe . . . has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

123 Stat. 2904, 2922 (2009).[88]

---

[87]As the Court has determined herein, the term "trust funds" includes "trust assets." See Black's Law Dictionary at 1520 (7th ed. 1999)("trust fund" defined as "property held in a trust by a trustee").

[88]The phrase "the statute of limitations shall not commence to run on any claim" is found in the Act of November 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915, 1930, and has been included in each subsequent appropriations act. See Doc. 152 at 9, n.3. The phrase "including any claim in litigation" was added in 1993 and repeated thereafter. See H.R. Rep. No. 103-138, 107 Stat. 1379, 1391; Pub. L. No. 108-108, 117 Stat. 1241, 1263 (2003). See Felter v. Salazar, 679 F. Supp.2d 1, 4 (D.D.C. 2010)(appropriations acts serve to stop statute of limitations period from

As the Nations have argued, the phrase "notwithstanding any other provision of law" has suspended any previous statutes of limitations and the phrase "the statute of limitations shall not commence to run . . . until," id., defines the act that triggers the accrual of the Nations' claims:  the provision of "an accounting . . . from which the [Nations, as] beneficiar[ies] can determine whether there has been a loss."  Id.; e.g., Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1347 (Fed. Cir. 2004)("Shoshone II")(claims falling within ambit of appropriations acts shall not accrue until claimant is provided meaningful accounting)(footnote omitted).  Moreover, to the extent any claims had already expired, case law holds that these appropriations acts revive the same. E.g., Felter v. Salazar, 679 F. Supp. 2d 1, 6-8 (D.D.C. 2010)(legislative history reaffirms conclusion that appropriations acts revive stale claims).  Cf. Shoshone II, 364 F.3d at 1346 (statutes that toll statutes of limitations, resurrect untimely claims, defer accrual of causes of action are considered waivers of sovereign immunity).

In light of the Nations' well-pleaded allegations for purposes of Rule 12(b)(6) regarding the defendants' exercise of "total control over the Nations, their governments, their property, their funds and their claims," Doc. 91 at 19, ¶ 50; e.g., id. at 4, ¶ 13 ("United States has pervasively managed and controlled many of [Nations'] . . . affairs, properties and funds"), "render[ing] the Nations legally defenseless and incapable of protecting their interests," Doc. 119 at 12,[89] and regarding their failure to receive "an accounting from

---

beginning to run on claims involving losses or mismanagement of Indian trust funds until accounting has been provided).

[89]The Nations have contended that in 1906, DOI "orchestrated the illegal takeover of the Nations' governments in . . . violation of Congressional mandate requiring the continuation of the Nations' constitutional governments 'in full force and effect for all purposes authorized by law,'" Doc. 119-1 at 11 (quoting 1906 Act, § 28, 34 Stat. 137), and that "[t]his illegal takeover rendered

which 'the [Nations could] . . . determine whether there has been a loss,'" Doc. 91 at 35, ¶ 107 (citation omitted), coupled with that case law that addresses the effect of these appropriations acts, the Court finds that the Nations' claims have not yet accrued for purposes of the 1924 Act or the ICCA.

In further support of their arguments that the Nations' claims are untimely, the defendants have also asserted that the Nations' Phase I trust mismanagement claims that relate to the legality of federal government's sale of over 1,000,000 acres of timber lands are barred by title 28, section 2401(a) of the United States Code, which provides in relevant part that

> every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

28 U.S.C. § 2401(a). "'Unlike an ordinary statute of limitations, [section] 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity, and as such must be strictly construed.'" Urabazo v. United States, 947 F.2d 955, 1991 WL 213406 *2 (10th Cir. 1991)(quoting Spannaus v. United States Department of Justice, 824 F.2d 52, 55 (D.C. Cir.1987))(cited pursuant to Tenth Cir. R. 32.1).

---

the Nations legally defenseless and incapable of protecting their interests," id., until the Nations' governments, as they have conceded, "were finally restored in 1983." Id. See Doc. 169-1 at 46, ¶ 65.

Generally, as the defendants have argued, a statute of limitations begins to run when a plaintiff's disability is removed. E.g., McDonald v. Hovey, 110 U.S. 619, 630 (1884). However, as the Nations' well-pleaded allegations and the record herein further establish, the United States' possession of the Nations' records coupled with the lack of a meaningful accounting of the management and disposition of the Nations' assets even after 1983 at the least hindered the Nations' ability, and at the most relieved the Nations from their obligation, to commence and prosecute this lawsuit at an earlier date.

This six-year limitations period "begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of [its] . . . action." Industrial Constructors Corporation v. U.S. Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir. 1994)(citations omitted). While "[a] plaintiff need not know the full extent of . . . [its] injuries before the statute of limitations begins to run," id. (citation omitted), a plaintiff is considered to "ha[ve] reason to know of . . . [its] injury when . . . [it] should have discovered [the injury] . . . through the exercise of reasonable diligence." Id. (citation omitted).

As to the plaintiffs' claim that the 1906 Act imposed a duty on the United States to retain the timber lands in trust for the Nations and that the United States by selling, transferring or purchasing the timber lands breached that duty, e.g., Doc. 91 at 40-41, ¶¶ 129-131, the defendants have argued that "it is impossible to conclude that [the Nations] . . . were unaware of the United States' sale of a significant portion of those lands long before 1990." Doc. 103-1 at 40 (citation omitted). The defendants have again relied on the publication of regulations and advertisements relating to transactions between 1907 and 1946 as well as on the Annual Reports that, in the defendants' opinion, fully detailed the status of the allotments and the sale of the unallotted lands,[90] identified the tracts and timber lands to be sold, totaled the acreage and listed the sale prices and the amounts collected. See Doc. 148-1, Exhibits 1-33. The defendants have further relied upon those cases that were filed by the Nations in the Court of Claims and before the ICC that sought

---

[90]As the Nations' documents have established, representatives of the Choctaw and Chickasaw Nations had notice of, and attended, sales of various tracts and challenged the bids thereon. See, e.g., Doc. 164-1 (wherein tribal representatives identified by tract that property "not receiving any bid, and all tracts not receiving a bid commensurate with the actual value thereof").

accountings and, in response to which, the United States through GAO supplied lengthy reports.[91]

Based upon these documents alone, it might appear that the Nations knew or should have known that the United States had sold their timber lands long before the date this lawsuit was filed and that the Nations should have been therefore "capable enough to seek advice, launch an inquiry, and discover . . . the facts underlying their current claim[s]." Menominee Tribe of Indians v. United States, 726 F.2d 718, 721 (Fed. Cir. 1984). And at the conclusion of this litigation, the record may well demonstrate that all the facts were sufficiently then available to the Nations to render the present claim that the United States violated a "duty to retain" these timber lands untimely. However, in light of the Court's findings with regard to the federal government's interference with the Nations' governments together with the Court's findings with regard to the 1994 Reform Act and the less than "meaningful accounting," Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States, 69 Fed. Cl. 639, 664 (Fed. Cl. 2006), heretofore provided the Nations, as opposed to "simple notice," id., the Court finds at this stage of the litigation that section 2401 does not bar this claim.

The defendants have also challenged the timeliness of the Nations' claim in the third amended complaint that "[b]eginning in 1902 the United States assumed a trusteeship over

---

[91]But see Rice Affidavit at 17-19, ¶¶ 21-23. Rice has opined that none of the three GAO reports, which identify only aggregate revenues received, individually or collectively, "meet requirements for adequate trust accounting for the management and/or sale of the Nations' lands, minerals or timber trust fund assets . . . ." Id. at 17, ¶ 21. She has asserted that these reports inter alia not only fail to provide a statement of the initial trust assets (number of acres of each type of land, either allotted or reserved), e.g., id. ¶ 21(A), but also fail to identify the amount of land remaining after allotment or reserved. E.g., id. Rice has also stated that GAO's reports inter alia do not identify (other than with limited exception) the sale or lease transactions of the mineral and timber lands or the terms, dates or details of such transactions. E.g., id. at 17-18, ¶ 21(B)-(E).

all of the [Nations'] assets . . . , including the lands, buildings, farms, furnishings, records, roads, bridges, [and] natural resources . . . ," Doc. 91 at 41, ¶ 133, and that "the United States[, acting as trustee,] has never accounted to the Nations for its management and/or disposal of these assets as required by law." Id.

First, to the extent, the defendants have argued that the DOI appropriations acts do not apply to these claims, the Court disagrees.[92] As stated herein, the term "trust funds," for purposes of the Nations' claims and these appropriations acts,[93] includes both monies and assets. See Doc. 130-3.[94] See also Declaration of Ross O. Swimmer (August 10, 2007)(hereafter "Swimmer Declaration").[95]

_____

[92]But see Shoshone Indian Tribe of the Wind River Reservation v. United States, 672 F.3d 1021 (Fed. Cir. 2012)("Shoshone IX"); Shoshone II, 364 F.3d at 1350 (appropriation acts applies only to "funds," not "assets," refusing to extend acts to accounting claims beyond those claims for mismanagement of monies).

[93]To the extent, as the defendants have also argued, these acts are ambiguous, the Indian canon of construction would require that the acts' language be interpreted and construed in favor of the Nations. E.g., Blackfeet Tribe of Indians, 471 U.S. at 766 (statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit).

[94]In a report dated September 22, 1994, and submitted to the House of Representatives Committee on Government Operations Subcommittee on Environment, Energy and Natural Resources, GAO's Accounting and Information Management Division "identif[ied] options for improving Indian trust fund management," Doc. 130-3 at 4, which included "ways to address related problems in . . . natural resource assets." Id. GAO determined that DOI's "Indian trust fund management problems . . . include[d] . . . inadequate management of natural resource assets to ensure that all earned revenues [were] . . . collected[.]" Id.; e.g., id. at 5-6 (recognizing that DOI as trustee for the tribes is responsible for managing natural resource assets, funds, and investments to maximize benefits to trust holders); id. at 8 (advising that DOI has numerous, long-standing trust fund financial management problems, including BIA's inadequate management of Indian land and resources); id. at 9 (stating that BIA among others had not adequately managed Indian natural resource assets (deemed vital to Indian economic development) to ensure maximum revenue was generated to tribal trust beneficiaries).

[95]In his declaration, which was submitted on behalf of DOI in tribal trust accounting and trust mismanagement litigation pending in the United States District Court for the District of Columbia, see Doc. 152-1, Swimmer, then DOI Special Trustee for American Indians, stated inter alia that DOI "intend[ed] to prepare an accounting plan and accompanying record that fully articulates its

Second, to the extent the defendants have again relied on the allegedly detailed GAO reports, Annual Reports or published regulations and/or advertisements regarding DOI's management and disposal of assets and have argued that the same would have not only alerted the Nations (whose tribal officials were then laboring under a conflict and/or had been rendered powerless) to the United States' conduct, but also given the Nations sufficient notice of the basis of their claims and the cause of any injuries resulting therefrom, the Court finds for the same reasons that prevent resolution at this stage of the litigation of whether the Nations' timber land claims are time-barred apply to the Nations' claims of mismanagement and wrongful disposal of assets and their claim, if any, that the United States breached the Treaty of 1852, 10 Stat. 974, Art. 8, because it failed to provide "[r]egular semiannual accounts of receipts and disbursements," Doc. 91 at 8, ¶ 23, to the Chickasaw Nation from 1906 to 1946.

The Court has next considered the defendants' challenge to, and request for dismissal of, the Nations' claims of mismanagement involving the Nations' coal and asphalt lands. In the third amended complaint, the Nations have alleged

(1) that 445,052.23 acres of coal and asphalt land were excepted from allotment, and the bulk of the surface was sold to third parties, reserving the minerals to the Nations, see Doc. 91 at 31, ¶ 92;

(2) that a United States Geological Survey Report in 1903 "valued the coal resources of the Nations in excess of $160,000,000.00," id.;

---

understanding and interpretations of its various tribal accounting duties under law," Swimmer Declaration at 14, ¶ 22, and recognized that "[a]s part of its tribal accounting plan, [DOI] . . . will review and address the tribes' non-monetary trust asset accounting claims." Id. at 17, ¶ 26; e.g., id. (DOI "needs to determine the level of land-based or non-monetary asset accountings owed").

(3) that the Nations' "coal and asphalt resources were exploited under a variety of permits and leases, and some production was involuntary," id. ¶ 93; and

(4) that the United States as trustee "received vast amounts of money for coal and asphalt production from the Nations' lands." Id. ¶ 94.[96]

The Nations have further asserted that in 1948, the United States purchased from the Nations the coal and asphalt lands and mineral deposits that had been reserved from allotment for the sum of $8,500,000.00, see id. at 32, ¶ 95, but that the United States, as trustee charged with the management of these lands and minerals, never reported to the Nations the funds actually received for coal and asphalt production or accounted for the value of the assets acquired by the United States.

The United States' purchase in 1948 was authorized by a joint resolution dated June 24, 1948, that provided for Congressional ratification of a contract entered into on October 8, 1947, pursuant to the provisions of the Act of June 28, 1944, 58 Stat. 483, between the Secretary and Principal Chief Durant and Governor Maytubby on behalf of the Nations. See Pub. L. 80-754 (S.J. Res. 203). The joint resolution read in part:

> Subject to the approval of this contract by a vote of the living enrolled eligible voters of the . . . Nations, and its ratification by . . . Congress . . . , the United States agrees to pay to the . . . Nations, and the . . . Nations agree to accept, the sum of $8,500,000 in full payment for all of their right, title, and interest in the lands and mineral deposits reserved from allotment . . . and in full and final settlement of any and all claims for damages against the United States for any failure on the part of the United States . . . to sell such properties . . . or for any other failure alleged to have occurred in connection with the sale, lease, and administration of such properties by the United States . . . .

[96]The Nations have alleged that in 1900 and 1901, the United States reported that it had received $199,663.55 from coal and asphalt royalties from the Nations' coal assets, see Doc. 91 at 31-32, ¶ 94, and that later reports and records indicate that the royalties received for coal and asphalt ranged from approximately $150,000.00 to $250,000.00 per year. See id. at 32, ¶ 94.

62 Stat. 596, ¶ 1.

Based upon the expressed intent of the parties that the payment shall be the "full and final settlement of any and all claims for damages," id., and the Nations' express agreement to "releas[e] all claims for damages against the United States for the failure of the United States . . . to sell such properties in accordance with the terms and provisions of . . . [the 1902] Supplemental Agreement . . . , or for any other failure alleged to have occurred in connection with the sale, lease, and administration of [the Nations'] . . . properties," id. ¶ 3, the Court finds any pre-1946 claims of mismanagement relating to the Nations' coal and asphalt lands seeking money damages as that term is used in the law are not now actionable. However, because the Nations have contended that they seek only an accounting and potentially reimbursement for the United States' alleged mismanagement such claims,[97] the Court finds at this stage of the proceedings such claims are actionable, despite the monetary aspect of the requested relief. See Bowen v. Massachusetts, 487 U.S. 879, 893-94 (1988).

Relying on the United States Supreme Court's comment that "[t]he principles advanced by the res judicata doctrine 'are at their zenith in cases concerning real property, land, and water,'" Doc. 170-1 at 40, ¶ 104 (quoting Nevada v. United States, 463 U.S. 110, 129 n.10 (1983) (citations omitted)), the defendants, assuming this Court has jurisdiction over the Nations' Phase I claims, have argued in the alternative that the Nations are barred from relitigating their pre-1946 trust accounting claims because these claims are based on

---

[97]The Joint Resolution provided in part that "the purchase price when appropriated shall be allocated three-fourths (3/4) to the Choctaw Nation and one-fourth (1/4) to the Chickasaw Nation . . . . 62 Stat. 596, ¶ 4.

matters and issues that the Nations raised, or could have raised, in the twenty-three (23)

cases that were brought in the Court of Claims and before the ICC. Relying primarily on

Choctaw Nation v. United States, 91 Ct. Cl. 320 (1940)(No. K-260), Choctaw Nation v.

United States, 38 Ind. Cl. Comm. 441 (1976)(ICC No. 249), and Chickasaw Nation v.

United States, 103 Ct. Cl. 1 (1945)(No. K-544),[98] the defendants have contended that the

claims asserted by the Choctaw Nation that predate 1946 and the claims asserted by the

Chickasaw Nation that predate 1929 are barred by the doctrine of res judicata,[99] or "claim

---

[98] In particular, the defendants have relied on Judge Littleton's comment in Choctaw Nation v. United States, 91 Ct. Cl. 320, 1940 WL 3998 (1940)(No. K-260), that his findings were "based upon full and complete accounting reports made and filed by the [United States] . . . ," id. at ___, 1940 WL 3998 *1 (describing 888-page GAO report containing over 200 pages accounting for certain disbursements made prior to June 30, 1929), to argue that that case resolved both the Choctaw Nation's pre-1929 accounting claims and those issues relating to the transactions addressed in those accounting reports, including any claims relating (a) to the sums of $5,595,785.32 in principal and $720,190.98 in interest received through the "sale of timber lands," (b) the defendants' disposal of properties for which the Choctaw Nation has now sought an additional accounting and (c) the defendants' disbursement of the Choctaw Nation's funds. See Doc. 103-1 at 48-49 & nn.71, 72, 73.

The defendants have further argued that the remainder of the Choctaw Nation's pre-1946 accounting claims are barred by the resolution of the ICC action, Choctaw Nation v. United States, 38 Ind. Cl. Comm. 441 (1976)(ICC No. 249), wherein GAO provided the Choctaw Nation with an accounting of matters dating from July 1, 1929, to June 30, 1951, and as a result of which, the Choctaw Nation in 1976 stipulated to the entry of a final judgment in the amount of $250,000.00 that resolved its remaining pre-1946 accounting claims. See id. The Stipulation for Entry of Final Judgment, which the ICC adopted, provided that the entry of this judgment operated to "finally dispose of all rights, claims or demands which were asserted or could have been asserted." Id. at 451, ¶ 2.

As to the Chickasaw Nation, the defendants have contended that it is likewise barred from relitigating any pre-1929 claims that are related to, or that might have been raised in relation with, Chickasaw Nation v. United States, 103 Ct. Cl. 1, 1945 WL 4025 (1945)(No. K-544), wherein GAO provided the 487-page Supplemental Report. The Court of Claims found in that action that a "thorough investigation ha[d] been made in matters of accounting," 103 Ct Cl. at ___, 1945 WL 4025 *32, and that, based upon that accounting, the Chickasaw Nation was "entitled to recover" $22,858.78, minus gratuities. E.g., id. at 44, rev'd 326 U.S. 217 (application of offsetting gratuities).

[99] In their motion, the defendants further asserted that the Nations' "claims may also be barred by the doctrine of collateral estoppel," Doc. 103-1 at 51, n.67, but advised that its "collateral estoppel arguments are subsumed by its res judicata arguments." Id.

preclusion." This doctrine "provides that when a final judgment has been entered on the merits of a case, '[i]t is a finality as to the claim or demand in controversy,' concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" Nevada, 463 U.S. at 129-30 (quoting Cromwell v. County of Sac, 94 U.S. 351, 352 (1876)); Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981)(doctrine provides that final judgment on merits precludes parties or their privies from relitigating issues that were or could have been raised in that action).

Its purpose "'is to secure the peace and repose of society by the settlement of matters capable of judicial determination,'" Nevada, 463 U.S. at 129 (quoting Southern Pacific Railroad v. United States, 168 U.S. 1, 49 (1897))(footnote omitted), and it protects parties "from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-54 (1979)(footnote omitted); e.g., Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979)(doctrine protects litigants from burden of relitigating identical issue with same party).

In this circuit, "[r]es judicata is an affirmative defense on which the defendant[s] ha[ve] the burden to set forth facts sufficient to satisfy [the following three] . . . elements[,]" Nwosun v. General Mills Restaurants, Inc., 124 F.3d 1255, 1257 (10th Cir. 1997)(citing Rule 8(c), F.R.Civ.P.)(other citations omitted): "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." Pelt v. Utah, 539 F.3d 1271, 1281 (10th Cir. 2008)(quoting MACTEC

Inc. v. Gorelick, 427 F.3d 821, 831 (10th Cir. 2005)).  Tenth Circuit law further teaches that even in the event a defendant has met its burden of establishing these elements, res judicata is still not appropriate if the defendant cannot show that the plaintiff had a "full and fair opportunity" to litigate its claims in the prior lawsuit.  E.g., MACTEC, 427 F.3d at 83.

Because the Court finds genuine issues of material fact exist with regard to the second element–identity of parties–and with regard to whether the Nations had a full and fair opportunity to litigate any prior claims–two separate, but closely related requirements, e.g., Kinslow v. Ratzlaff, 158 F.3d 1104, 1107 n.4 (10th Cir. 1998),[100] the Court finds as set forth herein that judgment as a matter of law as the defendants have requested under Rule 56, supra, is not warranted at this stage of the litigation.[101]

In connection with these elements, the Nations have argued that because the prior actions were "brought by the United States' hand-picked delegates who were illegally appointed during a time period of 'bureaucratic imperialism,'" Doc. 119 at 55, the doctrine of res judicata cannot apply.  They have contended that those proceedings "were filed by illegitimate officials with no valid authority to act on behalf of the Nations," id. at 56

---

[100]"A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit,' so that applying preclusion principles in such cases "runs up against the deep-rooted historic tradition that everyone should have his own day in court.""  Pelt, 539 F.3d at 1281 (quoting Taylor v. Sturgell, 553 U.S. 880, 892-93 (2008)(quoting Richards v. Jefferson County, 517 U.S. 793, 798 (1996))).

"An exception to this rule exists when it can be said that there is 'privity' between a party to the second case and one who is bound by an earlier judgment."  Id. (citing Richards, 517 U.S. at 798); id. (quoting Lowell Staats Mining Co. v. Philadelphia Electric Co., 878 F.2d 1271, 1275 (10th Cir. 1989))("'[p]rivity requires, at a minimum, a substantial identity between the issues in controversy and showing the parties in the two actions are really and substantially in interest the same'").  The defendants have not relied upon this exception.

[101]Having determined that these issues are dispositive, the Court has not considered the defendants' arguments regarding the first and third elements of this affirmative defense.

(footnote omitted), and that the "interests of the illegally appointed tribal executives were [not] aligned with those of the Nations." Id. at 57.

In a somewhat different context, the United States Supreme Court has stated that "'[i]dentity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different; and parties nominally different may be, in legal effect, the same.'" Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402 (1940) (quoting Chicago, Rock Island & Pacific Railway Co. v. Schendel, 270 U.S. 611, 620 (1926)). The Court finds a similar analysis to be applicable in this instance and holds for purposes of the case-at-bar that "[t]he crucial point is whether or not in the earlier litigation the representative[s] of the [Nations] . . . had authority to represent [the Nations'] . . . interests in a final adjudication of the issue in controversy." Id. at 403 (citation omitted).

In making this determination, the Court has considered inter alia whether the alleged tribal attorneys appearing in the Court of Claims and before the ICC had the "'incentive to fully litigate the [Nations'] claim[s], . . . [or] whether effective litigation was limited by the nature or relationship [between these attorneys and the United States] . . . .'" Nwosun, 124 F.3d at 1257-58 (citation omitted).[102]

---

[102]See Doc. 164-2 (wherein Governor Johnston advised, despite objections by tribal representatives, that since DOI "has had much experience in selling land" he had no objection if DOI believed sales should be approved); Doc. 164-3 (wherein Principal Chief Harrison advised, despite objection by Choctaw Nation representative, "if in [DOI's] . . . opinion . . . the sale of these tracts should be approved," he would "not interpose any objections"); Doc. 169-1 at 85, ¶ 77. Cf. Harjo, F. Supp. at 1130 (evidence available at that time clearly reveals pattern of action on DOI's part designed to prevent any tribal resistance to DOI's methods of administering those Indian affairs delegated to it by Congress); id. at 1133 (by late 1909, DOI had made considerable progress in demoralizing Creek Nation government and had refused to permit elections to fill council vacancies; consistent with earlier and continuing BIA efforts to ensure that Creek government be subservient to and compliant with BIA wishes, this marked genesis of DOI's strategy of dealing with principal chief as though he was sole repository of Creek Nation governmental authority).

Under the instant record and despite the defendants' arguments that the United States' alleged "interference," Doc. 103-1 at 52, with, and exercise of "total control," id., over, the Nations are immaterial to the elements of their affirmative defense, the Court finds there is genuine dispute in connection with these two elements that requires further deliberation. Such dispute prevents resolution at this stage of whether the proponents of the proceedings in the Court of Claims and before the ICC and the Nations are really and substantially the same and if so, whether the Nations' interests through vigorous and competent representation were fully and fairly litigated.

The evidence suggests substantial controversy with regard to whether the interests of the Nations and their alleged representatives in the Court of Claims and before the ICC were aligned or whether the Nations' interests so differed from the interests of their attorneys, who, according to the Nations, inter alia "failed to object to facially inadequate [GAO] reports," Doc. 169-1 at 85, ¶ 77, that the Nations were deprived of the opportunity to fully and fairly present their claims. The evidence further suggests substantial controversy over whether these representatives, employed in the manner in which they

were, possessed in the first instance the authority[103] to prosecute[104] or settle[105] those

lawsuits on which the defendants have relied, in the Court of Claims and before the ICC.

---

[103]Cf. Pueblo of Santa Rosa v. Fall, 273 U.S. 315 (1927).

[104]The general council of the Choctaw Nation not only was charged with authorizing and empowering the Principal Chief to employ attorneys, but also tasked with delineating the terms of employment, see, e.g., Bill No. 7 ("An Act to Authorize the Principal Chief to Employment an Attorney for the Choctaw Nation in Citizenship Cases")(October 19, 1899), and with repealing such appointments and employment. See, e.g., Bill 48 ("An Act repealing an act employing and appointing S. Guerrier Special Agent and Attorney of the Choctaw Nation")(October 28, 1889).
The legislature of the Chickasaw Nation was likewise responsible for both authorizing and directing the Governor to enter into contracts with attorneys to prosecute claims on behalf of the Chickasaw Nation, see, e.g., An Act to Authorize a Certain Contract with Halbert E. Paine (February 14, 1890); An Act Making Appropriation for the Defense of the Chickasaw Citizenship Case, and for Other Purposes (December 14, 1898), and setting the rate of compensation. See, e.g., An Act to Authorize the Employment of Halbert E. Paine (February 7, 1896); An Act Authorizing and Directing Governor to Enter Into a Contract With Halbert E. Paine for General Services (April 5, 1889).
See also Doc. 119-10 at 2, ¶ (1)(a)(1953 Report: although "the Choctaw people [in 1934] authorized the creation of the Choctaw Advisory Council[,] . . . this provision was never followed after the demise of the then Chief Will Durant"); id. at 3, ¶ (2)(d)(conceding there was "no Choctaw Tribal Council at th[e] time," id. ¶ (2)(d), report continued that "[i]n 1948, under the newly elected Principal Chief, [Belvin,] the [practice of electing members of the] Choctaw Advisory council was discontinued. The Principal Chief selects such persons as he wishes for his advisory group. They have no relation to the communities of Indians, and there has not been much opportunity for the agency staff to work with this group as in customary with the other four tribes").

[105]In Choctaw Nation v. United States, 38 Ind. Cl. Comm. 441 (1976)(ICC No. 249), an offer of settlement was approved by a resolution dated June 30, 1975, drafted by Principal Chief Belvin and his advisory council, which read in part that the Principal Chief was the "only elected official of the Choctaw Nation," id. at 445, and that the advisory council was composed of elected presidents of county clubs. E.g., id. The settlement was thereafter approved and ratified by Principal Chief Gardner and his advisory council on February 14, 1976. E.g., id. at 445-46.
The United States accepted the offer subject to certain conditions, including "[t]hat the proposed settlement be approved by appropriate resolution of the governing body of the Choctaw Nation." Id. at 447. Despite this condition and the fact that the United States had recognized that the Choctaw Nation legislature had ceased to function, see Doc. 119-10 at 3 ("no Choctaw Tribal Council at this time"), and that the Principal Chiefs' advisory councils "ha[d] no relation to the communities of [the Choctaw Nation] Indians, Doc. 119-10 at 3, ¶ 2(d), and were not authorized under any Choctaw Nation constitution, the United States nevertheless approved the offer of settlement. E.g., 38 Ind. Cl. Comm. at 450.
Based in part on Principal Chief Gardner's testimony that "it was his opinion that the tribal members of the Choctaw Nation were generally aware of the proposed settlement," id. at 453, and that "[h]is [a]dvisory [c]ouncil was unanimous in its advice to him to approve and accept the settlement," id., the ICC approved the proposed compromise settlement. E.g., id. at 454.

71

Based upon the foregoing, the Court

(1) DENIES the defendants' Motion for Dismissal or, in the Alternative, for Summary Judgment [Doc. 103];

(2) DENIES as MOOT the defendants' Motion to Strike Certain Portions of Plaintiffs' Declaration [Doc. 125];[106] and

(3) GRANTS to the extent stated the plaintiffs' Motion to Supplement the Record [Doc. 175].[107]

ENTERED this _16th_ day of April, 2014.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

---

[106]See n.2 supra.

[107]See id.