**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THE CHICKASAW NATION and THE CHOCTAW NATION, )<br>)<br>) | |
| Plaintiffs, ) | No.: 05-01524-W |
| ) | |
| v. ) | Senior Judge Lee West |
| ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, )<br>)<br>) | |
| Defendants. ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION PURSUANT TO RULE 54(b)**

Plaintiffs, the Chickasaw Nation and the Choctaw Nation (the "Nations"), respectfully submit this reply in support of their motion asking the Court to revise its Order of April 22, 2015 (Doc. No. 270, the "Order").

For centuries, the United States has abused its power over Indian Nations. Cruelly. Tragically. And with impunity. The promises made time and again by high-ranking government officials to rectify the wrongs of the past have rung hollow. So, the Nations turned to the one remaining sanctuary where they hoped the United States would be held accountable for its recidivist history of abuse and broken promises—this Court.

On April 16, 2014, this Court took an important step toward providing redress for the United States' illegal sale of over 1,300,000 acres of the Nations' land and natural resources. *See* Doc. No. 254 at 22, n.32 (the "April 16, 2014 Order"). That day, the Court held Section 16 of the 1906 Act prohibited the Secretary of the Interior from selling the Nations' unallotted lands that were principally valuable for timber purposes. *Id.* at 22, n.32. However, on April 22, 2015, the Court reversed itself. *See* Doc. No. 270. The Court's recent Order puts aside the United States' repeated admission that it owes the Nations the *highest* moral and legal obligations (*see e.g.*, Doc. No. 240-8, Secretarial Order 3335), and instead works a manifest injustice against the Nations. Indeed, the Court's Order is a judicial stamp of approval for the United States' repeated abuse of power. Unless it is revised, history may view the Court's Order as one of the most negative legal opinions ever handed down against Oklahoma Indians. The Nations do not believe this was the Court's intention. As such, the Nations respectfully ask the Court to revise the Order to conform to its earlier ruling in the April 16, 2014 Order.

1

**ARGUMENT**

I.  The "Historical and Statutory Background" and The Doctrine of "Constitutional Avoidance" Require Rejection of Defendants' Interpretation

As Defendants have conceded, Section 16 of the 1906 Act cannot be interpreted in isolation from the "historical and statutory background" of the 1906 Act. *Id.* Rather, Section 16 must be read and interpreted in accordance with the earlier agreements and acts on which the 1906 Act is based, including the agreement and acts Defendants themselves identified: the Atoka Agreement of 1897, the Curtis Act of 1898 (incorporating the Atoka Agreement), the Supplemental Agreement of 1902, and the 1902 Act (incorporating the Supplemental Agreement). *See*, *e.g.*, Dkt. 260-1 at 16-18 (where Defendants discuss the importance of these prior statutes and treaties).

These statutes and treaties together make clear that Congress and the Nations intended *all the lands of the Choctaw and Chickasaw Nations* to be allotted, including the Nations' valuable timber lands, for the benefit of the Nations and their members. The Atoka Agreement—which was then incorporated in the Curtis Act—states, "[t]hat *all lands within the Indian Territory belonging to the Choctaw and Chickasaw Indians shall be allotted to the members* of said tribes so as to give each member of these tribes so far as possible *a fair and equal share thereof*[.]" Curtis Act, 30 Stat. 495, at sec. 29 (incorporating the Atoka Agreement) (emphasis added). Only those lands needed for coal and asphalt leases, towns, schools, and other public services were reserved from allotment. *Id.* Neither the Atoka Agreement nor the Curtis Act reserved *timber lands* from allotment. *Id.*

The Supplement Agreement and the 1902 Act also called for the allotment of *all the Nations' lands*, including the Nations' valuable timber lands, stating, "the terms 'allottable lands' or 'lands allottable' shall be deemed to mean *all the lands of the Choctaw and Chickasaw tribes* not herein reserved from allotment."  32 Stat. 716 (emphasis added).  While the Supplemental Agreement and the 1902 Act expressly reserved certain "coal or asphalt" lands and authorized the sale of such lands, *id.* at sections 58-59, neither authorized any such reservation or sale of timber lands.  The Supplemental Agreement further states that these terms "shall be binding upon the United States … when ratified by Congress," which occurred with the passage of the 1902 Act.

Defendants contend Section 16 required Interior to sell the Nations' timber lands when it required Interior "to sell all of the Nations' residue lands."  Opp. at 1; *see also* Dkt. 260-1 at 16-17.  This argument is backward.  As provided in the Atoka Agreement and the Curtis Act, the Nations accepted the allotment process on the express condition that "*all the lands of the Choctaws and Chickasaws*" would be allotted "in accordance with the provisions of this agreement," with the exception only of the particular lands excepted from allotment.  30 Stat. 495 (emphasis added).  Timber lands were never excepted from allotment or otherwise authorized for disposition or sale.  *Id.*

Moreover, any "residue" of lands after allotment of "all the lands" would have been *de minimis*.  In fact, the allotment of "all the lands" should not have resulted in any "residue" at all.  However, if certain valueless land could not, as a practical matter, be given away in the allotment process, such valueless "residue" would never under any circumstances have included 1.3 million acres of the Nations' most valuable timber lands.

3

Rather, after the proper reservation of lands for public purposes and the allotment of all other lands to the Nations' members, the "residue" would have been *de minimis*.

Defendants rely heavily on a sentence in the Court's Order stating that "[t]he first sentence of Section 16 authorized and required the Secretary to sell all of the Nations' unallotted lands 'not reserved or otherwise disposed of.'" Opp. at 1-2. But this misstates the actual text of the 1906 Act. The first sentence of Section 16 does not refer to "the Nations' unallotted lands," but to the lands of *all Five Civilized Tribes*, including the "Cherokee, Creek, and Seminole tribes." 1906 Act, Sec. 16, 34 Stat. at 143. Given the unique and binding commitments to allot and distribute "all the lands" of the Choctaws and Chickasaws in accordance with earlier treaties and acts of Congress (*i.e.*, the Atoka Agreement, Curtis Act, Supplemental Agreement, and 1902 Act), it is likely that Congress was referring in the first sentence of Section 16 primarily to the residual lands of the other three tribes, the Cherokee, Creek, and Seminole, and not the Choctaw and Chickasaw Nations. This explains why Congress separately dealt with the residual lands of the Choctaw and Chickasaw tribes in the fourth sentence of Section 16, where Congress gave the Secretary the discretion to sell Choctaw and Chickasaw lands "not principally valuable for mining, agricultural, or timber purposes"—*i.e.*, the valueless land left over after all other lands had been allotted in accordance with earlier Choctaw and Chickasaw treaties and the "other Acts" to which Section 16 expressly refers.

Defendants would have the Court adopt an interpretation of Section 16 that flouts these earlier treaties and acts, but this is impermissible under the "constitutional avoidance" doctrine. This canon provides that if a particular statutory construction

4

"would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [courts] are *obligated* to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (emphasis added) (citation and internal quotation marks omitted). The canon "reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress … is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *Grenada Cnty. Supervisors v. Brogden*, 112 U.S. 261, 269 (1884)). The canon "has for so long been applied … that it is beyond debate." *Jones v. United States*, 526 U.S. 227, 240 (1999).

The constitutional-avoidance canon applies here because the government's reading of Section 16 creates serious takings problems. *See* Third Amended Complaint, Doc. No. 91, at ¶¶136-37 (alleging the United States' unlawful activity "violat[ed] the laws and treaties of the United States, including the Fifth Amendment of the Constitution of the United States."); Doc. No. 273 at 2 ("The Nations brought this action seeking redress for … the theft and sale of the Nations' invaluable land in violation of the United States Constitution…."). The Supreme Court has long recognized that the Nations had constitutionally protected property rights, which were enacted into law in the Curtis Act, the 1902 Act, and the 1906 Act. *See, e.g.*, *Choate v. Trapp*, 224 U.S. 665 (1912). As the Supreme Court explained just six years after the enactment of the 1906 Act, the Nations' members obtained constitutionally protected property rights in the Nations' lands when

5

they accepted "the allotments [of the lands] on the conditions proposed" and, in turn, "furnished a consideration" in the form of the "relinquishment of their claim[s]" to the Nations' common property. *Id.* at 673. Thereafter, neither Congress nor the State of Oklahoma had the authority to take those rights away by subsequent statute:

> The patent [to members' lands] and the legislation of Congress must be construed together, and when so construed, they show that Congress, in consideration of the Indians' relinquishment of all claim to the [Nations'] common property, and for other satisfactory reasons, made a grant of land which should be nontaxable for a limited period. The patent [to members' lands] issued in pursuance of those statutes gave the Indian as good a title to the [tax] exemption as it did to the land itself. Under the provisions of the 5th Amendment there was no more power to deprive him of the exemption than *of any other right in the property. No statute would have been valid which reduced his fee to a life estate, or attempted to take from him 10 acres, or 50 acres, or the timber growing on the land.* … It is conceded that no right which was actually conferred on the Indians can be arbitrarily abrogated by statute.

*Id.* at 674 (emphasis added).

By the Supreme Court's reasoning in *Choate*, once the members relinquished their claims to the Nations' common property, they acquired constitutionally protected rights in their fair and equal share in all the lands; thereafter, those rights could not be "arbitrarily abrogated by statute." *Id.* If the government's interpretation were correct, then Section 16 gave the Secretary the authority to sell the Nations' valuable timber lands notwithstanding their constitutionally protected rights to have that property allotted in fair and equal share to the members of the tribes. However, once the Nations struck their deal with the United States—and once that deal was ratified by the parties and enacted into legislation—Congress no longer had the authority to remove any of the Nations' lands from the allotment process, much less egregiously sell 1.3 million acres of the Nations'

6

valuable timber lands to third parties.

The Nations' expert and former Special Trustee, Paul Homan, made this very point when questioned by the Government during his deposition:

> Q. Were you asked as part of your assignment in this case to assess the constitutionality of the 1906 Act?
>
> A. I was asked to assess the duties of the—of the public trustee. The threshold question any public or private trustee has to ask is, is the law legal, and I have reason to believe that [Section 16] was not or concerned that it was not. And … so I consulted again [DOI Solicitor] Krulitz['s memo], and … he opined that while the Congress has the right to abrogate treaties and he cites Lone Wolf versus Hitchcock, … Indian property rights are protected under the Fifth Amendment from any repeal citing I believe Choate versus Trapp …. He further cites a Supreme Court case in 1937 which is—addresses the same issue about the taking of Indian lands and giving it from one band of Indians to another, and that case is Chippewa versus the United States…. And so I would seek, as the threshold question as a trustee I would seek the court's answer to that question as a threshold question as to whether you could proceed with a mandatory implementation of the [1906] act ….

*See* Doc. No. 274-1 at 54:11–55:18.

Due to the constitutional issues at play, the Court should reconsider its prior ruling and conclude that Section 16 did not authorize the sale of the Nations' timber lands.

**II.   The Order's Interpretation Of Section 16 Impermissibly Renders Other Provisions Superfluous**

The Nations' motion explained (at 4-6) that Section 16 cannot be read to mandate the sale of the Nations' timber lands, because that reading renders Sections 7 and 27 of the 1906 Act superfluous. Defendants' responses are unavailing.

As to Section 27—which provides that the Nations' lands will be held in trust by the United States upon the dissolution of the Nations—Defendants argue that the section

7

is not rendered superfluous because the Nations have not been dissolved. Opp. at 6. That is a non sequitur. The Nations' point is that under Defendants' reading of Section 16, there *could not be* "any lands unsold at dissolution." *Id.* That is precisely why Defendants' reading of Section 16 is not correct. Nothing in Defendants' response changes this simple—and dispositive—reality.

Defendants' responses regarding Section 7 fare no better. Section 7—which provides for the reservation and sale of specifically identified acres of timber land—would be unnecessary if Section 16 required the sale of *all* timber land. Defendants argue Section 7 reserved the specified acres from allotment. But if that were Congress's goal, it could have simply exempted the approximately 11,000 acres in the provision actually governing allotment. Defendants also argue Section 7 uniquely directed an appraisal of those acres. But Section 16 *also* required an appraisal, providing that unallotted lands were to be sold at a price "not less than the present appraised value." And Defendants' point regarding the method of sale set out in Section 7 cuts in the *Nations'* favor: the fact that Congress bothered to specify a method for selling these 11,000 acres suggests these were the only timber lands Congress meant to sell.

Defendants offer no plausible reading of either Section 7 or Section 27 that would render these provisions meaningful under the Order's interpretation of Section 16.

### III. Documents Contemporaneous To The 1906 Act Show That The Government Long Agreed With The Nations' Reading Of Section 16

Defendants' effort to explain away the contemporaneous interpretations on which the Nations rely is unpersuasive. Defendants argue the Interior Secretary's 1907

8

statement to the Senate that "[t]he authority [under Section 16] is simply for land not found fit for agricultural, mineral or timber purposes," S. Rep. No. 59-5013, part 2 at 1688 (1907) (Doc. No. 266-6), merely "addressed sales of 'valueless' lands, rather than lands 'principally valuable for mining, agricultural or timber.'" Opp. at 9.  That is exactly the Nations' point:  Timber lands were not the sort of "valueless" lands meant to be sold under Section 16.  As for Interior Solicitor Nathan Margold's memorandum, Doc. No. 254-3, Defendants argue that it "addressed the legality of selling <u>timber separate from the land</u>, rather than timber <u>lands</u>." Opp. at 9.  However, as the memorandum explains, that "timber sale authority is confined to … Section 7"—and Section 7 provides for the sale of timber *lands*.  *See* 1906 Act § 7 ("Said segregated land *and* the pine timber thereon shall be sold and disposed of[.]" (emphasis added)).

Combined with the plain text of Section 16, the government's contemporaneous reading of Section 16 weighs compellingly in the Nations' favor.  At the very least, it precludes the Court from reading Section 16 as unambiguously favoring Defendants.

## IV. Any Ambiguity Must Be Resolved In The Nations' Favor

The Nations' motion explained at length (at 7-10) that while Section 16 unambiguously has the meaning the Nations suggest, even if the Court were to deem the language ambiguous, the Indian canons of statutory construction would require the ambiguity to be resolved in the Nations' favor.  Defendants' offer *no* argument that they should prevail if the statutory language is indeed ambiguous.

9

### V. The Court Should Have Adhered To The Law Of The Case

Finally, the Court should revise its Order because the narrow exception to the law-of-the-case doctrine is not met here. While court has *discretion* to revisit a prior ruling, the point of the law-of-the-case doctrine is that it should do so only sparingly, and with good reason. The Court should reconsider its decision not to apply law-of-the-case doctrine here, because it gave no adequate reason for that exercise of discretion.

Defendants also argue that the Court's prior interpretation of Section 16 should not be regarded as law of the case because (1) it was expressed in one sentence of a footnote in a lengthy opinion, (2) the parties had briefed it "in a cursory manner," and (3) it was not incorporated in an appealable final judgment. Opp. At 10-11. Defendants cite no case treating either of the first two points as relevant. As to the third point, the one case they cite states only the undisputed proposition that "[i]t is within the District Judge's discretion to revise his interlocutory orders prior to entry of final judgment." *Anderson v. Deere & Co.*, 852 F.2d 1244, 1246 (10th Cir. 1988). This case says nothing about when it is proper for a court to exercise that discretion. The Court's initial interpretation of Section 16 was law of the case, and the Court should not have disturbed that ruling absent a showing that it was "'clearly erroneous and would work a manifest injustice.'" *Agostini v. Felton*, 521 U.S. 203, 236 (1997).

### CONCLUSION

The Court should revise its April 22, 2015, Order and reinstate its prior holding that Section 16 of the 1906 Act prohibited the sale of the Nations' lands that were "principally valuable for … timber purposes."

DATED this 26th day of May 2015.

        Respectfully submitted,

        */s/ Robert Henry*
        Robert Henry, OBA #4111
        109 Lake Aluma Drive
        Oklahoma City, OK 73121
        Phone: 405-820-0343
        *Pro Bono*

        */s/ Michael Burrage*
        Michael Burrage, OBA No. 1350
        Reggie Whitten, OBA No. 9576
        **WHITTEN BURRAGE**
        1215 Classen Drive
        Oklahoma City, OK 73103
        Telephone: (405) 516-7800
        Facsimile: (405) 516-7800

        C. Cary Patterson, TX Bar No. 1558700
        Bradley E. Beckworth, OBA No. 19982
        Trey Duck, TX Bar No. 24077234
        **NIX, PATTERSON & ROACH, LLP**
        205 Linda Drive
        Daingerfield, TX 75638
        Telephone:  (903) 645-7333
        Facsimile:  (903) 645-4415

        Louis Bullock, OBA No. 1305
        **BULLOCK LAW FIRM, PLLC**
        110 West 7th Street, Suite 707
        Tulsa, OK 74119
        Telephone: (918) 584-2001
        Facsimile: (918) 779-4383

        Bob Rabon, OBA No. 7373
        **RABON WOLF & RABON**
        P.O. Box 726
        Hugo, OK 74743
        Telephone: (580) 326-6427
        Facsimile: (580) 326-6032

Jason B. Aamodt, Esq., OBA No. 16974
Deanna Hartley-Kelso, Esq., OBA No. 19272
Dallas L.D. Strimple, Esq., OBA No. 30266
**INDIAN AND ENVIRONMENTAL LAW GROUP**
1723 E. 15th St, Suite 100
Tulsa, OK 74104
Telephone: (918) 347-6169
Facsimile: (918) 398-0514

K. Lawson Pedigo, TX Bar No. 15716500
**MILLER, KEFFER & PEDIGO**
3400 Carlisle, Ste. 550
Dallas, Texas 75204
Telephone: (214) 696-2050
Facsimile: (214) 696-2482

*Attorneys for The Chickasaw Nation*
*and The Choctaw Nation*

## CERTIFICATE OF SERVICE

I hereby certify that I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send email notification of such filing to all registered parties.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: May 26, 2015.

/s/ <i>Robert Henry</i>